1

2

3

4

5

6

7

**Exhibit "16"**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

**CALIFORNIA PENAL CODE SECTION 12050, et al.**

**SECTION 12050**

(a)(1)(A) The sheriff of a county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying satisfies any one of the conditions specified in subparagraph (D) and has completed a course of training as described in subparagraph (E), may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats:

(i) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(ii) Where the population of the county is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in that county a pistol, revolver, or other firearm capable of being concealed upon the person.

(B) The chief or other head of a municipal police department of any city or city and county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying is a resident of that city and has completed a course of training as described in subparagraph (E), may issue to that person a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person in either one of the following formats:

(i) A license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person.

(ii) Where the population of the county in which the city is located is less than 200,000 persons according to the most recent federal decennial census, a license to carry loaded and exposed in that county a pistol, revolver, or other firearm capable of being concealed upon the person.

(C) The sheriff of a county or the chief or other head of a municipal police department of any city or city and county, upon proof that the person applying is of good moral character, that good cause exists for the issuance, and that the person applying is a person who has been deputized or appointed as a peace officer pursuant to subdivision (a) or (b) of Section 830.6 by that sheriff or that chief of police or other head of a municipal police department, may issue to that person a license to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person. Direct or indirect fees for the issuance of a license pursuant to this subparagraph may be waived. The fact that

**- 61 -**

**Complaint for Monetary Damages, Declaratory And Injunctive Relief And Demand For Jury Trial**

1   an applicant for a license to carry a pistol, revolver,
or other firearm capable of being concealed upon the person has

2   been deputized or appointed as a peace officer pursuant to
subdivision (a) or (b) of Section 830.6 shall be considered

3   only for the purpose of issuing a license pursuant to this
subparagraph, and shall not be considered for the purpose

4   of issuing a license pursuant to subparagraph (A) or (B).

5   (D) For the purpose of subparagraph (A), the applicant shall
satisfy any one of the following:

6   (i) Is a resident of the county or a city within the county.

7   (ii) Spends a substantial period of time in the applicant's
principal place of employment or business in the county or a

8   city within the county.

9   (E)(i) For new license applicants, the course of training
may be any course acceptable to the licensing authority,

10   shall not exceed 16 hours, and shall include instruction on
at least firearm safety and the law regarding the

11   permissible use of a firearm. Notwithstanding this clause,
the licensing authority may require a community college

12   course certified by the Commission on Peace Officer
Standards and Training, up to a maximum of 24 hours, but

13   only if required uniformly of all license applicants without
exception.

14

15   (ii) For license renewal applicants, the course of training
may be any course acceptable to the licensing authority,

16   shall be no less than four hours, and shall include
instruction on at least firearm safety and the law regarding

17   the permissible use of a firearm. No course of training
shall be required for any person certified by the licensing

18   authority as a trainer for purposes of this subparagraph, in
order for that person to renew a license issued pursuant to

19   this section.

20   (2)(A)(i) Except as otherwise provided in clause (ii),
subparagraphs (C) and (D) of this paragraph, and

21   subparagraph (B) of paragraph (4) of subdivision (f), a
license issued pursuant to subparagraph (A) or (B)

22   of paragraph (1) is valid for any period of time not to exceed
two years from the date of the license.

23   (ii) If the licensee's place of employment or business was
the basis for issuance of the license pursuant to

24   subparagraph (A) of paragraph (1), the license is valid for
any period of time not to exceed 90 days from the date

25   of the license. The license shall be valid only in the county
in which the license was originally issued. The licensee

26   shall give a copy of this license to the licensing authority
of the city, county, or city and county in which he or she

27   resides. The licensing authority that originally issued the

28

- 62 -

1  license shall inform the licensee verbally and in writing in
   at least 16-point type of this obligation to give a copy
2  of the license to the licensing authority of the city, county,
   or city and county of residence. Any application to renew
3  or extend the validity of, or reissue, the license may be
   granted only upon the concurrence of the licensing authority
4  that originally issued the license and the licensing
   authority of the city, county, or city and county in which
5  the licensee resides.

6  (B) A license issued pursuant to subparagraph (C)
   of paragraph (1) to a peace officer appointed pursuant to
7  Section 830.6 is valid for any period of time not to exceed
   four years from the date of the license, except that the
8  license shall be invalid upon the conclusion of the person's
   appointment pursuant to Section 830.6 if the four-year
9  period has not otherwise expired or any other condition
   imposed pursuant to this section does not limit the validity
10 of the license to a shorter time period.

11 (C) A license issued pursuant to subparagraph (A) or (B)
   of paragraph (1) is valid for any period of time not to exceed
12 three years from the date of the license if the license is
   issued to any of the following individuals:

13 (i) A judge of a California court of record.

14 (ii) A full-time court commissioner of a California court
15 of record.

16 (iii) A judge of a federal court.

17 (iv) A magistrate of a federal court.

18 (D) A license issued pursuant to subparagraph (A) or (B)
   of paragraph (1) is valid for any period of time not to exceed
19 four years from the date of the license if the license is
   issued to a custodial officer who is an employee of the
20 sheriff as provided in Section 831.5, except that the
   license shall be invalid upon the conclusion of the person's
21 employment pursuant to Section 831.5 if the four-year period
   has not otherwise expired or any other condition imposed
22 pursuant to this section does not limit the validity of the
   license to a shorter time period.

23 (3) For purposes of this subdivision, a city or county may
24 be considered an applicant's "principal place of employment
   or business" only if the applicant is physically present in
25 the jurisdiction during a substantial part of his or her
   working hours for purposes of that employment or business.

26 (b) A license may include any reasonable restrictions
27 or conditions which the issuing authority deems warranted,
   including restrictions as to the time, place, manner, and

28

- 63 -

1   circumstances under which the person may carry a pistol,
    revolver, or other firearm capable of being concealed upon
2   the person.

3   (c) Any restrictions imposed pursuant to subdivision (b)
    shall be indicated on any license issued.

4   (d) A license shall not be issued if the Department
5   of Justice determines that the person is prohibited by state
    or federal law from possessing, receiving, owning,
6   or purchasing a firearm.

7   (e)(1) The license shall be revoked by the local licensing
    authority if at any time either the local licensing
8   authority is notified by the Department of Justice that a
    licensee is prohibited by state or federal law from owning
9   or purchasing firearms, or the local licensing authority
    determines that the person is prohibited by state or federal
10  law from possessing, receiving, owning, or purchasing a
    firearm.

11  (2) If at any time the Department of Justice determines that
12  a licensee is prohibited by state or federal law from
    possessing, receiving, owning, or purchasing a firearm, the
13  department shall immediately notify the local licensing
    authority of the determination.

14  (3) If the local licensing authority revokes the license,
15  the Department of Justice shall be notified of the
    revocation pursuant to Section 12053. The licensee shall
16  also be immediately notified of the revocation in writing.

17  (f)(1) A person issued a license pursuant to this
    section may apply to the licensing authority for an amendment to the
18  license to do one or more of the following:

19  (A) Add or delete authority to carry a particular pistol,
    revolver, or other firearm capable of being concealed upon
20  the person.

21  (B) Authorize the licensee to carry concealed a pistol,
    revolver, or other firearm capable of being concealed upon
22  the person.

23  (C) If the population of the county is less than 200,000
    persons according to the most recent federal decennial
24  census, authorize the licensee to carry loaded and exposed
    in that county a pistol, revolver, or other firearm capable
25  of being concealed upon the person.

26  (D) Change any restrictions or conditions on the license,
    including restrictions as to the time, place, manner, and
27  circumstances under which the person may carry a pistol,
    revolver, or other firearm capable of being concealed upon

28
                              - 64 -

    **Complaint for Monetary Damages, Declaratory And Injunctive Relief
                      And Demand For Jury Trial**

the person.

(2) When the licensee changes his or her address, the license shall be amended to reflect the new address and a new license shall be issued pursuant to paragraph (3).

(3) If the licensing authority amends the license, a new license shall be issued to the licensee reflecting the amendments.

(4)(A) The licensee shall notify the licensing authority in writing within 10 days of any change in the licensee's place of residence.

(B) If the license is one to carry concealed a pistol, revolver, or other firearm capable of being concealed upon the person, then it may not be revoked solely because the licensee changes his or her place of residence to another county if the licensee has not breached any conditions or restrictions set forth in the license and has not become prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm. However, any license issued pursuant to subparagraph (A) or (B) of paragraph (1) of subdivision (a) shall expire 90 days after the licensee moves from the county of issuance if the licensee's place of residence was the basis for issuance of the license.

(C) If the license is one to carry loaded and exposed a pistol, revolver, or other firearm capable of being concealed upon the person, the license shall be revoked immediately if the licensee changes his or her place of residence to another county.

(5) An amendment to the license does not extend the original expiration date of the license and the license shall be subject to renewal at the same time as if the license had not been amended.

(6) An application to amend a license does not constitute an application for renewal of the license.

(g) Nothing in this article shall preclude the chief or other head of a municipal police department of any city from entering an agreement with the sheriff of the county in which the city is located for the sheriff to process all applications for licenses, renewals of licenses, and amendments to licenses, pursuant to this article.

(Added by Stats. 1953, c. 36, p. 656, § 1. Amended by Stats. 1969, c. 1188, p. 2318, § 1; Stats. 1970, c. 1478, p. 2923, § 1; Stats. 1977, c. 987, p. 2970, § 3; Stats. 1992, c. 1340, § 9; Stats. 1993, c. 1167, § 2; Stats. 1997, c. 408, § 1; Stats. 1997, c. 744, § 2; Stats. 1998, c. 110,

§ 2; Stats. 1998, c. 910, § 1; Stats. 1999, c. 142, § 1; Stats. 2000, c. 123, § 1; Stats. 2008, c. 698, § 14.)

**SECTION 12050.2**

Within three months of the effective date of the act adding this section, each licensing authority shall publish and make available a written policy summarizing the provisions of subparagraphs (A) and (B) of paragraph (1) of subdivision (a) of Section 12050.

(Added by Stats. 1998, Ch. 910, § 2. Effective January 1, 1999.)

**SECTION 12051**

(a)(1) The standard application form for licenses described in paragraph (3) shall require information from the applicant including, but not limited to, the name, occupation, residence and business address of the applicant, his or her age, height, weight, color of eyes and hair, and reason for desiring a license to carry the weapon. Applications for licenses shall be filed in writing, and signed by the applicant. Any license issued upon the application shall set forth the licensee's name, occupation, residence and business address, his or her age, height, weight, color of eyes and hair, the reason for desiring a license to carry the weapon, and shall, in addition, contain a description of the weapon or weapons authorized to be carried, giving the name of the manufacturer, the serial number, and the caliber. The license issued to the licensee may be laminated.

 (2) Applications for amendments to licenses shall be filed in writing and signed by the applicant, and shall state what type of amendment is sought pursuant to subdivision (f) of Section 12050 and the reason for desiring the amendment.

 (3)(A) Applications for amendments to licenses, applications for licenses, amendments to licenses, and licenses shall be uniform throughout the state, upon forms to be prescribed by the Attorney General. The Attorney General shall convene a committee composed of one representative of the California State Sheriffs' Association, one representative of the California Police Chiefs' Association, and one representative of the Department of Justice to review, and as deemed appropriate, revise the standard application form for licenses. The committee shall meet for this purpose if two of the committee's members deem that necessary. The application shall include a section summarizing the statutory provisions of state law that result in the automatic denial of a license.

 (B) The forms shall contain a provision whereby the applicant attests to the truth of statements contained in the application.

- 66 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief And Demand For Jury Trial**

(C) An applicant shall not be required to complete any additional application or form for a license, or to provide any information other than that necessary to complete the standard application form described in subparagraph (A), except to clarify or interpret information provided by the applicant on the standard application form.

(D) The standard application form described in subparagraph (A) is deemed to be a local form expressly exempt from the requirements of the Administrative Procedures Act, Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(b) Any person who files an application required by subdivision (a) knowing that statements contained therein are false is guilty of a misdemeanor.

(c) Any person who knowingly makes a false statement on the application regarding any of the following shall be guilty of a felony:

(1) The denial or revocation of a license, or the denial of an amendment to a license, issued pursuant to Section 12050.

(2) A criminal conviction.

(3) A finding of not guilty by reason of insanity.

(4) The use of a controlled substance.

(5) A dishonorable discharge from military service.

(6) A commitment to a mental institution.

(7) A renunciation of United States citizenship.

(Added by Stats. 1953, c. 36, p. 656, § 1. Amended by Stats. 1953, c. 692, p. 1960, § 1; Stats. 1977, c. 996, p. 2994, § 1; Stats. 1981, c. 945, § 1; Stats. 1992, c. 1340, § 10; Stats. 1993, c. 1167, § 3; Stats. 1994, c. 716, § 4; Stats. 1998, c. 910, § 3; Stats. 2003, c. 541, § 2.)

## SECTION 12052

(a) The fingerprints of each applicant shall be taken and two copies on forms prescribed by the Department of Justice shall be forwarded to the department. Upon receipt of the fingerprints and the fee as prescribed in Section 12054, the department shall promptly furnish the forwarding licensing authority a report of all data and information pertaining to any applicant of which there is a record in its office, including information as to whether the person is prohibited by state or federal law from possessing, receiving, owning,

- 67 -

1    or purchasing a firearm. No license shall be issued by any
licensing authority until after receipt of the report from
2    the department.

3    (b) However; if the license applicant has previously applied
to the same licensing authority for a license to carry
4    firearms pursuant to Section 12050 and the applicant's
fingerprints and fee have been previously forwarded to the
5    Department of Justice, as provided by this section, the
licensing authority shall note the previous identification
6    numbers and other data that would provide positive
identification in the files of the Department of Justice on
7    the copy of any subsequent license submitted to the
department in conformance with Section 12053 and no
8    additional application form or fingerprints shall be
required.

9

10    (c) If the license applicant has a license issued pursuant
to Section 12050 and the applicant's fingerprints have been
previously forwarded to the Department of Justice, as
11    provided in this section, the licensing authority shall note
the previous identification numbers and other data that
12    would provide positive identification in the files of the
Department of Justice on the copy of any subsequent license
13    submitted to the department in conformance with
Section 12053 and no additional fingerprints shall be
14    required.

15    (Added by Stats. 1953, c. 36, p. 657, § 1. Amended by
Stats. 1953, c. 692, p. 1960, § 2; Stats. 1959, c. 1856,
16    p. 4410, § 1; Stats. 1971, c. 1309, p. 2602, § 3, eff.
Nov. 1, 1971; Stats. 1972, c. 1377, p. 2845, § 91;
17    Stats. 1992, c. 1340, § 11; Stats. 1992, c. 1341, § 12;
Stats. 2008, c. 698, § 15.)

18    **SECTION 12052.5**

19    The licensing authority shall give written notice to the applicant
indicating if the license is approved or denied within 90 days of the
20    initial application for a new license or a license renewal or 30 days
after receipt of the applicant's criminal background check from the
21    Department of Justice, whichever is later.

22    (Added by Stats. 1998, Ch. 910, § 4. Effective January 1, 1999.)

23    **SECTION 12053**

24    (a) A record of the following shall be maintained in the office of the
licensing authority:
25

26    (1) The denial of a license.

27    (2) The denial of an amendment to a license.

28

<div align="center">- 68 -</div>

<div align="center">**Complaint for Monetary Damages, Declaratory And Injunctive Relief<br>And Demand For Jury Trial**</div>

1    (3) The issuance of a license.

2    (4) The amendment of a license.

3    (5) The revocation of a license.

4    (b) Copies of each of the following shall be filed immediately by the issuing officer or authority with the Department of Justice:

5    (1) The denial of a license.

6    (2) The denial of an amendment to a license.

7    (3) The issuance of a license.

8    (4) The amendment of a license.

9    (5) The revocation of a license.

10   (c) Commencing on or before January 1, 2000, and annually thereafter,
11   each licensing authority shall submit to the Attorney General the total
     number of licenses issued to peace officers, pursuant to subparagraph (C)
12   of paragraph (1) of subdivision (a) of Section 12050, and to
     judges, pursuant to subparagraph (A) or (B) of paragraph (1)
13   of subdivision (a) of Section 12050. The Attorney General shall
     collect and record the information submitted pursuant to this
14   subdivision by county and licensing authority.

15   (Amended by Stats. 1998, Ch. 910, § 5. Effective January 1,
     1999.)

16   **SECTION 12054**

17   (a) Each applicant for a new license or for the renewal of a license
18   shall pay at the time of filing his or her application a fee determined
     by the Department of Justice not to exceed the application processing
19   costs of the Department of Justice for the direct costs of furnishing the
     report required by Section 12052. After the department establishes
20   fees sufficient to reimburse the department for processing costs, fees
     charged shall increase at a rate not to exceed the legislatively approved
21   annual cost-of-living adjustments for the department's budget. The
     officer receiving the application and the fee shall transmit the fee,
22   with the fingerprints if required, to the Department of Justice. The
     licensing authority of any city, city and county, or county may charge an
23   additional fee in an amount equal to the actual costs for processing the
     application for a new license, excluding fingerprint and training costs,
24   but in no case to exceed one hundred dollars ($100), and shall transmit
     the additional fee, if any, to the city, city and county, or county
25   treasury. The first 20 percent of this additional local fee may be
     collected upon filing of the initial application. The balance of the fee
26   shall be collected only upon issuance of the license.

27   The licensing authority may charge an additional fee, not to exceed
     twenty-five dollars ($25), for processing the application for a license

28
                                   - 69 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

1   renewal, and shall transmit an additional fee, if any, to the city, city
and county, or county treasury. These local fees may be increased at a
2   rate not to exceed any increase in the California Consumer Price Index as
compiled and reported by the California Department of Industrial
3   Relations.

4   (b) In the ease of an amended license pursuant to subdivision (f)
of Section 12050, the licensing authority of any city, city and
5   county, or county may charge a fee, not to exceed ten dollars ($10),
except that the fee may be increased at a rate not to exceed any increase
6   in the California Consumer Price Index as compiled and reported by the
California Department of Industrial Relations, for processing the amended
7   license and shall transmit the fee to the city, city and county,
or county treasury.

8   (c) If psychological testing on the initial application is required by
the licensing authority, the license applicant shall be referred to a
9   licensed psychologist used by the licensing authority for the
psychological testing of its own employees. The applicant may be charged
10   for the actual cost of the testing in an amount not to exceed one hundred
fifty dollars ($150). Additional psychological testing of an applicant
11   seeking license renewal shall be required only if there is compelling
evidence to indicate that a test is necessary. The cost to the applicant
12   for this additional testing shall not exceed one hundred fifty dollars
($150).
13

14   (d) Except as authorized pursuant to subdivisions (a), (b), and (c), no
requirement, charge, assessment, fee, or condition that requires the
15   payment of any additional funds by the applicant may be imposed by any
licensing authority as a condition of the application for a license.

16   (Amended by Stats. 1998, Ch. 910, § 6. Effective January 1,
1999.)
17

18

19

20

21

22

23

24

25

26

27

28
- 70 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "17"**

- 71 -

## CALIFORNIA PENAL CODE SECTIONS 12031(a) and 12031(b)

(a) (1) A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory.

(2) Carrying a loaded firearm in violation of this section is punishable, as follows:

(A) Where the person previously has been convicted of any felony, or of any crime made punishable by this chapter, as a felony.

(B) Where the firearm is stolen and the person knew or had reasonable cause to believe that it was stolen, as a felony.

(C) Where the person is an active participant in a criminal street gang, as defined in subdivision (a) of Section 186.22, under the Street Terrorism Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1), as a felony.

(D) Where the person is not in lawful possession of the firearm, as defined in this section, or is within a class of persons prohibited from possessing or acquiring a firearm pursuant to Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code, as a felony.

(E) Where the person has been convicted of a crime against a person or property, or of a narcotics or dangerous drug violation, by imprisonment in the state prison, or by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(F) Where the person is not listed with the Department of Justice pursuant to Section 11106, as the registered owner of the pistol, revolver, or other firearm capable of being concealed upon the person, by imprisonment in the state prison, or by imprisonment in a county jail not to exceed one year, or by a fine not to exceed one thousand dollars ($1,000), or both that fine and imprisonment.

(G) In all cases other than those specified in subparagraphs (A) to (F), inclusive, as a misdemeanor, punishable by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(3) For purposes of this section, "lawful possession of the firearm" means that the person who has possession or custody of the firearm either lawfully acquired and lawfully owns the firearm or has the permission of the lawful owner or person who otherwise has apparent authority to possess or have custody of the firearm. A person who takes a firearm without the permission of the lawful owner or without the permission of a person who has lawful custody of the firearm does not have lawful

- 72 -

possession of the firearm.

(4) Nothing in this section shall preclude prosecution under Sections 12021 and 12021.1 of this code, Section 8100 or 8103 of the Welfare and Institutions Code, or any other law with a greater penalty than this section.

(5) (A) Notwithstanding paragraphs (2) and (3) of subdivision (a) of Section 836, a peace officer may make an arrest without a warrant:

(i) When the person arrested has violated this section, although not in the officer's presence.

(ii) Whenever the officer has reasonable cause to believe that the person to be arrested has violated this section, whether or not this section has, in fact, been violated.

(B) A peace officer may arrest a person for a violation of subparagraph (F) of paragraph (2), if the peace officer has probable cause to believe that the person is carrying a loaded pistol, revolver, or other firearm capable of being concealed upon the person in violation of this section and that person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of that pistol, revolver, or other firearm capable of being concealed upon the person.

(6) (A) Every person convicted under this section who has previously been convicted of an offense enumerated in Section 12001.6, or of any crime made punishable under this chapter, shall serve a term of at least three months in a county jail, or, if granted probation or if the execution or imposition of sentence is suspended, it shall be a condition thereof that he or she be imprisoned for a period of at least three months.

(B) The court shall apply the three-month minimum sentence except in unusual cases where the interests of justice would best be served by granting probation or suspending the imposition or execution of sentence without the minimum imprisonment required in this subdivision or by granting probation or suspending the imposition or execution of sentence with conditions other than those set forth in this subdivision, in which case, the court shall specify on the record and shall enter on the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

(7) A violation of this section which is punished by imprisonment in a county jail not exceeding one year shall not constitute a conviction of a crime punishable by imprisonment for a term exceeding one year for the purposes of determining federal firearms eligibility under Section 922(g)(1) of Title 18 of the United States Code.

(b) Subdivision (a) shall not apply to any of the following:

(1) Peace officers listed in Section 830.1 or 830.2, or subdivision (a) of Section 830.33, whether active or honorably retired, other duly

- 73 -

1  appointed peace officers, honorably retired peace officers listed in
   subdivision (c) of Section 830.5, other honorably retired peace officers
2  who during the course and scope of their employment as peace officers
   were authorized to, and did, carry firearms, full-time paid peace
3  officers of other states and the federal government who are carrying out
   official duties while in California, or any person summoned by any
4  of those officers to assist in making arrests or preserving the peace while
   the person is actually engaged in assisting that officer. Any peace
5  officer described in this paragraph who has been honorably retired shall
   be issued an identification certificate by the law enforcement agency
6  from which the officer has retired. The issuing agency may charge a fee
   necessary to cover any reasonable expenses incurred by the agency in
7  issuing certificates pursuant to this paragraph and paragraph (3).

8  Any officer, except an officer listed in Section 830.1 or 830.2,
   subdivision (a) of Section 830.33, or subdivision (c)
9  of Section 830.5 who retired prior to January 1, 1981, shall have an endorsement
   on the identification certificate stating that the issuing agency
10 approves the officer's carrying of a loaded firearm.

11 No endorsement or renewal endorsement issued pursuant to paragraph (2)
   shall be effective unless it is in the format set forth in
12 subparagraph (D) of paragraph (1) of subdivision (a) of Section 12027, except
   that any peace officer listed in subdivision (f) of Section 830.2
13 or in subdivision (c) of Section 830.5, who is retired between
   January 2, 1981, and on or before December 31, 1988, and who is
14 authorized to carry a loaded firearm pursuant to this section, shall not
   be required to have an endorsement in the format set forth in
15 subparagraph (D) of paragraph (1) of subdivision (a) of Section 12027
   until the time of the issuance, on or after January 1, 1989, of a renewal
16 endorsement pursuant to paragraph (2).

17 (2) A retired peace officer, except an officer listed in
   Section 830.1 or 830.2, subdivision (a)
18 of Section 830.33, or subdivision (c) of Section 830.5
   who retired prior to January 1, 1981, shall petition the issuing agency
19 for renewal of his or her privilege to carry a loaded firearm every five
   years. An honorably retired peace officer listed in
20 Section 830.1 or 830.2, subdivision (a)
   of Section 830.33, or subdivision (c)
21 of Section 830.5 who retired prior to January 1, 1981, shall not be
   required to obtain an endorsement from the issuing agency to carry
22 a loaded firearm. The agency from which a peace officer is honorably
   retired may, upon initial retirement of the peace officer,
23 or at any time subsequent thereto, deny or revoke for good cause the retired
   officer's privilege to carry a loaded firearm. A peace officer who is
24 listed in Section 830.1 or 830.2, subdivision (a)
   of Section 830.33, or subdivision (c) of Section 830.5
25 who is retired prior to January 1, 1981, shall have his or her privilege
   to carry a loaded firearm denied or revoked by having the agency from
26 which the officer retired stamp on the officer's identification
   certificate "No CCW privilege."

27 (3) An honorably retired peace officer who is listed in subdivision (c)

28
                                    - 74 -

of Section 830.5 and authorized to carry loaded firearms by this subdivision shall meet the training requirements of Section 832 and shall qualify with the firearm at least annually. The individual retired peace officer shall be responsible for maintaining his or her eligibility to carry a loaded firearm. The Department of Justice shall provide subsequent arrest notification pursuant to Section 11105.2 regarding honorably retired peace officers listed in subdivision (c) of Section 830.5 to the agency from which the officer has retired.

(4) Members of the military forces of this state or of the United States engaged in the performance of their duties.

(5) Persons who are using target ranges for the purpose of practice shooting with a firearm or who are members of shooting clubs while hunting on the premises of those clubs.

(6) The carrying of pistols, revolvers, or other firearms capable of being concealed upon the person by persons who are authorized to carry those weapons pursuant to Article 3 (commencing with Section 12050) of Chapter 1 of Title 2 of Part 4.

(7) Armored vehicle guards, as defined in Section 7521 of the Business and Professions Code, (A) if hired prior to January 1, 1977, or (B) if hired on or after that date, if they have received a firearms qualification card from the Department of Consumer Affairs, in each case while acting within the course and scope of their employment.

(8) Upon approval of the sheriff of the county in which they reside, honorably retired federal officers or agents of federal law enforcement agencies, including, but not limited to, the Federal Bureau of Investigation, the Secret Service, the United States Customs Service, the Federal Bureau of Alcohol, Tobacco, and Firearms, the Federal Bureau of Narcotics, the Drug Enforcement Administration, the United States Border Patrol, and officers or agents of the Internal Revenue Service who were authorized to carry weapons while on duty, who were assigned to duty within the state for a period of not less than one year, or who retired from active service in the state.

Retired federal officers or agents shall provide the sheriff with certification from the agency from which they retired certifying their service in the state, the nature of their retirement, and indicating the agency's concurrence that the retired federal officer or agent should be accorded the privilege of carrying a loaded firearm.

Upon approval, the sheriff shall issue a permit to the retired federal officer or agent indicating that he or she may carry a loaded firearm in accordance with this paragraph. The permit shall be valid for a period not exceeding five years, shall be carried by the retiree while carrying a loaded firearm, and may be revoked for good cause.

The sheriff of the county in which the retired federal officer or agent resides may require recertification prior to a permit renewal, and may suspend the privilege for cause. The sheriff may charge a fee necessary to cover any reasonable expenses incurred by the county.

- 75 -

1    (Amended by Stats. 1999, Ch. 571, § 3. Effective January 1, 2000.)

1
2
3
4
5
6
7                                      **Exhibit "18"**
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
- 77 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief And Demand For Jury Trial**

# LAW ENFORCEMENT OFFICERS SAFETY ACT (LEOSA)

## 18 U.S.C. § 926B

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b) This section shall not be construed to supersede or limit the laws of any State that—
　(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or
　(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c) As used in this section, the term "qualified law enforcement officer" means an employee of a governmental agency who—
　(1) is authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and has statutory powers of arrest;
　(2) is authorized by the agency to carry a firearm;
　(3) is not the subject of any disciplinary action by the agency;
　(4) meets standards, if any, established by the agency which require the employee to regularly qualify in the use of a firearm;
　(5) is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and
　(6) is not prohibited by Federal law from receiving a firearm.

(d) The identification required by this subsection is the photographic identification issued by the governmental agency for which the individual is employed as a law enforcement officer.

(e) As used in this section, the term "firearm" does not include—
　(1) any machinegun (as defined in section 5845 of the National Firearms Act);
　(2) any firearm silencer (as defined in section 921 of this title); and
　(3) any destructive device (as defined in section 921 of this title).

## 18 U.S.C. § 926C

(a) Notwithstanding any other provision of the law of any State or any political subdivision thereof, an individual who is a qualified retired law enforcement officer and who is carrying the identification required by subsection (d) may carry a concealed firearm that has been shipped or transported in interstate or foreign commerce, subject to subsection (b).

(b) This section shall not be construed to supersede or limit the laws of any State that—
　(1) permit private persons or entities to prohibit or restrict the possession of concealed firearms on their property; or
　(2) prohibit or restrict the possession of firearms on any State or local government property, installation, building, base, or park.

(c) As used in this section, the term "qualified retired law enforcement officer" means an individual who—
　(1) retired in good standing from service with a public agency as a law enforcement officer, other than for reasons of mental instability;
　(2) before such retirement, was authorized by law to engage in or supervise the prevention,

- 78 -

detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and had statutory powers of arrest;
(3)
    (A) before such retirement, was regularly employed as a law enforcement officer for an aggregate of 15 years or more; or
    (B) retired from service with such agency, after completing any applicable probationary period of such service, due to a service-connected disability, as determined by such agency;
    (4) has a nonforfeitable right to benefits under the retirement plan of the agency;
    (5) during the most recent 12-month period, has met, at the expense of the individual, the State's standards for training and qualification for active law enforcement officers to carry firearms;
    (6) is not under the influence of alcohol or another intoxicating or hallucinatory drug or substance; and
    (7) is not prohibited by Federal law from receiving a firearm.

(d) The identification required by this subsection is—
    (1) a photographic identification issued by the agency from which the individual retired from service as a law enforcement officer that indicates that the individual has, not less recently than one year before the date the individual is carrying the concealed firearm, been tested or otherwise found by the agency to meet the standards established by the agency for training and qualification for active law enforcement officers to carry a firearm of the same type as the concealed firearm; or
(2)
    (A) a photographic identification issued by the agency from which the individual retired from service as a law enforcement officer; and
    (B) a certification issued by the State in which the individual resides that indicates that the individual has, not less recently than one year before the date the individual is carrying the concealed firearm, been tested or otherwise found by the State to meet the standards established by the State for training and qualification for active law enforcement officers to carry a firearm of the same type as the concealed firearm.

(e) As used in this section, the term "firearm" does not include—
    (1) any machinegun (as defined in section 5845 of the National Firearms Act);
    (2) any firearm silencer (as defined in section 921 of this title); and
    (3) a destructive device (as defined in section 921 of this title).

- 79 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit "19"**

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

# National Rifle Association recruits San Franciscans to overturn gun-control laws

**By Matt Smith**

published: October 14, 2009

Subject(s):
Matt Smith on National
Rifle Association recruits
San Franciscans to overturn
gun-control laws

It's an hour before dawn, and Espanola Jackson, a 76-year-old activist known for her leading role in antidevelopment battles, is awoken by a clunk coming from the kitchen of her house, five blocks east of Candlestick Park. She sits up in her bed, takes a pair of keys out of her nightstand drawer, and steps softly toward her gun cabinet. While struggling with the lock, she hears footsteps growing louder.

Miles away from Jackson's Hunters Point home, San Francisco residents Therese Marie Pizzo and her domestic partner are on an out-of-state vacation. Two red-faced men approach them, laughing, taunting, asking menacing questions about the women's hair and clothes. Pizzo imagines reaching into her jacket to pull out a loaded pistol, but she's carrying only a pocketknife. She grabs her partner's forearm and steps back.

These scenes are fantasies. But they're based on fears described in legal complaints filed on behalf of real-life city residents Jackson and Pizzo, who are plaintiffs in separate but similar anti-gun-control lawsuits against San Francisco filed recently in federal court. Jackson is an elderly woman who keeps handguns in her home for self-defense "and other lawful purposes," according to a lawsuit filed on behalf of Jackson and several co-plaintiffs, including the National Rifle Association. Pizzo and her partner enjoy taking trips out of California; she says she applied for a concealed weapon permit to protect her against bigoted hicks, but was brushed off by the San Francisco sheriff's office. Pizzo's suit was filed by independent gun-control opponent Gary Gorski, an attorney in Fair Oaks.

On Sept. 30, the Supreme Court agreed to hear arguments that a Chicago handgun ban violates the Second Amendment. If it determines the ban is unconstitutional, Jackson and her co-plaintiffs have a good chance of striking down various San Francisco gun control laws, including a 2007 law requiring that guns be kept under lock and key. If that happens, said Calvin Massey, constitutional law professor at UC Hastings College of the Law, "San Francisco will lose this [Jackson's] lawsuit."

Pizzo's suit also seeks to overturn various San Francisco gun control laws, but goes a step further by seeking to strike down portions of the California code that give local law enforcement agencies discretion to reject applications for concealed weapons. However, under state and federal law, honorably retired police officers have the right to carry concealed weapons. In Pizzo's view, this is a violation of the constitutional guarantee to equal protection.

"If you took away the exemption for retired cops, I bet you $20 none of these [gun control] laws would ever get passed, because cops don't want their dicks cut off," Gorski said. "The idea that retired cops are better than anyone else, that's a bunch of bullshit."

Whether a possible Supreme Court order to lift the Chicago gun ban would result in a judge ruling that California cities have to issue concealed-weapons permits "is an open question," Massey said.

NRA attorney Chuck Michel, who has been quoted calling Gorski a "well-intentioned loose cannon," said that he will ask for the Pizzo case to be put on hold, pending the Supreme Court resolution of the challenge to the Chicago gun ban. Despite their differing strategies, Michel and Gorski share the idea that they can make their clients safer by eliminating gun control.

If they prevail, we will find ourselves in a country where the Second Amendment law has drifted from something reasonable — a constitutional clause enabling state militias — toward a land of illogic where the Constitution ensures public safety by enshrining citizens' rights to secretly pack guns loaded with hollow-point, or "cop-killer," bullets; where neighbors have a protected right to shoot off pistols in their backyards; and where youngsters visiting a relative's house can expect to find a Winchester resting above the couch, its place protected by the U.S. Constitution.

Gorski "wants to return us to the Wild West. He wants to see us wear a holster on the hip," said deputy city attorney Sherri Kaiser, who represents San Francisco in both cases.

In 2006, the California Supreme Court struck down a ban on private ownership of handguns in San Francisco because it was inconsistent with state law. But other local ordinances remain. Thanks to a 2007 law, San Francisco gun owners must keep their firearms in locked cabinets, or with trigger locks engaged — unless they have the weapons on their person. It is also illegal to sell bullets designed to expand on impact to produce a cantaloupe-sized flesh wound.

As a matter of practice, San Francisco issues virtually no concealed-weapons permits, under discretion allowed under state law. (Court papers indicate only one resident currently has such a permit.)

In June, gun control laws such as San Francisco's seemed imperiled when the Supreme Court struck down a Washington, D.C., handgun ban, which it ruled violated the right to bear arms.

The decision had gun-control advocates apoplectic because it represented a polar shift from conventional wisdom among legal experts that the Second Amendment didn't guarantee individuals the right to carry guns, but merely established militias such as the California National Guard.

Such a disparate range of perceived meanings has been possible because the Second Amendment is not clear. It reads, "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

Until recently, this jumble of clauses and commas was widely interpreted as an expression by the Founding Fathers that, since it's inconvenient to keep a standing army, we'd have to occasionally muster citizen militias. And they'd need arms. The ascendant, NRA-backed view says the Founding Fathers meant for citizens to keep pistols on their nightstands to repel intruders.

But the ruling on the Washington law didn't overturn other local handgun bans, because the District of Columbia is not a state. In the Chicago case, the Supreme Court is expected to decide whether handgun bans passed by local or state governments are also unconstitutional. In the meantime, Jackson's lawsuit has been stayed, pending resolution of that case.

"Obviously if the Supreme Court finds that the Second Amendment does not apply to state or local governments, the San Francisco claims will be dismissed," said Juliet Leftwich, legal director of the gun control advocacy group Legal Community Against Violence. "But we're not optimistic that will be the outcome."

If the Supreme Court does overturn Chicago's law, Jackson may very well be able to keep her guns at home, and she could reach for one someday and gun down an intruder. But if her neighbors, friends, fellow congregants, and San Francisco residents indulge their newfound right to leave unfettered firearms around their houses, it's at least as likely that someone will use one of them to shoot someone, either by accident or on purpose, who is innocent.

If Pizzo ultimately wins her case, she might get to pull a licensed Glock .45-caliber pistol from a concealed holster to frighten away gay-bashing bubbas. But she won't be the only one with a right to pack hidden heat.

"On that reasoning, lots of people should get to carry concealed weapons if they have reason to believe somebody in the big wide world should want to hurt them," Kaiser said. "The decision Pizzo and her attorneys would have is taking trigger locks off guns, loading them with flesh-shredding ammunition, and putting them on your hip as you stroll down the street."

While that may be a compelling fantasy, I don't think it was what attendees at the Constitutional Convention of 1787 had in mind.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Exhibit "20"**

- 81 -



**Swivel**
*preview*    **Home    Graphs    Data    People    Groups    Upload**

Confectionary    Blog    Help    Feedback    Sign Up!    Sign In

Search

## Percent of Firearms Ownership by State

By millerip on Feb 19, 2008
Viewed 385 times

See the new Swivel.

**Graph    Table    Map        Absolute Relative    All    [·] 51    [>]    More Options**



| State | Percent |
|---|---|
| Wyoming | 59.7 |
| Alaska | 57.8 |
| Montana | 57.7 |
| South Dakota | 56.6 |
| West Virginia | 55.4 |
| Mississippi | 55.3 |
| Idaho | 55.5 |
| Arkansas | 55.3 |
| Alabama | 51.7 |
| North Dakota | 50.7 |
| Kentucky | 47.7 |
| Wisconsin | 44.4 |
| Louisiana | 44.1 |
| Tennessee | 43.9 |
| Utah | 43.9 |
| Oklahoma | 42.9 |
| Iowa | 42.8 |
| South Carolina | 42.3 |
| Kansas | 42.1 |
| Vermont | 42 |
| Minnesota | 41.7 |
| Missouri | 41.7 |
| North Carolina | 41.3 |
| Maine | 40.5 |
| Georgia | 40.3 |
| Oregon | 39.8 |
| Indiana | 39.1 |
| Nebraska | 38.6 |
| Michigan | 38.4 |
| Texas | 36.9 |
| Virginia | 35.1 |
| New Mexico | 34.8 |
| Colorado | 34.7 |
| Pennsylvania | 34.7 |
| Nevada | 33.8 |
| Washington | 33.1 |
| Ohio | 32.4 |
| Arizona | 31.1 |
| New Hampshire | 30 |
| Delaware | 25.5 |
| Florida | 24.5 |
| California | 21.3 |
| Maryland | 21.3 |
| Illinois | 20.2 |
| New York | 18 |



Legend

Percent of Firearms Ownership by State

Percent of Firearms Ownership

More >

Tags
no tags yet

Community Tags          Add tags
no tags yet

Related Graphs

Percent of Firearms Ownership by State
Created By: millerjp
Views: 5260

Percent of Firearms Ownership by State
Created By: millerjp
Views: 141

Percent of Firearms Ownership by State
Created By: screenpunk
Views: 101

Percent of Firearms Ownership by State
Created By: guest
Views: 81

Percent of Firearms Ownership by State
Created By: guest
Views: 70

Percent of Firearms Ownership by State
Created By: millerjp
Views: 53

Percent of Firearms Ownership by State
Created By: millerjp
Views: 53

Percent of Firearms Ownership by State
Created By: millerjp
Views: 38

Percent of Firearms Ownership by State
Created By: guest
Views: 13

Percent of Firearms Ownership by State
Created By: guest
Views: 9

Percent of Firearms Ownership by State
Created By: guest
Views: 8

Percent of Firearms Ownership by State
Created By: guest
Views: 4

Percent of Firearms Ownership by State
Created By: guest
Views: 2

OK to share with attribution



Bling        Compare                                        ⌐⌐

**Sources:** BRFSS Survey Results 2001 for Nationwide Firearms
(http://www.schs.state.nc.us...)                    **Share this Graph**

Comments (0)                                              Send an Email

                                                         Post to Blog
**Would you like to comment?**
                                                         **Digg** submit
Sign in to leave a comment. Or, sign up if you don't have an
account.                                                 **Rate It**

                                                         ☆  0 ratings
                                                            Sign in to rate

                                                         **Like It**

                                                         Feature It


About  |  Help  |  Jobs  |  Contact  |  Legal  |  Press  |  What is Swivel?                                    © 2007 Swivel

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit "21"**

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

Notice: Trying to get property of non-object in /var/www/vhosts/gunowners.org/httpdocs/templates/rt_terrantribune_j15/rt_utils.php on line 57

Notice: Trying to get property of non-object in /var/www/vhosts/gunowners.org/httpdocs/templates/rt_terrantribune_j15/rt_utils.php on line 57

Notice: Trying to get property of non-object in /var/www/vhosts/gunowners.org/httpdocs/templates/rt_terrantribune_j15/rt_utils.php on line 60

Notice: Undefined index: in /var/www/vhosts/gunowners.org/httpdocs/templates/rt_terrantribune_j15/rt_utils.php on line 60

HOME    TAKE ACTION    JOIN GOA    CONGRESS    RESOURCES    MEDIA    OFFERS    CONTRIBUTE    CONTACT    SEARCH

Mar 2004

Gun Control Fact-Sheet 2004 / From Gun Owners Foundation

by Gun Owners Foundation 8001 Forbes Place, Suite 102 Springfield, VA 22151

## 1. Highlights

*Guns are used 2.5 million times a year in self-defense. Law-abiding citizens use guns to defend themselves against criminals as many as 2.5 million times every year—or about 6,850 times a day.1 This means that each year, firearms are used more than 80 times more often to protect the lives of honest citizens than to take lives.2

*Even anti-gun Clinton researchers concede that guns are used 1.5 million times annually for self-defense. According to the Clinton Justice Department, there are as many as 1.5 million cases of self-defense with a firearm every year. The National Institute of Justice published this figure in 1997 as part of "Guns in America"—a study which was authored by noted anti-gun criminologists Philip Cook and Jens Ludwig.3

*Concealed carry laws have reduced murder and crime rates in the states that have enacted them. According to a comprehensive study which reviewed crime statistics in every county in the United States from 1977 to 1992, states which passed concealed carry laws reduced their rate of murder by 8.5%, rape by 5%, aggravated assault by 7% and robbery by 3%.4

*Anti-gun journal pronounces the failure of the Brady law. One of the nation's leading anti-gun medical publications, the Journal of the American Medical Association, found that the Brady registration law has failed to reduce murder rates. In August 2000, JAMA reported that states implementing waiting periods and background checks did "not [experience] reductions in homicide rates or overall suicide rates."5

*Twice as many children are killed playing football in school than are murdered by guns. That's right. Despite what media coverage might seem to indicate, there are more deaths related to high school football than guns. In a recent three year period, twice as many football players died from hits to the head, heat stroke, etc. (45), as compared with students who were murdered by firearms (22) during that same time period.6

* More guns, less crime. In the decade of the 1990s, the number of guns in this country increased
by roughly 40 million—even while the murder rate decreased by almost 40% percent.7
Accidental gun deaths in the home decreased by almost 40 percent as well.8

* CDC admits there is no evidence that gun control reduces crime. The Centers for Disease
Control (CDC) has long been criticized for propagating questionable studies which gun control
organizations have used in defense of their cause. But after analyzing 51 studies in 2003, the
CDC concluded that the "evidence was insufficient to determine the effectiveness of any of these
[firearms] laws."9

* Gun shows are NOT a primary source of illegal guns for criminals. According to two
government studies, the National Institute of Justice reported in 1997 that "less than two
percent [of criminals] reported obtaining [firearms] from a gun show."10 And the Bureau of
Justice Statistics revealed in 2001 that less than one percent of firearm offenders acquired their
weapons at gun shows.11

* Several polls show that Americans are very pro-gun. Several scientific polls indicate that the
right to keep and bear arms is still revered—and gun control disdained—by a majority of
Americans today. To mention just a few recent polls:

  * In 2002, an ABC News poll found that almost three-fourths of the
  American public believe that the Second Amendment of the U.S.
  Constitution protects the rights of "individuals" to own guns.12

  * Zogby pollsters found that by a more than 3 to 1 margin, Americans
  support punishing "criminals who use a gun in the commission of a crime"
  over legislation to "ban handguns."13

  * A Research 2000 poll found that 85% of Americans would find it
  appropriate for a principal or teacher to use "a gun at school to defend the
  lives of students" to stop a school massacre.14

* A study claiming "guns are three times more likely to kill you than help you" is a total fraud.
Even using the low figures from the Clinton Justice Department, firearms are used almost 50
times more often to save life than to take life.15 More importantly, however, the figure claiming
one is three times more likely to be killed by one's own gun is a total lie:

  * Researcher Don Kates reveals that all available data now indicates that
  the "home gun homicide victims [in the flawed study] were killed using
  guns not kept in the victim's home."16

  * In other words, the victims were NOT murdered with their own guns!
  They were killed "by intruders who brought their own guns to the victim's
  household."17

*Gun-free England not such a utopia after all. According to the BBC News, handgun crime in the United Kingdom rose by 40% in the two years after it passed its draconian gun ban in 1997.18 And according to a United Nations study, British citizens are more likely to become a victim of crime than are people in the United States. The 2000 report shows that the crime rate in England is higher than the crime rates of 16 other industrialized nations, including the United States.19*

## 2. Self-defense

*A. Guns save more lives than they take; prevent more injuries than they inflict*

* Guns are used 2.5 million times a year in self-defense. Law-abiding citizens use guns to defend themselves against criminals as many as 2.5 million times every year—or about 6,850 times a day20. This means that each year, firearms are used more than 80 times more often to protect the lives of honest citizens than to take lives.21*

* Of the 2.5 million times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers. Less than 8% of the time, a citizen will kill or wound his/her attacker.22*

* As many as 200,000 women use a gun every year to defend themselves against sexual abuse.23*

* Even anti-gun Clinton researchers concede that guns are used 1.5 million times annually for self-defense. According to the Clinton Justice Department, there are as many as 1.5 million cases of self-defense with a firearm every year. The National Institute of Justice published this figure in 1997 as part of "Guns in America"—a study which was authored by noted anti-gun criminologists Philip Cook and Jens Ludwig.24*

* Armed citizens kill more crooks than do the police. Citizens shoot and kill at least twice as many criminals as police do every year (1,527 to 606)25. And readers of Newsweek learned that "only 2 percent of civilian shootings involved an innocent person mistakenly identified as a criminal. The 'error rate' for the police, however, was 11 percent, more than five times as high."26*

* Handguns are the weapon of choice for self-defense. Citizens use handguns to protect themselves over 1.9 million times a year.27 Many of these self-defense handguns could be labeled as "Saturday Night Specials."*

*B. Concealed carry laws help reduce crime*

\* *Nationwide: one-half million self-defense uses. Every year, as many as one-half million citizens defend themselves with a firearm away from home.28*

\* *Concealed carry laws are dropping crime rates across the country. A comprehensive national study determined in 1996 that violent crime fell after states made it legal to carry concealed firearms. The results of the study showed:*

> \* *States which passed concealed carry laws reduced their rate of murder by 8.5%, rape by 5%, aggravated assault by 7% and robbery by 3%;29 and*

> \* *If those states not having concealed carry laws had adopted such laws in 1992, then approximately 1,570 murders, 4,177 rapes, 60,000 aggravated assaults and over 11,000 robberies would have been avoided yearly.30*

\* *Vermont: one of the safest five states in the country. In Vermont, citizens can carry a firearm without getting permission . . . without paying a fee . . . or without going through any kind of government-imposed waiting period. And yet for ten years in a row, Vermont has remained one of the top-five, safest states in the union—having three times received the "Safest State Award."31*

\* *Florida: concealed carry helps slash the murder rate in the state. In the fifteen years following the passage of Florida's concealed carry law in 1987, over 800,000 permits to carry firearms were issued to people in the state.32 FBI reports show that the homicide rate in Florida, which in 1987 was much higher than the national average, fell 52% during that 15-year period—thus putting the Florida rate below the national average.33*

\* *Do firearms carry laws result in chaos? No. Consider the case of Florida. A citizen in the Sunshine State is far more likely to be attacked by an alligator than to be assaulted by a concealed carry holder.*

> \* *During the first fifteen years that the Florida law was in effect, alligator attacks outpaced the number of crimes committed by carry holders by a 229 to 155 margin.34*

*And even the 155 "crimes" committed by concealed carry
permit holders are somewhat misleading as most of these
infractions resulted from Floridians who accidentally
carried their firearms into restricted areas, such as an
airport.35*

*Concealed Carry v. Waiting Period Laws. In 1976, both Georgia and
Wisconsin tried two different approaches to fighting crime. Georgia
enacted legislation making it easier for citizens to carry guns for self-
defense, while Wisconsin passed a law requiring a 48 hour waiting period
before the purchase of a handgun. What resulted during the ensuing
years? Georgia's law served as a deterrent to criminals and helped drop
its homicide rate by 21 percent. Wisconsin's murder rate, however, rose 33
percent during the same period.36*

## C. Criminals avoid armed citizens

*Kennesaw, GA. In 1982, this suburb of Atlanta passed a law requiring
heads of households to keep at least one firearm in the house. The
residential burglary rate subsequently dropped 89% in Kennesaw,
compared to the modest 10.4% drop in Georgia as a whole.37*

*Ten years later (1991), the residential burglary rate in Kennesaw was
still 72% lower than it had been in 1981, before the law was passed.38*

*Nationwide. Statistical comparisons with other countries show that
burglars in the United States are far less apt to enter an occupied home
than their foreign counterparts who live in countries where fewer civilians
own firearms. Consider the following rates showing how often a
homeowner is present when a burglar strikes:*

*Homeowner occupancy rate in the gun control countries
of Great Britain, Canada and Netherlands: 45% (average
of the three countries); and,*

*Homeowner occupancy rate in the United States:
12.7%.39*

*Rapes averted when women carry or use firearms for protection*

* *Orlando, FL. In 1966-67, the media highly publicized a safety course which taught Orlando women how to use guns. The result: Orlando's rape rate dropped 88% in 1967, whereas the rape rate remained constant in the rest of Florida and the nation.40*

* *Nationwide. In 1979, the Carter Justice Department found that of more than 32,000 attempted rapes, 32% were actually committed. But when a woman was armed with a gun or knife, only 3% of the attempted rapes were actually successful.41*

*Justice Department study:*

* *3/5 of felons polled agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun."42*

* *74% of felons polled agreed that "one reason burglars avoid houses when people are at home is that they fear being shot during the crime."43*

* *57% of felons polled agreed that "criminals are more worried about meeting an armed victim than they are about running into the police."44*

*D. Police cannot protect—and are not required to protect—every individual*

* *The courts have consistently ruled that the police do not have an obligation to protect individuals, only the public in general. For example, in Warren v. D.C. the court stated "courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, it assumes a duty only to the public at large and not to individual members of the community."45*

* *Former Florida Attorney General Jim Smith told Florida legislators that police responded to only about 200,000 of 700,000 calls for help to Dade County authorities. Smith was asked why so many citizens in Dade County*

were buying guns and he said, "They damn well better, they've got to
protect themselves."46

* The Department of Justice found that in 1989, there were 168,881 crimes
of violence which were not responded to by police within 1 hour.47

* The numbers clearly show that the police cannot protect every
individual. In 1996, there were about 150,000 police officers on duty at
any one time to protect a population of more than 260 million
Americans—or more than 1,700 citizens per officer.48

## 3. Failure of Gun Control

### A. Poor track record

* Washington, D.C. has, perhaps, the most restrictive gun control laws in
the country, and yet it is frequently the Murder Capital of the nation. In
the 25 years following the DC gun ban, its murder rate INCREASED 51
percent, even while the national rate DECREASED 36 percent.49

* Objection: Critics claim criminals merely get their guns in Virginia
where the laws are more relaxed. This, they argue, is why the D.C. gun ban
is not working.

* Answer: Perhaps criminals do get their guns in Virginia, but this
overlooks one point: If the availability of guns in Virginia is the root of
D.C.'s problems, why does Virginia not have the same murder and crime
rate as the District? Virginia is awash in guns and yet the murder rate is
much, much lower. This holds true even for Virginia's urban areas, as seen
by the following comparison on the 25-year anniversary of the DC gun
ban (in 2001):

| City | Murder rates: 25 years after DC's ban |
|------|----------------------------------------|
| Washington, DC | 46.4 per 100,00050 |
| Arlington, VA | 2.1 per 100,00051 |
| (Arlington is just across the river from D.C.) | |
| Total VA metropolitan area | 6.1 per 100,00052 |

* Guns are not the problem. On the contrary, lax criminal penalties and
laws that disarm the law-abiding are responsible for giving criminals a
safer working environment.

*B. Criminologists turning from anti-gun position*

*\* Dr. Gary Kleck. A criminologist at Florida State University, Kleck began his research as a firm believer in gun control. But in a speech delivered to the National Research Council, he said while he was once "a believer in the 'anti-gun' thesis," he has now moved "beyond even the skeptic position." Dr. Kleck now says the evidence "indicates that general gun availability does not measurably increase rates of homicide, suicide, robbery, assault, rape, or burglary in the U.S."53*

*\* James Wright. Formerly a gun control advocate, Wright received a grant from President Carter's Justice Department to study the effectiveness of gun control laws. To his surprise, he found that waiting periods, background checks, and all other gun control laws were not effective in reducing violent crime.54*

*\* Wright says that at one time, "It seemed evident to me, we needed to mount a campaign to resolve the crisis of handgun proliferation." But he says, "I am now of the opinion that a compelling case for 'stricter gun control' cannot be made."55*

*\* Every scholar who has "switched" has moved away from the anti-gun position. Dave Kopel, an expert in constitutional issues and firearms research, categorically states that, "Every scholar who has 'switched' has 'switched' to the side that is skeptical of controls. Indeed, most of the prominent academic voices who are gun control skeptics—including law professor Sanford Levinson and criminologists Gary Kleck and James Wright—are people who, when they began studying guns, were supporters of the gun control agenda."56*

*\* Kopel continues: "I do not know of a single scholar who has published a pro-control article who started out as a skeptic of gun control. This suggests how heavily the weight of the evidence is distributed, once people begin studying the evidence."57*

## 4. Problems with waiting periods and background checks

*A. Waiting periods threaten the safety of people in imminent danger*

*\* Bonnie Elmasri—She inquired about getting a gun to protect herself from a husband who had repeatedly threatened to kill her. She was told there was a 48 hour waiting period to buy a handgun. But unfortunately, Bonnie was never able to pick up a gun. She and her two sons were killed*

*the next day by an abusive husband of whom the police were well aware.58*

*\* Marine Cpl. Rayna Ross—She bought a gun (in a non-waiting period state) and used it to kill an attacker in self-defense two days later.59 Had a 5-day waiting period been in effect, Ms. Ross would have been defenseless against the man who was stalking her.*

*\* Los Angeles riots—USA Today reported that many of the people rushing to gun stores during the 1992 riots were "lifelong gun-control advocates, running to buy an item they thought they'd never need." Ironically, they were outraged to discover they had to wait 15 days to buy a gun for self-defense.60*

## B. *Prior restraints on rights are unconstitutional*

### 1. *Second Amendment protects an individual right*

*Report by the U.S. Senate Subcommittee on the Constitution (1982)—"The conclusion is thus inescapable that the history, concept, and wording of the second amendment to the Constitution of the United States, as well as its interpretation by every major commentator and court in the first half-century after its ratification, indicates that what is protected is an individual right of a private citizen to own and carry firearms in a peaceful manner."61*

*Supreme Court admits "the people" in the Second Amendment are the same "people" as in the rest of the Bill of Rights—In U.S. v. Verdugo-Urquidez the Court stated that "'the people' seems to have been a term of art employed in select parts of the Constitution. . . . [and] it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."62*

*2. Courts agree that rights should be free from prior restraints*

*Near v. Minnesota—In this case, the Supreme Court stated that government officials should punish the abuse of a right and not place prior restraints on the exercise of the right.63*

*What about yelling "Fire" in a crowded theater?—The courts have stated that one cannot use his "freedom of speech" to yell "Fire" in a crowded theater. And yet, no one argues that officials should gag everyone who goes into the theater, thus placing a prior restraint on movie-goers. The proper response is to punish the person who does yell "Fire." Likewise, citizens should not be "gagged" before exercising their Second Amendment rights, rather they should be punished if they abuse that right.*

*C. Background checks invite official abuse*

*\* A review of FBI computer records reveals that the firearms industry was shut down for more than eight full business days during the first six months that the National Instant Background Check (NICS) was online. Many of these shutdowns have resulted in the virtual blackout of gun sales at gun shows across the country.*

*\* According to gun laws expert Alan Korwin, "With the NICS computer out of commission, the only place you could legally buy a firearm—in the whole country—was from a private individual, since all dealers were locked out of business by the FBI's computer problem."64*

*D. Background checks can (and do) lead to gun registration*

*\* Justice Department report (1989). "Any system that requires a criminal history record check prior to purchase of a firearm creates the potential for the automated tracking of individuals who seek to purchase firearms."65*

*\* Justice Department initiates registration (1994). The Justice Department gave a grant to the city of Pittsburgh and Carnegie Mellon University to*

create a sophisticated national gun registry using data compiled from states' background check programs. This attempt at registration was subsequently defeated in the courts.66

* More gun owner registration (1996). Computer software distributed by the Justice Department allowed police officials to easily (and unlawfully) register the names and addresses of gun buyers. This software -- known as FIST -- also kept information such as the type of gun purchased, the make, model and caliber, the date of purchase, etc.67 This demonstrates how easily background checks can be used to register gun owners' information.68

* Federal Bureau of Investigation registers gun owners (1998). Despite prohibitions in federal law, the FBI announced that it would begin keeping gun buyer's names for six months. FBI had originally wanted to keep the names for 18 months, but reduced the time period after groups like Gun Owners of America strongly challenged the legality of their actions. GOA submitted a formal protest to the FBI, calling their attempt at registration both "unlawful" and "unconstitutional."69

* California. State officials have used the state background check—required during the waiting period—to compile an illegal registry of handgun owners. These lists have been compiled without any statutory authority to do so.70

* Nationwide. Highly acclaimed civil rights attorney, researcher and author, David Kopel, has noted several states where either registration lists have been illegally compiled from background checks or where such registration lists have been abused by officials.71

E. Myth: The Brady registration law is dropping crime rates

* Fact: Anti-gun journal pronounces the failure of the Brady law. One of the nation's leading anti-gun medical publications, the Journal of the American Medical Association, found that the Brady registration law has failed to reduce murder rates. In August 2000, JAMA reported that states implementing waiting periods and background checks did "not [experience] reductions in homicide rates or overall suicide rates."72

* Fact: Brady checks are not taking criminals off the streets. Not every person who is denied a firearm is truly a criminal, as many persons have been denied erroneously. But even assuming each denial was legitimate, the Brady law is still not taking criminals off the streets (and thus keeping them from getting firearms).

*The Washington Times reported in 1999 that, "Although federal officials say about 400,000 persons have been prevented from buying guns by the instant check system, only one has been prosecuted by the Department of Justice in the last three years."73*

\* Fact: *The Brady law has NOT stopped thugs like Benjamin Smith from going on killing sprees. In 1999, Benjamin Smith was rejected by a background check when he tried to buy a firearm from an Illinois gun dealer. But after this initial rejection, "he hit the streets and in just three days had two handguns" from an illegal source, reported the Associated Press. Three days after getting the guns, Smith went on a rampage that killed two people and wounded nine others.*

\* Fact: *The Brady Law is not physically keeping criminals from getting firearms. The simple truth is that any person who's denied a firearm can simply walk out the door and buy a gun down the street. Ohio's Attorney General, Betty Montgomery, testified to this very irony in the law in 1997:*

*"In 1996, 60,037 people went to licensed gun dealers to purchase handguns. Of that figure, 327—less than one half of one percent—were denied because of a disqualifying factor. . . . [W]hile we were able to keep 327 people from getting a handgun at point A—each of them was able to purchase a rifle or handgun the very same day at point B. To our knowledge, under the Brady Act, not a single one of the 327 people . . . have been prosecuted by the U.S. Justice Department."74*

\* *Criminals bypass gun controls. A Justice Department survey of felons showed that 93% of handgun predators had obtained their most recent guns "off-the-record."75 And press reports show that the few criminals who get their guns from retail outlets can easily get fake IDs or use surrogate buyers, known as "straw purchasers," to buy their guns.76*

\* *Legal gun shows are not a problem. Some have demonized gun shows and claimed that these are the outlets where criminals supposedly get their weapons. But the Clinton Justice Department found that less than two percent of the people arrested for using firearms in homicide got their weapons from gun shows.77*

*Fact: The Department of Justice has grossly overstated the number of people who were denied firearms. The Indianapolis Star and News reported in 1998 that the U.S. Department of Justice had overstated the number of people who were denied firearms in Indiana alone by more than 1,300%. Indiana was not an aberration, as the newspaper found that "paperwork errors and duplications inflated the [DOJ's] numbers" in many states.78*

*F. General Accounting Office questions the Brady law's supposed effectiveness*

*The Brady Law has failed to result in the incarceration of dangerous criminals. After the first year and a half, there were only seven successful prosecutions for making false statements on Brady handgun purchase forms—and only three of them were actually incarcerated.79 Because the situation hardly improved in subsequent years, one cannot argue that the law is working to keep violent criminals from getting handguns on the street.80*

*The Brady Law has ERRONEOUSLY denied firearms to thousands of applicants. Over fifty percent of denials under the Brady Law are for administrative snafus, traffic violations, or reasons other than felony convictions.81*

*Gun control advocates admit the Brady Law is not a panacea. According to a January, 1996 report by the General Accounting Office, "Proponents [of gun control] acknowledge that criminal records checks alone will not prevent felons from obtaining firearms."82*

*Criminals can easily evade the background checks by using straw purchasers: "Opponents of gun control note that criminals can easily circumvent the law by purchasing handguns on the secondary market or by having friends or spouses without a criminal record make the purchases from dealers."83*

## 5. Problems with gun registration and licensing

*A. Licensing or registration can lead to confiscation of firearms*

*1. New York City*

*Registration. In the mid-1960's officials in New York City began registering long guns. They promised they*

would never use such lists to take away firearms from
honest citizens. But in 1991, the city banned (and soon
began confiscating) many of those very guns.84

\* Confiscation. In 1992, a New York City paper reported
that, "Police raided the home of a Staten Island man who
refused to comply with the city's tough ban on assault
weapons, and seized an arsenal of firearms. . . . Spot
checks are planned [for other homes]."85

2. California

Part 1. The Golden State passed a ban on certain semi-
automatic firearms in 1989. Banned guns could be legally
possessed if they were registered prior to the ban. In the
Spring of 1995, one man who wished to move to
California asked the Attorney General whether his SKS
Sporter rifle would be legal in the state. The citizen was
assured the rifle was legal, and based on that
information, he subsequently moved into the state. But in
1998, the state's Attorney General reversed course and
officials confiscated the firearm.86 In a legal brief before
the state supreme court, Attorney General Daniel Lungren
said that "tens of thousands of California citizens" would
have to either surrender their firearms or become
felons.87

Part 2. Having registered the firearms, the California
Department of Justice issued a notice in 1999 to explain
how more than 1,500 individuals in the state were in
possession of illegal firearms—all of which were subject to
forfeiture without compensation.88

Part 3. Plans to confiscate firearms in California were
leaked to the public in 1999, sending shock waves through
the gun rights community. The document entitled
"Relinquishment of Assault Weapons" stated: "Once the
90-day window of opportunity for turning in such assault

weapons concludes, we will send each sheriff and police
chief a listing of the affected individuals [who own banned
firearms]."89


3. Foreign Countries

* Gun registration has led to confiscation in several
countries, including Greece, Ireland, Jamaica and
Bermuda.90

* And in an exhaustive study on this subject, Jews for the
Preservation of Firearms Ownership has researched and
translated several gun control laws from foreign
countries. Their publication, Lethal Laws: "Gun Control"
is the Key to Genocide documents how gun control (and
confiscation) has preceded the slaughter and genocide of
millions of people in Turkey, the Soviet Union, Germany,
China, Cambodia and others.91


B. People in imminent danger can die waiting for a firearms license

* Igor Hutorsky was murdered by two burglars who broke into his
Brooklyn furniture store. The tragedy is that some time before the murder
his business partner had applied for permission to keep a handgun at the
store. Even four months after the murder, the former partner had still not
heard from the police about the status of his gun permit.92

C. The power to license a right is the power to destroy a right

* Arbitrary Delays—While New Jersey law requires applications to be
responded to within thirty days, delays of ninety days are routine;
sometimes, applications are delayed for several years for no readily
apparent reason.93

* Arbitrary Denials—Officials in New York City routinely deny gun
permits for ordinary citizens and store owners because, as the courts have
ruled, they have no greater need for protection than anyone else in the
city. In fact, the authorities have even refused to issue permits when the
courts have ordered them to do so.94

*Arbitrary Fee Increases—In 1994, the Clinton administration pushed for a license fee increase of almost 1,000 percent on gun dealers. According to U.S. News & World Report, the administration was seeking the license fee increase "in hopes of driving many of America's 258,000 licensed gun dealers out of business."95

D. Officials cannot license or register a constitutional right

*The Supreme Court held in Lamont v. Postmaster General (1965) that the First Amendment prevents the government from registering purchasers of magazines and newspapers—even if such material is "communist political propaganda."96

## 6. Assault weapons: fact or fiction?

A. Definition of real "assault weapons"

*According to one of the preeminent experts in the field of firearms, Dr. Edward Ezell,97 a key characteristic of a true assault weapon is that it must have the capability of "full automatic fire."98 Similarly, the U.S. Defense Department defines real assault weapons as "selective-fire weapons"—meaning that these guns can fire either automatically or semi-automatically.99

*Anti-gun pundits in recent years have managed to define "assault weapons" as semi-automatic firearms which only externally resemble a military firearm.100 Dr. Edward Ezell notes that true assault weapons "were designed to produce roughly aimed bursts of full automatic fire"101—something which a semi-automatic firearm does not do.

B. Semi-automatic "assault rifles" are no different than many hunting rifles

*Officer William McGrath: "These [semi-automatic assault rifles] are little different than the semi-automatic hunting rifles that have been on the market since before World War II. The main difference between an assault rifle and a semi-automatic hunting rifle is that the assault rifle looks more 'military.'"102

* "The term 'assault' rifle is really a misnomer as a true assault rifle is a selective fire weapon capable of switching from fully automatic to semi automatic and back with the flip of a lever."103

* "The charge that the assault rifle holds more rounds than a 'legitimate' hunting rifle shows either a lack of knowledge or a deliberate twisting of

*the facts, as 10, 20 and 30 round magazines for 'legitimate' hunting rifles have been on the market for decades without the world coming to an end."104*

*C. So-called assault weapons have never been the "weapon of choice" for criminals*

*(All of the following figures pre-date the "assault weapons" ban passed by Congress in 1994)*

*\* Police View: Over 100,000 police officers delivered a message to Congress in 1990 stating that only 2% to 3% of crimes are committed using a so-called "assault weapon."105*

*\* New Jersey: The New York Times reported that, "Although New Jersey's pioneering ban on military-style assault rifles was sold to the state as a crime-fighting measure, its impact on violence in the state . . . has been negligible, both sides agree."106 Moreover, New Jersey police statistics show that only .026 of 1 percent of all crimes involve "assault rifles."107*

*\* Nationwide: The Bureau of Justice Statistics reported in 1993 that violent criminals only carry or use a "military-type gun" in about one percent of the crimes nationwide.108*

*\* Knives more deadly: According to the FBI, people have a much greater chance of being killed by a knife or a blunt object than by any kind of rifle, including an "assault rifle."109 In Chicago, the chance is 67 times greater. That is, a person is 67 times more likely to be stabbed or beaten to death in Chicago than to be murdered by an "assault rifle."110*

*\* Cops' own guns more deadly: So-called assault weapons are not menacing police officers nationwide. The FBI reports show that before the 1994 ban on semi-automatic "assault weapons," no more than three officers were killed in any one year by such guns.111 Contrastly, police*

officers were more than three times as likely to be killed
by their own guns than by "assault weapons."112

* It would seem one can't have it both ways. If Congress
wants to ban weapons that are dangerous to police, then
it should begin by pushing for a ban on police officers'
own weapons, since these guns kill far more often than
"assault weapons." The same is true with knives and blunt
objects. These instruments kill policemen more often than
semi-automatic "assault weapons."113

* Sarah Brady's own figures show that so-called assault
weapons are not the criminal's "weapon of choice." A
study published by Handgun Control, Inc. in November of
1995 shows that the overwhelming majority of guns used
to murder police officers are not "assault weapons."114
The irony is that HCI used a very inflated definition of
"assault weapon" and still could not demonstrate that
they are used in over 50% of the crimes.115

* Does tracing of crime guns show that "assault weapons"
are the weapons of choice for criminals? No. Gun control
advocates will often make the claim that so-called assault
weapons are frequently used in crime. To justify this
claim, such advocates will cite as "evidence" the fact that
law-enforcement run a high percentage of traces on these
types of firearms. But this is a classic example of circular
reasoning: law enforcement arbitrarily run a high
percentage of trace requests on "assault weapons," and
then this figure is used to justify the "fact" that these guns
are frequently used in crime. Consider the following:

  * Tracing requests are not representative of
  all guns used in crime. The Congressional
  Research Service states that, "Firearms
  selected for tracing do not constitute a
  random sample and cannot be considered
  representative of the larger universe of all

*firearms used by criminals."116 (Emphasis added.) Moreover, BATF agents themselves have stated that, "ATF does not always know if a firearm being traced has been used in a crime."117*

*\* Tracing requests are not random samples. CRS notes that "ATF tracing data could be potentially biased because of screening conducted by local ATF agents prior to the submission of the tracing from."118 This means that police could, if they wanted, only trace so-called assault weapons. Would this mean that they are the only guns used in crime? No, it would just mean that law enforcement have a particular interest in tracing "assault weapons" over other guns.*

*\* Tracing in L.A. That tracing is an unreliable measure of a gun's use in crime is clear. For example, in 1989 in Los Angeles, "assault rifles" represented approximately only 3% of guns seized, but 19% of gun traces.119*

*D. Semi-automatic "assault weapons" are excellent for self-defense*

*\* Police Capt. Massad Ayoob: "The likelihood of multiple opponents who move fast, often wear body armor, know how to take cover, and tend to*

firearms used by criminals."116 (Emphasis
added.) Moreover, BATF agents themselves
have stated that, "ATF does not always know
if a firearm being traced has been used in a
crime."117

* Tracing requests are not random samples.
CRS notes that "ATF tracing data could be
potentially biased because of screening
conducted by local ATF agents prior to the
submission of the tracing from."118 This
means that police could, if they wanted, only
trace so-called assault weapons. Would this
mean that they are the only guns used in
crime? No, it would just mean that law
enforcement have a particular interest in
tracing "assault weapons" over other guns.

* Tracing in L.A. That tracing is an
unreliable measure of a gun's use in crime is
clear. For example, in 1989 in Los Angeles,
"assault rifles" represented approximately
only 3% of guns seized, but 19% of gun
traces.119

D. Semi-automatic "assault weapons" are excellent for self-defense

* Police Capt. Massad Ayoob: "The likelihood of multiple opponents who
move fast, often wear body armor, know how to take cover, and tend to
ingest chemicals that make them resistant to pain and shock, are all good
reasons for carrying guns that throw a whole lot more bullets than six-
shooters do."120 (Emphasis added.)

* "All four of these factors make it likely that more of the Good Guys'
bullets will be expended before the Bad Guys are neutralized. All of these

*factors, therefore, militate for a higher capacity handgun in the hands of
the lawful defenders."121*

*1. Drugs and alcohol can make criminals resistant to pain*

*Arkansas: A drunk opened fire on an officer,
who responded by firing 29 shots—15 of
them striking the criminal. It was only the
last bullet which finally killed the drunk and
effectively stopped him from shooting.122*

*Illinois: Police shot a drug-induced criminal
33 times before the junkie finally dropped
and was unable to shoot any longer.123*

*2. Hi-capacity semi-autos can help decent people to
defend themselves*

*Los Angeles riots: Many of the guns targeted
by so-called assault weapons bans are the
very guns with which the Korean merchants
used to defend themselves during the 1992
Los Angeles riots.124 Those firearms proved
to be extremely useful to the Koreans. Their
stores were left standing while other stores
around them were burned to the ground.*

*The Korean merchants would probably
agree with Capt. Massad Ayoob. When one is
facing mob violence and the police are
nowhere to be found, one needs a gun that
shoots more than just six bullets. A ban on
large capacity semi-automatic firearms will*

only harm one's ability to defend himself and
his family.

*E. The Second Amendment protects an individual's right to own military rifles and handguns*

* Report by the U.S. Senate Subcommittee on the Constitution (1982)—"In
the Militia Act of 1792, the second Congress defined 'militia of the United
States' to include almost every free adult male in the United States. These
persons were obligated by law to possess a [military-style] firearm and a
minimum supply of ammunition and military equipment. . . . There can be
little doubt from this that when the Congress and the people spoke of the a
'militia,' they had reference to the traditional concept of the entire
populace capable of bearing arms, and not to any formal group such as
what is today called the National Guard."125

* The Supreme Court—In U.S. v. Miller, the Court stated that, "The Militia
comprised all males physically capable of acting in concert for the
common defense . . . [and that] when called for service, these men were
expected to appear bearing arms supplied by themselves and of the kind in
common use at the time."126

## 7. Firearms statistics

*A. General Death Rates*

| Cause | Number |
|---|---|
| Heart disease | 710,760 |
| Cancer | 553,091 |
| Stroke (cerebrovascular disease) | 167,661 |
| Chronic lower respiratory diseases | 122,009 |
| Doctor's negligence | 98,329 |
| Influenza and pneumonia | 65,313 |
| Motor-vehicle | 43,354 |
| Suicides (all kinds, including firearms) | 29,350 |
| Firearms (Total)* | 28,163 |

| Suicides | 16,586 |
|---|---|
| Homicides | 10,801 |

| | |
|---|---|
| *Accidents* | 776 |

*Accidents (six causes)*

| | |
|---|---|
| *Falls* | *13,322* |
| *Poison (solid, liquid)* | *12,757* |
| *Choking on food or other object* | *4,313* |
| *Drowning* | *3,402* |
| *Fires, flames* | *3,377* |
| *Firearms* | *776* |

*Homicides (all instruments)*                    *16,765*

*Source: Except for the figure on doctor's negligence, the above information is*
*for 2000 and is taken from National Safety Council, Injury Facts: 2003*
*Edition, at 10, 19-20, 129. The number of yearly deaths attributed to doctor's*
*negligence is based on the Harvard Medical Practice Study (1990) which is*
*cited in Kleck, Point Blank, at 43.127*
*\*The total firearms death figure above is a summary of the "Suicides,"*
*"Homicides" and "Accidents" subcategories. The Total excludes two*
*categories: Legal Intervention and Undetermined.*

*B. Children Accidental Death Rates (Ages 0-14)*

| Cause | Number (Ages 0-14) | Number (Ages 0-4) |
|---|---|---|
| *Motor-vehicle* | *2,591* | *819* |
| *Drowning* | *943* | *568* |
| *Fires and flames* | *593* | *327* |
| *Mechanical suffocation* | *601* | *508* |
| *Ingestion of food, object\** | *169* | *169* |
| *Firearms* | *86* | *19* |

*Source: Figures are for 2000. National Safety Council, Injury Facts: 2003*
*Edition, at 10-11, 129.*

*\* The "Ingestion of food, object" category is underreported in the first*
*column since the NSC did not include death rates for "5 to 14 Years."*

*C. Children and Guns*

*\*Fact: Accidental gun deaths among children have declined by over 50 %*
*in 25 years, even though the population (and the gun stock) has continued*
*to increase.128*

*\* Fact: Despite the low number of gun accidents among children (see*
*above), most of these fatalities are not truly "accidents." According to Dr.*

Gary Kleck, many such accidents are misnamed—those "accidents" actually resulting from either suicides or extreme cases of child abuse.129

* Dr. Kleck also notes that, "Accidental shooters were significantly more likely to have been arrested, arrested for a violent act, arrested in connection with alcohol, involved in highway crashes, given traffic citations, and to have had their driver's license suspended or revoked."130

* Myth: One child is accidentally killed by a gun every day. Dr. Gary Kleck notes that to reach this figure, anti-gun authors must include "children" aged 18-24.131 As noted above, there were only 142 fatal gun accidents for children in 1997.

* Myth: 135,000 children take guns to school every day. This factoid was based on a survey that did not even ask children if they carried a weapon to school. The "take guns to school" statement is completely imputed into the survey results. With regard to the 135,000 figure, Dr. Gary Kleck has shown that this number is wildly inflated.132

* Myth: Children gun deaths are at epidemic proportions.

Fact: Twice as many children are killed playing football in school than are murdered by guns. That's right. Despite what media coverage might seem to indicate, there are more deaths related to high school football than guns. In the last three years, twice as many football players died from hits to the head, heat stroke, etc. (45), as compared with students who were murdered by firearms (22) during that same time period.133

Fact: More children will die in a car, drown in a pool, or choke on food than they will by firearms. As seen by the chart above, children are at a 2,000 percent greater risk from the car in their driveway, than they are by the gun in their parents' closet. Children are almost 7 times more likely to drown than to be shot, and they are 130 percent more likely to die from choking on their dinner.134

* Myth: There are more guns in schools today because of lax gun control laws. To the contrary, two facts put this myth to rest:

*Fact: Currently, there are strict laws that, with few exceptions, prevent adults from possessing a firearm within 1,000 feet of a school. These and other gun control laws have failed to keep guns off school grounds.*

*Fact: In the past, "guns in schools" were never a problem during the era when children had the greatest access to firearms. For example, even though there were far fewer gun control laws on the books in the 1950's, there was not a problem with illegal guns in schools. Rather, the top problems in American classrooms during that era were such (non-violent) activities as chewing gum, talking in class and running in the halls.*

*\* More on guns in schools. So what has changed? Why do illegal guns make their way onto school grounds today, even though federal gun control laws have now grown to comprise more than 88,000 words of restrictions and requirements?135 There are several possible reasons, including:*

*a. Lax punishment of juvenile children. Several state studies have shown that juvenile offenders will make several journeys through the legal system before doing any time in a penal facility.136 This problem, of course, is not just limited to juveniles. A murderer of any age (in 1990) could expect to serve only 1.8 years in prison, after one considers the risk of apprehension and the length of the sentence.137*

*b. Imitation of T.V. violence. Before completing the sixth grade, the average American child sees 8,000 homicides and 100,000 acts of violence on television.138 Two surveys of young American males found that 22 to 34 percent had tried to perform crime techniques they had watched on television.139*

*c. Morality shift. "The kids have changed," says Judge Gaylord Finch, speaking with the help of a dozen years of*

*observation from his bench, where he sits as chief judge of*
*Juvenile and Domestic Relations District Court. "The*
*values have just become so relative, and it sometimes*
*seems we have no values in common anymore."140*

### D. Women and Guns

*\* At least 17 million women own firearms in the United States.141 And*
*according to the National Research Opinion Center, 44 percent of adult*
*women either own or have access to firearms.142*

*\* As many as 561 times a day, women use guns to protect themselves*
*against sexual assault.143*

*\* In 89.6% of violent crimes directed against women, the offender does not*
*have a gun; and only 10% of rapists carry a firearm.144 Thus, armed*
*women will usually have a decided advantage against their attackers.*

*\* A man can kill a woman with whatever he has at hand, but she can*
*usually only resist him successfully with a gun. Don Kates, a civil rights*
*attorney who specializes in firearms issues, cites a Detroit study showing*
*that three-quarters of wives who killed their spouses were not even*
*charged, since prosecutors found their acts necessary to protect their lives*
*or their children's lives.145*

## 8. Eight Common Gun Control Myths

*A. Myth #1: If one has a gun in the home, one is three times more likely to be killed than if there is no gun present.*

*1. Fact: Guns are used more often to save life. Dr. Edgar Suter has pointed*
*out that studies which make the claim that guns are more likely to kill the*
*owner are flawed because they fail to consider the number of lives saved*
*by guns.146 That is, such claims ignore the vast number of non-lethal*
*defensive uses with firearms. Criminologists have found that citizens use*
*firearms as often as 2.5 million times every year in self-defense. In over*
*90% of these defensive uses, citizens merely brandish their gun or fire a*
*warning shot to scare off the attacker.147*

*2. Fact: A study claiming "guns more likely to kill you than help you" is a*
*total fraud. Not surprisingly, the figure claiming one is three times more*
*likely to be killed by one's own gun is a total lie. The author of this study,*

*Dr. Arthur Kellerman, refused to release the data behind his conclusions for years.148 Subsequently available evidence shows why Kellerman stonewalled for so long:*

*\* Researcher Don Kates reveals that all available data now indicates that the "home gun homicide victims [in Kellerman's study] were killed using guns not kept in the victim's home." In other words, the victims were NOT murdered with their own guns! They were killed "by intruders who brought their own guns to the victim's household."149*

*\* In retrospect, Kates found, it was not the ownership of firearms that put these victims at high risk. Rather, it was the victim's "high-risk life-styles [such as criminal associations] that caused them to own guns at higher rates than the members of the supposedly comparable control group."150*

*B. Myth #2: Most homicides are committed by otherwise law-abiding people who end up killing a friend or relative.*

*1. While most murders do involve the killing of an acquaintance, it is fallacious to assume these are otherwise law-abiding people killing one another. In fact, sixty-one percent of murder victims themselves—and an even greater majority of murderers—have prior criminal records.151 This indicates that most murders occur between criminals who have already demonstrated a pattern of violence.*

*2. The problem? The criminal justice system is a revolving door which continues to throw violent offenders back onto the street. Nationwide, 70% of murderers (under sentence of death) have prior felony convictions.152 This number does not include criminals who have plea-bargained their felonies down to lesser charges.*

*C. Myth #3: Gun Control has reduced the crime rates in other countries.*

*1. The murder rates in many nations (such as England) were ALREADY LOW BEFORE enacting gun control. Thus, their restrictive laws cannot be credited with lowering their crime rates.153*

*2. Gun control has done nothing to keep crime rates from rising in many of the nations that have imposed severe firearms restrictions.*

*\* Australia: Readers of the USA Today newspaper discovered in 2002 that, "Since Australia's 1996 laws banning most guns and making it a crime to use a gun defensively, armed robberies rose by 51%, unarmed robberies by 37%, assaults by 24% and kidnappings by 43%. While murders fell by 3%, manslaughter rose by 16%."154*

*\* Canada: After enacting stringent gun control laws in 1991 and 1995, Canada has not made its citizens any safer. "The contrast between the criminal violence rates in the United States and in Canada is dramatic," says Canadian criminologist Gary Mauser in 2003. "Over the past decade, the rate of violent crime in Canada has increased while in the United States the violent crime rate has plummeted."155*

*\* England: According to the BBC News, handgun crime in the United Kingdom rose by 40% in the two years after it passed its draconian gun ban in 1997.156*

*\* Japan: One newspaper headline says it all: Police say "Crime rising in Japan, while arrests at record low." 157*

*3. British citizens are now more likely to become a victim of crime than are people in the United States:*

*\* In 1998, a study conducted jointly by statisticians from the U.S. Department of Justice and the University of Cambridge in England found that most crime is now worse in England than in the United States.*

*\* "You are more likely to be mugged in England than in the United States," stated the Reuters news agency in summarizing the study. "The rate of robbery is now 1.4*

*times higher in England and Wales than in the United States, and the British burglary rate is nearly double America's."158 The murder rate in the United States is reportedly higher than in England, but according to the DOJ study, "the difference between the [murder rates in the] two countries has narrowed over the past 16 years."159*

*\* The United Nations confirmed these results in 2000 when it reported that the crime rate in England is higher than the crime rates of 16 other industrialized nations, including the United States.160*

*4. British authorities routinely underreport murder statistics. Comparing statistics between different nations can be quite difficult since foreign officials frequently use different standards in compiling crime statistics.*

*\* The British media has remained quite critical of authorities there for "fiddling" with crime data. Consider some of the headlines in their papers: "Crime figures a sham, say police,"161 "Police are accused of fiddling crime data,"162 and "Police figures under-record offences by 20 percent."163*

*\* British police have also criticized the system because of the "widespread manipulation" of crime data:*

*a. "Officers said that pressure to convince the public that police were winning the fight against crime had resulted in a long list of ruses to 'massage' statistics."164*

*b. Sgt. Mike Bennett says officers have become increasingly frustrated with the practice of manipulating statistics. "The crime figures are meaningless," he said.*

*"Police everywhere know exactly what is going on."165*

*c. According to The Electronic Telegraph, "Officers said the recorded level of crime bore no resemblance to the actual amount of crime being committed."166*

*\* Underreporting crime data: "One former Scotland Yard officer told The Telegraph of a series of tricks that rendered crime figures 'a complete sham.' A classic example, he said, was where a series of homes in a block of flats were burgled and were regularly recorded as one crime. Another involved pickpocketing, which was not recorded as a crime unless the victim had actually seen the item being stolen."167*

*\* Underreporting murder data: British crime reporting tactics keep murder rates artificially low. "Suppose that three men kill a woman during an argument outside a bar. They are arrested for murder, but because of problems with identification (the main witness is dead), charges are eventually dropped. In American crime statistics, the event counts as a three-person homicide, but in British statistics it counts as nothing at all. 'With such differences in reporting criteria, comparisons of U.S. homicide rates with British homicide rates is a sham,' [a 2000 report from the Inspectorate of Constabulary] concludes."168*

*5. Violence by any other name is still violent -- Many countries with strict gun control laws have violence rates that are equal to, or greater than, that of the United States. Consider the following rates:*

| High Gun Ownership Countries | Low Gun Ownership Countries |
|---|---|

| Country | Suicide | Homicide | Total* | Country | Suicide | Homicide | Total* |
|---------|---------|----------|--------|---------|---------|----------|--------|
| Switzerland | 21.4 | 2.7 | 24.1 | Denmark | 22.3 | 4.9 | 27.2 |
| U.S. | 11.6 | 7.4 | 19.0 | France | 20.8 | 1.1 | 21.9 |
| Israel | 6.5 | 1.4 | 7.9 | Japan** | 16.7 | 0.6 | 17.3 |

*The figures listed in the table are the rates per 100,000 people.*
***Suicide figures for Japan also include many homicides.*
*Source for table: U.S. figures for 1996 are taken from the Statistical Abstract of the U.S. and FBI Uniform Crime Reports. The rest of the table is taken from the UN 1996 Demographic Yearbook (1998), cited at http://www.haciendapub.com/stolinsky.html.*

6. The United States has experienced far fewer TOTAL MURDERS than Europe over the last 70 years. In trying to claim that gun-free Europe is more peaceful than America, gun control advocates routinely ignore the overwhelming number of murders that have been committed in Europe.

*Over the last 70 years, Europe has averaged about 400,000 murders per year, when one includes the murders committed by governments against mostly unarmed people.169 That murder rate is about 16 times higher than the murder rate in the U.S.170*

*Why hasn't the United States experienced this kind of government oppression? Many reasons could be cited, but the Founding Fathers indicated that an armed populace was the best way of preventing official brutality. Consider the words of James Madison in Federalist 46:*

Let a regular army, fully equal to the resources of the country, be formed; and let it be entirely at the devotion of the federal government; still it would not be going too far to say, that the State governments, with the people on their side, would be able to

> *repel the danger . . . a militia amounting to*
> *near half a million of citizens with arms in*
> *their hands.171*

D. Myth #4: Recent gun control laws have reduced the U.S. murder rate.

1. Murder rate was already decreasing before Brady and semi-auto gun ban passed. Those who claim that the two gun control laws enacted in 1994 have reduced the murder rate ignore the fact that the U.S. murder rate has been decreasing from the high it reached in 1991.172 Thus, the murder rate had already begun decreasing two to three years before the Brady law and the semi-auto gun ban became law.

2. Murder rate decrease results from fewer violent youths. The Democratic Judiciary Committee noted in 1991 that, "An analysis of the murder tolls since 1960 offers compelling evidence of the link—the significant rise of murder in the late 1960's, and the slight decrease in murder in the early 1980's follows from an unusually large number of 18-24 year-olds in the general population. This age group is the most violent one, as well as the group most likely to be victimized—and the murder figures ebb and flow with their ranks."173 (Emphasis added.)

3. According to the Clinton Justice Department, crime has decreased even while the number of guns increased. The Bureau of Justice Statistics, the research arm of the Justice Department, reported in 2000 that while the number of firearms in circulation rose nearly 10% during a recent five-year period, gun-related deaths and woundings dropped174 33%.

4. Concealed carry laws have dropped murder and crime rates in the states that have enacted them. According to a comprehensive study which studied crime statistics in all of the counties in the United States from 1977 to 1992, states which passed concealed carry laws reduced their murder rate by 8.5%, rapes by 5%, aggravated assaults by 7% and robbery by 3%.175

E. Myth #5: The Courts have never overturned a gun control law, and thus, there is no individual right guaranteed by the Second Amendment.

1. U.S. Senate Subcommittee Report (1982)

   * Courts have used the Second Amendment to strike down gun control: Nunn v. State and in re Brickey are just two

examples where the Courts have struck down gun control laws using the Second Amendment.176

* An individual right protected: "The conclusion is thus inescapable that the history, concept, and wording of the second amendment to the Constitution of the United States, as well as its interpretation by every major commentator and court in the first half-century after its ratification, indicates that what is protected is an individual right of a private citizen to own and carry firearms in a peaceful manner."177

2. U.S. Supreme Court

* U.S. v. Verdugo-Urquidez (1990). "'The people' seems to have been a term of art employed in select parts of the Constitution. . . . [and] it suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."178

* U.S. v. Lopez (1995). The Court struck down a federal law which prevented the possessing of firearms within 1,000 feet of a school. The Court argued that the Commerce Clause of the Constitution in no way grants Congress the authority to enact such gun control legislation.179

* Printz v. U.S. (1997). The Supreme Court ruled the federal government could not force state authorities to conduct so-called Brady background checks on gun buyers.180

* Majority of the Supreme Court cases clearly point to an individual right. In a mammoth work produced January 2004, three authors reprinted and analyzed the dozens of

Supreme Court cases that have referenced the Second
Amendment. Their conclusion? "These cases suggest that
the Justices of the Supreme Court do now and usually
have regarded the Second Amendment 'right of the people
to keep and bear arms' as an individual right, rather than
as a right of state governments."181

3. U.S. Congress:

Fourteenth Amendment (1868):

* The framers of the 14th Amendment intended to protect
an individual's Second Amendment right to keep and bear
arms by striking down state laws that denied this right.
As stated by a Senate subcommittee in 1982, "[During] the
debates over the Fourteenth Amendment, Congress
frequently referred to the Second Amendment as one of
the rights which it intended to guarantee against state
action."182

Firearm Owners' Protection Act (1986):

* The 1986 Law affirms individual right to keep and bear
arms: "The Congress finds that the right of citizens to keep
and bear arms under the second amendment to the United
States Constitution . . . require[s] additional legislation to
correct existing firearms statutes and enforcement
policies."183 [Emphasis added.]

4. Nothing in Article I, Section 8 of the U.S. Constitution authorizes
Congress to pass gun control legislation (see U.S. v. Lopez, 1995). Since the
adoption of the Constitution, courts have ruled on both sides of the issue,
indicating that judges are just as political as the common man.

F. Myth #6: The Second Amendment militia is the National Guard.

The Founding Fathers made it clear that the Militia was composed of the
populace at large. Both the Congress and Supreme Court have affirmed
this definition of the Militia.

*1. Founding Fathers*

* George Mason: "I ask, who are the militia? They consist now of the whole people, except a few public officers."184

* Virginia Constitution, Art. I, Sec. 13 (1776): "That a well-regulated militia, composed of the body of the people, trained to arms, is the proper, natural, and safe defense of a free State; that standing armies, in time of peace, should be avoided, as dangerous to liberty. . . ."

* Richard Henry Lee: "To preserve liberty, it is essential that the whole body of the people always possess arms, and be taught alike, especially when young, how to use them . . . . The mind that aims at a select militia [like the National Guard], must be influenced by a truly anti-republican principle."185

*2. U.S. Congress*

* The Militia Act of 1792. One year after the Second Amendment was added to the Constitution, Congress passed a law defining the militia. The Militia Act of 1792 declared that all free male citizens between the ages of 18 and 44 were to be members of the militia. Furthermore, every citizen was to be armed. The Act stated:

"Every citizen . . . [shall] provide himself with a good musket, or firelock, a sufficient bayonet and belt, two spare flints . . . ."186

The Militia Act of 1792 made no provision for any type of select militia such as the National Guard.

*\* U.S. Senate Subcommittee Report (1982). "In the Militia Act of 1792, the second Congress defined 'militia of the United States' to include almost every free adult male in the United States. These persons were obligated by law to possess a [military-style] firearm and a minimum supply of ammunition and military equipment. . . . There can be little doubt from this that when the Congress and the people spoke of the a 'militia,' they had reference to the traditional concept of the entire populace capable of bearing arms, and not to any formal group such as what is today called the National Guard."187*

*\* Current Federal Law: 10 U.S.C. Sec. 311. "The militia of the United States consists of all able-bodied males at least 17 years of age and . . . under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States . . . ."188*

*3. Supreme Court: U.S. v. Miller (1939). In this case, the Court stated that, "The Militia comprised all males physically capable of acting in concert for the common defense . . . [and that] when called for service, these men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."189*

*G. Myth #7: Trigger locks will help save lives.*

*1. Fact: Locking up firearms can cost lives during a life-threatening situation. Consider two different cases from California.*

*\* Merced. On the morning of August 23, 2000, Jonathon David Bruce attacked a houseful of kids. Armed with a pitchfork—and without a stitch of clothing on his body— Bruce proceeded to stab the children. Two of them died.*

*The oldest of the children, Jessica Carpenter (14), was quite proficient with firearms. She had been trained by her father and knew how to use them. There was just one problem: the guns were locked up in compliance with California state law. Unable to use the firearms, Jessica was forced to flee the house to get help. Mr. Bruce's*

murderous rampage was finally cut short when officers—
carrying guns—arrived on the scene.190

* San Francisco. Contrast the Carpenter's tragic situation
to that of A.D. Parker. In February 2000, he was
awakened by strange noises outside his bedroom in the
middle of the night. The 83-year-old Parker grabbed a
handgun he had not even used in several decades, went to
his bedroom door, and found himself face-to-face with a
thug holding a crowbar.

Thankfully, Mr. Parker didn't have to fiddle with a trigger
lock, remember a combination, or look for a key in the
dark room. He simply pointed the gun and pulled the
trigger. That is why he survived the attack.191

2. Fact: A trigger lock can be very difficult to remove from a firearm in an
emergency. Maryland Governor Parris Glendening struggled for at least
two whole minutes to remove a trigger lock at a training session in March
2000.192 If it can take that long to remove such a lock—when there's only
the pressure of being embarrassed in front of the cameras—what will a
trigger lock mean for a homeowner who needs to use his or her self-
defense gun during an emergency, in the bedroom, in the dark?

3. Fact: The Mafia favors trigger locks—for their victims. Mafia turncoat,
Sammy "the Bull" Gravano, expressed his love for gun control in an
interview with Vanity Fair: "Gun control? It's the best thing you can do for
crooks and gangsters. I want you to have nothing. If I'm a bad guy, I'm
always gonna have a gun. Safety locks? You pull the trigger with a lock on,
and I'll pull the trigger. We'll see who wins."193

H. Myth #8: A majority of Americans favor gun control.

1. Fact: Biases exist in almost any poll. Those who understand how politics
work will realize that many surveys get the "desired result" by asking
questions in a certain way. In fact, pollsters such as Harris and Gallup
have been severely criticized for designing gun-related questions that will
reach a preordained conclusion.194

2. Fact: The poll that counts takes place on Election Day. Because of the
potential for bias among pollsters, it is often helpful to see how voters

*respond to specific gun laws AFTER they are enacted. Even more to the point, it is helpful to see how anti-gun candidates have reacted to the elections where gun control was a hot button issue.*

*Gun rights were the number one issue in Bush's victory over Gore (2000)*

a. *Gun control views handed Gore a loss in three key Democratic states (Baltimore Sun). "Had Al Gore carried Bill Clinton's home state [Arkansas], his own home state [Tennessee] or what arguably has been the most reliable Democratic state in the country [West Virginia], he'd had been president. But Mr. Gore lost all three. Professionals in both parties think his position on gun control was the reason why."195*

b. *Democratic governors faulted Gore for pushing gun control (The Christian Science Monitor). "A group of Southern Democratic governors recently told reporters that they believed the gun-control issue had hurt Gore in their region [in November of 2000]. 'We like to hunt; we like to fish—and I think there was a perception in the last general election ... that [Gore] was out of step with what most of us thought about that issue,' said Gov. Roy Barnes (D) of Georgia."196*

c. *Gore officials lament how there is little voter "intensity" for gun control:*

*\* The New Republic Online: Democratic party strategists speak of an "intensity gap." "Guns are a motivating issue for a sizable number of voters on the right, but that's not matched elsewhere on the [left]," laments Gore spokesman Doug Hattaway.197*

*\* USA Today: "We lost a number of voters who on almost every other issue realized they'd be better off with Al Gore,"*

*Connecticut Sen. Joe Lieberman, Gore's running mate, says of the gun issue. "They were anxious ... about what would happen if Al was elected. This one matters a lot to people who otherwise want to vote for us."198*

*Gun control caused Democrats to lose their grip on Congress (1994)*

*a. President Bill Clinton repeatedly blamed gun control (which he supported) as the reason that Democrats lost control of the Congress during the elections of 1994:*

*\* January 14, 1995. "The fight for the assault -weapons ban cost 20 members their seats in Congress ... [and is] the reason the Republicans control the House."199*

*\* January 24, 1995. "I don't think it's a secret to anybody in this room that several members of the last Congress who voted for [the Brady bill and the semi-auto ban] aren't here tonight because they voted for it. . . . [A] lot of people laid down their seats in Congress."200*

*\* April 27, 1999. "There are some [Democrats] who would be on this platform today who lost their seats in 1994 because they voted for the Brady Bill and they voted for the assault weapons ban."201*

*June 4, 1999. "This Congress came to power after the 1994 elections because in critical races the people who voted for more modest things, like the Brady Bill . . . got beat. They got beat, Charlie."202 After the 1994 election, Campaigns & Elections magazine documented how the gun issue was a major factor in 55 races where pro-gun challengers beat sitting incumbents.203

Voters often support pro-gun positions on initiatives around the country

a. Washington voters shot down a trigger locks initiative by a whopping 71-29% margin in 1997.204

b. Wisconsin voters passed a Right to Keep and Bear Arms Constitutional Amendment by a 74-26% margin in 1998.205

c. Also in the state of Wisconsin, Milwaukee voters trounced a city-wide handgun ban in 1994. The initiative lost 67-33%.206

d. In 1982, California voters rejected (against heavy odds and a hostile media) Proposition 15, a statewide initiative which would have banned the possession of privately owned handguns. The handgun ban lost by a 63-37% margin.207

> *e. Even in liberal Massachusetts, voters*
> *overwhelmingly rejected a ban on handguns*
> *in 1976. More than 70 percent of voters cast*
> *their ballots against the ban.208*

*3. Fact: Several polls show that Americans are still pro-gun. While*
*affirming that the potential for bias exists in any given poll, there are,*
*nevertheless, several scientific polls indicating that the right to keep and*
*bear arms is revered—and gun control disdained—by a majority of*
*Americans today.*

> *a. In 2002, an ABC News poll found that almost three-*
> *fourths of the American public believe that the Second*
> *Amendment of the U.S. Constitution protects the rights of*
> *"individuals" to own guns.209*

> *b. Zogby pollsters found that by a more than 3 to 1*
> *margin, Americans support punishing "criminals who use*
> *a gun in the commission of a crime" over legislation to*
> *"ban handguns."210*

> *c. A Research 2000 poll found that 85% of Americans*
> *would find it appropriate for a principal or teacher to use*
> *"a gun at school to defend the lives of students" to stop a*
> *school massacre.211*

> *d. In a Time/CNN poll conducted just weeks after the*
> *September 11 terrorist attacks, 61 percent said they*
> *favored allowing pilots to carry guns.212 A subsequent*
> *poll conducted by Wilson Research Strategies found*
> *support for arming pilots had risen to almost seven in ten*
> *people (68 percent).213*

> *e. Shortly after the 1999 Columbine High School massacre*
> *in Littleton, Colorado, a Colorado News poll showed that*
> *65 percent of people surveyed favored a concealed-carry*
> *law allowing private citizens to carry firearms.214*

> *This finding shocked anti-gun spokesmen who felt that the then-recent tragedy should have suppressed support for gun rights in the state of Colorado. "What really surprises me is we're at ground zero and I would expect our numbers to be higher," said Arnie Grossman, co-founder of SAFE, an anti-gun group in Colorado. "I think it means we have a big job ahead of us."215*

--------

1 Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun," 86 The Journal of Criminal Law and Criminology, Northwestern University School of Law, 1 (Fall 1995):164.

Dr. Kleck is a professor in the school of criminology and criminal justice at Florida State University in Tallahassee. He has researched extensively and published several essays on the gun control issue. His book, Point Blank: Guns and Violence in America, has become a widely cited source in the gun control debate. In fact, this book earned Dr. Kleck the prestigious American Society of Criminology Michael J. Hindelang award for 1993. This award is given for the book published in the past two to three years that makes the most outstanding contribution to criminology.

Even those who don't like the conclusions Dr. Kleck reaches, cannot argue with his impeccable research and methodology. In "A Tribute to a View I Have Opposed," Marvin E. Wolfgang writes that, "What troubles me is the article by Gary Kleck and Marc Gertz. The reason I am troubled is that they have provided an almost clear-cut case of methodologically sound research in support of something I have theoretically opposed for years, namely, the use of a gun in defense against a criminal perpetrator. . . . I have to admit my admiration for the care and caution expressed in this article and this research. Can it be true that about two million instances occur each year in which a gun was used as a defensive measure against crime? It is hard to believe. Yet, it is hard to challenge the data collected. We do not have contrary evidence." Wolfgang, "A Tribute to a View I Have Opposed," The Journal of Criminal Law and Criminology, at 188.

Wolfgang says there is no "contrary evidence." Indeed, there are more than a dozen national polls—one of which was conducted by The Los Angeles Times—that have found figures comparable to the Kleck-Gertz study. Even the Clinton Justice Department (through the National Institute of Justice) found there were as many as 1.5 million defensive users of firearms every year. See National Institute of Justice, "Guns in America: National Survey on Private Ownership and Use of Firearms," Research in Brief (May 1997).

As for Dr. Kleck, readers of his materials may be interested to know that he is a member of the ACLU, Amnesty International USA, and Common Cause. He is not and has never been a member of or contributor to any advocacy group on either side of the gun control debate.

2 According to the National Safety Council, the total number of gun deaths (by accidents, suicides and homicides) account for less than 30,000 deaths per year. See Injury Facts, published yearly by the National Safety Council, Itasca, Illinois.
3 Philip J. Cook and Jens Ludwig, "Guns in America: National Survey on Private Ownership and Use of Firearms," NIJ Research in Brief (May 1997); available at http://www.ncjrs.org/txtfiles/165476.txt. The finding of 1.5 million yearly self-defense cases did not sit well with the anti-gun bias of the study's authors, who attempted to explain why there could not possibly be one and a half million cases of self-defense every year. Nevertheless, the 1.5 million figure is consistent with a mountain of independent surveys showing similar figures. The sponsors of these studies—nearly a dozen—are quite varied, and include anti-gun organizations, news media organizations, governments and commercial polling firms. See also Kleck and Gertz, supra note 1, pp. 182-183.

4 One of the authors of the University of Chicago study reported on the study's findings in John R. Lott, Jr., "More Guns, Less Violent Crime," The Wall Street Journal (28 August 1996). See also John R. Lott, Jr. and David B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," University of Chicago (15 August 1996); and Lott, More Guns, Less Crime (1998, 2000).

5 Jens Ludwig and Philip J. Cook, "Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act," Journal of the American Medical Association, vol. 284, no. 5 (August 2, 2000).

6 For football deaths, see Frederick O. Mueller, Annual Survey of Football Injury Research: 1931-2001, National Center for Catastrophic Sport Injury Research (February 2002) at http://www.unc.edu/depts/nccsi/SurveyofFootballInjuries.htm. For school firearms murders, see Dr. Ronald D. Stephens, "School Associated Violent Deaths," The National School Safety Center Report (June 3, 2002) at http://www.NSSC1.org. In addition to the 22 murders which occurred on school property or at school-sponsored events, there were another two shooting deaths which were accidents and twelve which were suicides.

7 The BATF estimates that licensed gun dealers sell about 4 million new firearms each year. See US Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Commerce in Firearms in the United States (February 2000), p. 6, which is available at http://www.atf.treas.gov/pub/fire-explo_pub/020400report.pdf. A similar statistic which tracks with the number of firearms sold is the production of new firearms. According to the American Firearms Industry, there were about 4 million new firearms produced each year during the first half of the 1990s in this country. See American Firearms Industry, Production: 1973-1995 at http://www.amfire.com/production.htm. Numbers revealing the drop in the U.S. murder rate during the 1990s, can be examined using the FBI's Uniform Crime Reports. Murders in the United States dropped from a high of 9.4 murders per 100,000 in 1990 to a rate of 5.7 per 100,000 in 1999—a drop of 39%.
8 Accidental gun deaths in the home decreased by 38% between 1990 and 1999. National Safety Council, Injury Facts

(2000), p. 125.

9 The CDC study examined gun and ammunition bans, waiting periods, background checks, lock-up your safety laws, plus much more. The inescapable conclusion was that the "evidence was insufficient" to show that such gun restrictions reduced crime rates. [Centers for Disease Control and Prevention, "First Reports Evaluating the Effectiveness of Strategies for Preventing Violence: Early Childhood Home Visitation and Firearms Laws," Morbidity and Mortality Weekly Report (October 3, 2003), vol. 52(No. RR-14):14-18.] It should be noted that Dr. John's Lott research—made widely available in More Guns, Less Crime (see supra note 4)—was part of the data examined by the CDC. The agency concluded there was no evidence to support the idea that "shall issue" carry laws reduce crime. Despite the agency's vote of no confidence in Lott's data, his research has been verified by other independent works, such as the one published in the Stanford Law Review. [Florenz Plassmann and John Whitley, "Confirming 'More Guns, Less Crime,'" Stanford Law Review (April 16, 2003), vol. 55:1313.]

This law review article by Plassmann and Whitley cites several other studies showing that concealed carry laws have made a positive impact on crime rates—in some cases, finding benefits much greater than what was reported in Lott's research. Those studies include the following: William Alan Bartley & Mark A. Cohen, The Effect of Concealed Weapons Laws: An Extreme Bound Analysis, 36 ECON. INQUIRY 258, 258-65 (1998); Stephen G. Bronars and John R. Lott, Jr., Criminal Deterrence, Geographic Spillovers, and Right-to-Carry Laws, AM. ECON. REV., May 1998, at 475-79; John R. Lott, Jr. & John E. Whitley, Safe-Storage Gun Laws: Accidental Deaths, Suicides, and Crime, 44 J.L. & ECON. 659, 659-89 (2001); Tomas B. Marvell, The Impact of Banning Juvenile Gun Possession, 44 J.L. & ECON. 691, 691-714 (2001); Carlisle E. Moody, Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness, 44 J.L. & ECON. 799, 799-813 (2001); David B. Mustard, The Impact of Gun Laws on Police Deaths, 44 J.L. & ECON. 635, 635-58 (2001); David E. Olson & Michael D. Maltz, Right-to-Carry Concealed Weapon Laws and Homicide in Large U.S. Counties: The Effect on Weapon Types, Victim Characteristics, and Victim-Offender Relationships, 44 J.L. & ECON. 747, 747-70 (2001); Florenz Plassmann & T. Nicolaus Tideman, Does the Right to Carry Concealed Handguns Deter Countable Crimes? Only a Count Analysis Can Say, 44 J.L. & ECON. 771, 771-98 (2001); Eric Helland & Alexander Tabarrok, Using Placebo Laws to Test "More Guns, Less Crime": A Note (Univ. of Chi. Graduate Sch. of Bus., Working Paper, 2002).

10 National Institute of Justice, "Homicide in Eight U.S. Cities: Trends, Context, and Policy Implications," Research Report (December 1997), p. 99.

11 Caroline Wolf Harlow, "Firearm Use by Offenders: Survey of Inmates in State and Federal Correctional Facilities," Bureau of Justice Statistics Special Report (November 2001), p. 1.

12 Daniel Merkle, "America: It's Our Right to Bear Arms," ABCNews.com (May 14, 2002). The poll of 1,028 adults was conducted between May 8 and 12 of 2002. The poll found that after hearing the text of the Second Amendment verbatim, 73 percent of the American public viewed the amendment as guaranteeing an individual right. Only 20 percent thought the amendment guaranteed the right of a state to maintain a militia.

13 "Zogby American Values Poll Results," The Washington Times (March 28, 2000).

14 Research 2000 of Rockville, Maryland. This survey was conducted from January 30 through February 1, 2002. A total of 1101 likely voters nationally were interviewed by telephone.

15 See supra notes 2 and 3.

17 Don B. Kates, "Guns and Public Health: Epidemic of Violence, or Pandemic of Propaganda?" in Gary Kleck & Kates, Armed: New Perspectives on Gun Control (2001), p.75.

17 Ibid.

18 "Handgun crime 'up' despite ban," BBC News Online (July 16, 2001) at

http://news.bbc.co.uk/low/english/uk/newsid_1440000/1440764.stm.

19 John van Kesteren, Pat Mayhew and Paul Nieuwbeerta, "Criminal Victimisation in Seventeen Industrialised Courtries: Key findings from the 2000 International Crime Victims Survey," (2000). This study can be read at

http://www.unicri.it/icvs/publications/index_pub.htm. The link is to the ICVS homepage; study data are available for download as Acrobat pdf files.

20 See supra note 1.

21 See supra note 2.

22 Kleck and Gertz, "Armed Resistance to Crime," at 173, 185.

23 Kleck and Gertz, "Armed Resistance to Crime," at 185.

24 See supra note 3.

25 Kleck, Point Blank: Guns and Violence in America, (1991):111-116, 148.

26 George F. Will, "Are We 'a Nation of Cowards'?," Newsweek (15 November 1993):93.

27 Id. at 164, 185.

28 Dr. Gary Kleck, interview with J. Neil Schulman, "Q and A: Guns, crime and self-defense," The Orange County Register (19 September 1993). In the interview with Schulman, Dr. Kleck reports on findings from a national survey which he and Dr. Marc Gertz conducted in Spring, 1993—a survey which findings were reported in Kleck and Gertz, "Armed Resistance to Crime."

29 See supra note 4.

30 Lott and Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns."

31 Kathleen O'Leary Morgan, Scott Morgan and Neal Quitno, "Rankings of States in Most Dangerous/Safest State Awards 1994 to 2003," Morgan Quitno Press (2004) at http://www.statestats.com/dang9403.htm. Morgan Quitno Press is an independent private research and publishing company which was founded in 1989. The company specializes in reference books and monthly reports that compare states and cities in several different subject areas. In the first 10 years in which they published their Safest State Award, Vermont has consistently remained one of the top five safest states.

32 Memo by Jim Smith, Secretary of State, Florida Department of State, Division of Licensing, Concealed Weapons/Firearms License Statistical Report (October 1, 2002).

33 Florida's murder rate was 11.4 per 100,000 in 1987, but only 5.5 in 2002. Compare Federal Bureau of Investigation, "Crime in the United States," Uniform Crime Reports, (1988): 7, 53; and FBI, (2003):10, 79.

34 From 1988 through 2002, there were 229 documented alligator attacks on human beings in Florida. This does not include any unreported encounters. Interview with Henry Cabbage, Media Relations for the Florida Fish and Wildlife Conservation, Tallahassee, Florida (25 July 2003). By contrast, there were only 155 CCW holders who used their guns during the same period to commit a crime. See supra note 32.

35 John R. Lott, Jr., "Right to carry would disprove horror stories," Kansas City Star, (12 July 2003).

36 The comparison period between Georgia and Wisconsin is for the years 1976 to 1993. The enactment of the national Brady waiting period in 1994 ended the ability to extend, beyond 1993, any comparison of waiting periods and concealed

carry laws in states such as Georgia and Wisconsin. Compare FBI, "Crime in the United States," Uniform Crime Reports (1977):45, 53; and FBI, (1994):70, 78.
37 Gary Kleck, "Crime Control Through the Private Use of Armed Force," Social Problems 35 (February 1988):15.
38 Compare Kleck, "Crime Control," at 15, and Chief Dwaine L. Wilson, City of Kennesaw Police Department, "Month to Month Statistics: 1991." (Residential burglary rates from 1981-1991 are based on statistics for the months of March - October.)
39 Kleck, Point Blank, at 140.
40 Kleck. "Crime Control," at 13.
41 U.S. Department of Justice, Law Enforcement Assistance Administration, Rape Victimization in 26 American Cities (1979), p. 31.
42 U.S., Department of Justice, National Institute of Justice, "The Armed Criminal in America: A Survey of Incarcerated Felons," Research Report (July 1985): 27.
43 Id.
44 Id.
45 Warren v. District of Columbia, D.C. App., 444 A. 2d 1 (1981). See also Richard W. Stevens, Dial 911 and Die (1999) which gives the laws and cases in all 50 states to support the statement that government (police) owes no duty to protect individual citizens from criminal attack.
46 Statement of Representative Ron Johnson in U.S. Senate, "Handgun Violence Prevention Act of 1987," Hearing before the Subcommittee on the Constitution of the Committee on the Judiciary (16 June 1987):33.
47 Bureau of Justice Statistics, Sourcebook of Criminal Justice Statistics—1990 (1991):257.
48 Interview with Brian A. Reaves, Ph.D., statistician for the Bureau of Justice Statistics in Washington, D.C. (January 11, 2001). In 1996. the total number (estimated) of all law enforcement combined (federal, state and local) that were on duty and assigned to respond to calls at any one time—on the average—was approximately 146,395 officers. There were 265,463,000 people living in the United States in 1996 for an actual ratio of 1,813 citizens for every officer. See also Kleck, Point Blank, at 132.
49 The murder rates for Washington, D.C. and the nation were 26.8 and 8.8 respectively in 1976. Their respective murder rates 25 years later were 40.6 and 5.6. These murder rates are based on the population per 100,000 people. FBI, "Crime in the United States," Uniform Crime Reports (1977 and 2002).
50 FBI, "Crime in the United States," Uniform Crime Reports (October 28, 2002): 77.
51 Id. at 190. According to Arlington County's Department of Planning, Housing and Development, the population in Arlington, Virginia for 2001 was 190,092.
52 Id. at 85.
53 Gary Kleck, speech delivered to the National Research Council, quoted in Don B. Kates, Jr., "Scholars' ignorant bias causes anti-gun sentiments," Handguns (June 1991), pp. 12-13.
54 "Gun Critic Shifts His Position," The Denver Post (November 28, 1985).
55 James D. Wright, "Second Thoughts About Gun Control," The Public Interest, 91 (Spring 1988):23, 25.
56 Dave Kopel, "Guns, Germs, and Science: Public Health Approaches to Gun Control," 84 The Journal of the Medical Association of Georgia (June 1995): 272.
57 Id.
58 Congressional Record (May 8, 1991), at H 2859. H 2862.
59 Wall Street Journal (March 3, 1994) at A10.
60 Jonathan T. Lovitt, "Survival for the armed," USA Today (May 4, 1992).
61 U.S. Senate, "The Right to Keep and Bear Arms," Report of the Subcommittee on the Constitution of the Committee on the Judiciary, (1982):12.
62 U.S. v. Verdugo-Urquidez, 494 US 259 (1990).
63 The court stated, "The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any less necessary the immunity of the press from previous restraint in dealing with official misconduct. Subsequent punishment for such abuses as may exist is the appropriate remedy, consistent with constitutional privilege." Near v. Minnesota, 283 U.S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (1931).
64 Alan Korwin, Brady Law Closes Gun Stores More Than 8 Days, (Bloomfield Press: July 28, 1999). Bloomfield Press can be contacted at http://www.bloomfieldpress.com.
65 Richard B. Abell, Assistant Attorney General, Task Force Chairman, Report to the Attorney General on Systems for Identifying Felons Who Attempt to Purchase Firearms (October 1989), p. 75.
66 Bureau of Justice Assistance, Grant Manager's Memorandum, Pt. 1: Project Summary (September 30, 1994), Project Number: 94-DD-CX-0166.
67 Copy of "FIST" (Firearms Inquiry Statistical Tracking) software at GOA headquarters, Springfield, VA. See also Pennsylvania Sportsmen's News (Oct./Nov. 1996). The default in the "FIST" computer software is for the police officials to indefinitely retain the information on gun owners—despite the fact that the Brady law only allows officials to retain this data for 20 days. One wonders who will ensure that this information will be deleted after the 20th day.
68 Mike Slavonic, NRA Director and Chairman of the Legislative Committee for the Allegheny County Sportsmen's League, states that the instant background check could be "our downfall." He notes that, "What most Americans don't know is that once instant check goes into effect in 1998 the purpose of Brady could be used to set the stage for national confiscation. Instant check could eventually keep guns out of the hands of everyone by registering everyone who purchases a handgun, rifle and shotgun and who obtained concealed weapons permits in a computerized database like 'FIST'. The most difficult problem with a gun ban is locating the firearms. FIST [with the help of the instant check], over time, could solve that problem." Slavonic, "Another Gun Database Discovered," Pennsylvania Sportsmen's News (Oct./Nov. 1996) at 7.
69 FBI's Final Rule printed in the Federal Register (October 30, 1998) at 58311. After the FBI submitted its proposed regulations on June 4, 1998, Gun Owners of America submitted written comments (in September of 1988) to challenge the FBI's regulations. GOA stated, "These proposed regulations are unlawful and unconstitutional. They are so fundamentally corrupt that there are no incremental changes which will even marginally improve them. Rest assured that they will be challenged in every possible judicial and legislative forum. . . . The efforts to retain information on gun owners for eighteen months—and indefinitely in your computer backup system—constitutes an illegal system of firearms registration, in violation of 18 U.S.C. 926. The same is, in fact, true even for efforts to retain information about persons prohibited from purchasing firearms."
70 David B. Kopel, Policy Review 63 (Winter 1993):6.
71 Kopel, ed., Guns: Who Should Have Them? (1995) at 88, 117 (fn. 75), and 122 (fn. 124).

72 See supra note 5.

73 Scully. "Supremacist's shooting spree could spur gun control moves," The Washington Times (July 8, 1999).

74 Attorney General Betty D. Montgomery, "The U.S. Supreme Court's Action in Striking Portions of the Brady Act," News Statement (June 30, 1997).

75 Department of Justice, "Survey of Incarcerated Felons," p. 36.

76 Pierre Thomas, "In the Line of Fire: The 'Straw Purchase' Scam," The Washington Post (August 18, 1991); and Thomas, "Va. Driver's License is Loophole for Guns: Fake Addresses Used in No-Wait Sales," The Washington Post (January 20, 1992).

77 National Institute of Justice, "Homicide in Eight U.S. Cities: Trends, Context, and Policy Implications," Research Report (December 1997), p. 99.

78 Meghan Hoyer, "Brady Act results overstated in Indiana," Indianapolis Star and News (June 23, 1998).

79 See General Accounting Office, "Gun Control: Implementation of the Brady Handgun Violence Prevention Act," Report to the Committee on the Judiciary, U.S. Senate, and the Committee on the Judiciary, House of Representatives (January 1996), p. 8.

80 The Washington Times noted in July of 1999 that:

Although federal officials say about 400,000 persons have been prevented from buying guns by the instant check system, only one has been prosecuted by the Department of Justice in the last three years. [Sean Scully, "Supremacist's shooting spree could spur gun control moves," The Washington Times (July 8, 1999).]

That made for a whopping total of just eight prosecutions and merely three persons sent to jail in the first five years the Brady Law was in existence. One certainly had to conclude that the Brady Law was not working to put criminals behind bars. There are no reliable, government statistics that regularly update the public on how many Brady violators are being incarcerated. However, everyone agrees the number is very low. For example, a training manual produced by Handgun Control, Inc., guides its activists in how to answer a question regarding the low number of convictions under the Brady Law. The manual basically says, when you are asked why so few people are being sent to jail under Brady, just ignore the question. The question posed in the manual reads: "Q: You claim that the Brady Law works, why have only 7 people been convicted for violating the law?" To answer this question, the manual encourages activists to go on the offensive and say the following: "A quarter-million high-risk people have been stopped from buying firearms since 1994, and that was always the point of the Brady law. Ninety percent of Americans agree that background checks and waiting periods are sensible regulations that protect public safety. With the success of the Brady law, the only people who continue to oppose regulating guns like other products are the gun lobby and the politicians who receive their enormous campaign contributions." [Naomi Paiss, "Sense and Sanity: A Guide to Talking about Gun Control," Handgun Control, Center to Prevent Handgun Violence (November 1997).] In other words, since there is no good answer to this question, from their perspective, activists are to remember three words: Attack, Attack, Attack.

81 Of persons denied the right to purchase a firearm under the Brady Law, 7.6 percent of the denials involved routine traffic stops. Another 38.9 percent were the result of administrative snafus. Only 44.7 percent of denials were as a result of felony convictions, and many of these resulted from white collar crimes and ancient peccadilloes which would not suggest that the person would pose a danger. See supra note 79 at 39-40, 64-65.

82 Id., at 4.

83 Id.

84 On August 16, 1991, New York City Mayor David Dinkins signed Local Law 78 which banned the possession and sale of certain rifles and shotguns.

85 John Marzulli, "Weapons ban defied: S.I. man, arsenal seized," Daily News (September 5, 1992).

86 "Thousands of Californians Become Instant Criminals," The New Gun Week (March 1, 1998). See also "Gun Confiscation Begins: Gun Law Victim Holds Press Conference and Turns in Gun to Local Officials," NRA Press Release (January 28, 1998).

87 Id.

88 To read a photocopy of this notice, go to http://www.gunowners.org/fs9906.htm.

89 Id.

90 David Kopel, "Trust the People: The Case Against Gun Control," [Cato Institute] Policy Analysis 109 (July 11, 1988):25.

91 Jay Simkin, Aaron Zelman and Alan M. Rice, Lethal Laws: "Gun Control" is the Key to Genocide, (Milwaukee: Jews for the Preservation of Firearms Ownership, 1994).

92 Senate, "Handgun Violence," at 107, citing Novae Russkae Slovo, Vol. LXXII, No. 26.291, (6 Nov. 1983).

93 Kopel, "Trust the People," at 26.

94 Id., at 25-26.

95 U.S. News & World Report, (17 January 1994): 8.

96 Lamont v. Postmaster General, 381 U.S. 301, 85 S. Ct. 1493, 14 L. Ed. 2d 398 (1965).

97 Dr. Edward Ezell presented testimony before the Senate Subcommittee on the Constitution in 1989, and while doing so, helped clarify the true definition of an "assault rifle." The subcommittee record reports the following credentials for Dr. Ezell: Curator of the National Firearms Collection at the Smithsonian Institution's National Museum of American History, and founding Director of the Institute for Research on Small Arms in International Security.

98 Statement by Edward Ezell, "Assault Weapons," Hearings Before the Subcommittee on the Constitution of the Committee on the Judiciary, U.S. Senate, (5 May 1989):396.

99 Defense Intelligence Agency, Small Arms Identification and Operation Guide—Eurasian Communist Countries (Washington, D.C.: Government Printing Office, 1988):105, cited in Kopel, Guns: Who Should Have Them? at 162.

100 Kleck, Point Blank, at 70.

101 Senate, "Assault Weapons," at 396.

102 Officer William R. McGrath, "An Open Letter to American Politicians," The Police Marksman (May/June 1989): 19.

103 Id.

104 Id.

105 Congressional Record, 13 September 1990:E 2826, citing [Police Advertisement], Roll Call, 3 September 1990. Also, see Howard Schneider, "Gun Owners Take Shot at Schaefer Assault-Weapon Bill," The Washington Post (February 15, 1991).

106 Iver Peterson, "Both Sides Say Trenton's Ban on Assault Rifles Has Little Effect on Crime," The New York Times (June 20, 1993).

107 Id.

108 U.S. Department of Justice, Bureau of Justice Statistics, "Survey of State Prison Inmates, 1991" (March 1993):18.

109 FBI, "Crime in the United States," (1994):18.

110 Matt L. Rodriguez, Superintendent of Police for the City of Chicago, 1993 Murder Analysis at 12, 13.

111 Compare FBI, "Law Enforcement Officers Killed and Assaulted," Uniform Crime Reports, for the years 1989 (0 officers); 1990 (two officers), at 24, 36; 1991 (three officers), at 40, 41, 45; 1992 (two officers), at 46; 1993 (2 officers), at 41, 45. Note: In 1993, there were three officers who died by unknown firearms which possibly could have been classified as semi-automatic "assault weapons." (FBI, "Law Enforcement Officers Killed and Assaulted, 1993," at 55.) These three died at Waco, Texas—a jury later finding that authorities had provoked the residents at Mt. Carmel into firing. (Carol Moore, The Davidian Massacre (1995): 450.) Also supporting this view were two BATF agents who initially told the Texas Rangers that authorities had fired first upon the Davidians. (J.L.Pate, "Prosecution Against Waco Survivors Begins," The New Gun Week, (11 February 1994):5.) Despite the jury's finding that authorities provoked the residents in Mt. Carmel into firing, Newsweek and other news sources have pointed out that the officers might have died from "friendly fire." ("Was it Friendly Fire? In the bungled Waco raid, federal agents may have been shot by their own men," Newsweek, (5 April 1993):50.)

112 In the five years of 1989 to 1993, 30 officers were killed by their own service weapons. By contrast, only 9 officers were killed by so-called assault weapons. Id, for the years 1989, at 4; 1990, at 4, 24, 36; 1991, at 4, 40, 41, 45; 1992, at 4, 46; 1993, at 4, 41, 45.

113 In the five years of 1989 to 1993, 15 officers were killed by knives and blunt objects. By contrast, only nine officers were killed by so-called assault weapons. Compare FBI, "Officers Killed," for the years 1989, at 4, 13, 26; 1990, at 4, 12, 24, 36; and 1991, at 4, 40, 41, 45; 1992, at 4, 46; 1993, at 4, 13, 41, 45.

114 By using an inflated definition of "assault weapon," HCI attempts to "show" that these guns killed 36 percent (a minority) of the policemen who were murdered between January 1, 1994 and September 30, 1995. Of course, HCI's figure wildly departs from the 1% figure given by official government studies. (See supra note 108.) See Handgun Control, Inc., Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines, (29 November 1995):2.

115 Id. The HCI study borrowed the very expansive definition of semi-automatic firearm from the Clinton gun ban which passed in 1994. This definition is so broad that it covers over 180 types of firearms, including reproductions of the 1873 Winchester and the 1860 Henry Rifles. (While the Clinton gun ban exempted reproductions of these two guns under section 922(v)(3) of Title 18—the provisions defining what a semi-automatic "assault weapon" is—the ban did not exempt these rifles under section 922(w)—the provision banning high-capacity magazines. Both of these rifles have tubular-fed magazines holding over 10 rounds, thus making them banned firearms.)

The generic definition for an "assault weapon" in the Clinton gun ban would include many, many other guns, had the law failed to specifically exclude several hundreds of common guns which would have easily fallen under the definition of an "assault weapon."

Not surprisingly, by using President Clinton's over-inflated definition of an "assault weapon," HCI was able to find more and more of these guns killing officers. To extend their logic, if HCI figures a way to define ALL guns as "assault weapons," then it will be able to claim that these "assault weapons" comprise 100 percent of the guns that kill policemen.

Even so, HCI has now encountered a dilemma with the publishing of their study: their study "shows" that there has been a dramatic increase in the number of policemen being killed by so-called assault weapons AFTER the ban was put in place. (HCI claims that 36% of the guns killing officers are "assault weapons," but the government's own pre-ban figures show the number was only one percent. See supra note 108.) Thus, either HCI's data is wrong, or it must concede that gun control INCREASES the threat to police officers.

116 Keith Bea, Congressional Research Service, "'Assault Weapons': Military-Style Semiautomatic Firearms Facts and Issues," CRS Report for Congress (13 May 1992, Technical Revisions: 4 June 1992): 65.

117 Id. at 67.

118 Id. at 69.

119 Kleck, Point Blank, at 75.

120 Massad Ayoob, "Defending Firepower," Combat Handguns (October 1990), p. 71.

121 Id. at 70.

122 Id. at 25.

123 Id. at 71.

124 "Koreans make armed stand to protect shops from looters," Roanoke Times & World-News, 3 May 1992.

125 U.S. Senate, "The Right to Keep and Bear Arms," Report of the Subcommittee on the Constitution of the Committee on the Judiciary (1982):7.

126 U.S. v. Miller, 307 U.S. 174 (1939).

127 The Institute of Medicine says the number of yearly deaths in the United States resulting from medical errors ranges from 44,000 to 98,000 people. See Linda T. Kohn, Janet M. Corrigan, and Molla S. Donaldson, ed., "To Err is Human: Building a Safer Health System," National Academy Press (2000). The full text of this report is available at http://www.nap.edu/books/0309068371/html.

128 From 1970 to 1991, the number of fatal gun accidents for children aged 0-14 declined from 530 to 227. Kopel, Guns: Who Should Have Them? at 311. And according to the National Safety Council, the decline has continued as there were only 142 fatal gun accidents for children in that age group in 1997. National Safety Council, Injury Facts: 2000 Edition, at 18.

129 Kleck, Point Blank, at 271, 276.

130 Id. at 286.

131 Id. at 276, 277.

132 According to Dr. Kleck, the number of children who take guns to school is between 16,000 and 17,000 students on any given day—or about 1 in every 800 high school students. Kleck, cited in Kopel, Guns: Who Should Have Them?, at 323.

133 See supra note 6.

134 National Safety Council, Injury Facts: 2000 Edition, p. 10, 11, 18.

135 Alan Korwin, Researcher Finds Federal Gun Law Grew Nearly 6% in 1998, at http://www.bloomfieldpress.com/6percent.htm.

136 Kopel, Guns: Who Should Have Them?, at 355.

137 Id., at 356.

138 Id., at 359.

139 Id., at 360. Kopel notes how several infamous criminals—such as John Hinckley (who shot Jim Brady) and George Hennard (who killed 22 people at Luby's Cafeteria in Killeen, Texas)—were each reenacting scenes from movies that they had previously seen or studied.

140 Steve Twomey, "Indiscretions That Are Not So Youthful," The Washington Post (December 6, 1993).

141 Christine Biegler, "Fearing crime, more women buy firearms," The Washington Times (November 19, 1992).

142 Paxton Quigley, Armed & Female (1989): 7.

143 According to Dr. Gary Kleck, about 205,000 women use guns every year to protect themselves against sexual abuse. Kleck and Gertz, "Armed Resistance to Crime," at 185.

144 Don B. Kates, Jr., Guns, Murders, and the Constitution: A Realistic Assessment of Gun Control (1990), at 29, citing U.S. Bureau of Justice Statistics.

145 Id., at 25. 26.

146 Dr. Edgar A. Suter, "Guns in the Medical Literature—A Failure of Peer Review," The Journal of the Medical Association of Georgia, vol. 83 (March 1994):136.

147 Kleck and Gertz, "Armed Resistance to Crime," at 173, 185.

148 Don B. Kates, "Guns and Public Health: Epidemic of Violence, or Pandemic of Propaganda?" in Gary Kleck & Kates, Armed: New Perspectives on Gun Control (2001), p. 79.

149 Ibid., p. 75.

150 Ibid., p. 76.

151 Criminal histories of murder victims is based on statistics from the city of Chicago: Matt L. Rodriguez, Superintendent of Police for the City of Chicago, 1997 Murder Analysis, at 21; 1996 Murder Analysis, at 21; and 1995 Murder Analysis, at 21. For the city of Chicago, 76% of murderers have prior criminal records. For criminal histories of murderers nationwide, see Bureau of Justice Statistics, National Update (October 1991): 4.

152 Bureau of Justice Statistics, National Update, at 4.

153 Kleck, Point Blank, at 393, 394; Colin Greenwood, Chief Inspector of West Yorkshire Constabulary, Firearms Control: A Study of Armed Crime and Firearms Control in England and Wales (1972):31; David Kopel, The Samurai, the Mountie, and the Cowboy: Should America Adopt the Gun Controls of Other Democracies (1992):91, 154.

154 Dr. John R. Lott, Jr., "Gun laws don't reduce crime," USA Today (May 9, 2002). See also Rhett Watson and Matthew Bayley, "Gun crime up 40pc since Port Arthur," The Daily Telegraph (April 28, 2002). See also supra note 155.

155 Gary A. Mauser, "The Failed Experiment: Gun Control and Public Safety in Canada, Australia, England and Wales," Public Policy Sources (The Fraser Institute, November 2003), no. 71:4. This study can be accessed at http://www.fraserinstitute.org/shared/readmore.asp?sNav=pb&id=604.

156 "Handgun crime 'up' despite ban," BBC News Online (July 16, 2001) at http://news.bbc.co.uk/low/english/uk/newsid_1440000/1440764.stm. England is a prime example of how crime has increased after implementing gun control. For example, the original Pistols Act of 1903 did not stop murders from increasing on the island. The number of murders in England was 68 percent higher the year after the ban's enactment (1904) as opposed to the year before (1902). (Greenwood, supra note 153.) This was not an aberration, as almost seven decades later, firearms crimes in the U.K. were still on the rise: the number of cases where firearms were used or carried in a crime skyrocketed almost 1,000 percent from 1946 through 1969. (Greenwood,

supra note 153 at 159.) And by 1996, the murder rate in England was 132 percent higher than it had been before the original gun ban of 1903 was enacted. (Compare Greenwood, supra note 153, with Bureau of Justice Statistics, Crime and Justice in the United States and in England and Wales, 1981-96, Bureau of Justice Statistics, October 1998).

157 "Crime rising in Japan, while arrests at record low: police," AFP News (August 3, 2001); "A crime wave alarms Japan, once gun-free," The Philadelphia Inquirer, 11 July 1992.

158 "Most Crime Worse in England Than US, Study Says," Reuters (October 11, 1998). See also Bureau of Justice Statistics, Crime and Justice in the United States and in England and Wales, 1981-96 (October 1998).

159 See BJS study, supra note 158 at iii.

160 John van Kesteren, Pat Mayhew and Paul Nieuwbeerta, "Criminal Victimisation in Seventeen Industrialised Courtries: Key findings from the 2000 International Crime Victims Survey," (2000). This study can be read at http://www.unicri.it/icvs/publications/index_pub.htm. The link is to the ICVS homepage; study data are available for download as Acrobat pdf files.

161 Ian Henry and Tim Reid, "Crime figures a sham, say police," The Electronic Telegraph (April 1, 1996).

162 Tim Reid, "Police are accused of fiddling crime data," The Electronic Telegraph (May 4, 1997).

163 John Steele, "Police figures under-record offences by 20 percent," The Electronic Telegraph (July 13, 2000).

164 See supra note 161.

165 Ibid.

166 Ibid.

167 See supra note 162.

168 Dave Kopel, Dr. Paul Gallant and Dr. Joanne Eisen, "Britain: From Bad to Worse," NewsMax.com (March 22, 2001).

169 The number of people killed by their own government in Europe averages about 400,000 for the last 70 years. This includes Hitler's extermination of Jews, gypsies and other peoples (20,946,000); Stalin's genocide against the Ukrainian kulaks (6,500,000); and more. R.J. Rummel, Death by Government (2000), pp. 8 and 80.

170 At our historic worst, murders in the United States approached 25,000 in 1993—or 23,180 to be exact. So even applying our highest single-year tally over the past 70 years would mean that Europeans have experienced 16 times as many murders as we have in the United States.

171 THE FEDERALIST 46 (James Madison).

172 FBI, "Crime in the United States" (1996): 58.

173 United States Senate, A Majority Staff Report prepared for the use of the Committee on the Judiciary, 1991 Murder Toll: Initial Projections (August 1991).

174 Gary Fields, "Gun Conundrum: More on Streets, Fewer Reports of Deaths, Woundings," The Wall Street Journal (December 11, 2000).

175 See supra note 4.

176 U.S. Senate, "The Right to Keep and Bear Arms," Report of the Subcommittee on the Constitution of the Committee on the Judiciary (1982): 8-17.

177 Id., at 12.

178 U.S. v. Verdugo-Urquidez, 494 US 259 (1990).

179 U.S. v. Lopez, 514 US 549 (1995).

180 Printz v. U.S., 521 US 98 (1997).

181 David B. Kopel, Stephen P. Halbrook and Alan Korwin, Supreme Court Gun Cases: Two Centuries of Gun Rights Revealed (2004), p. 75. The quote in the text comes from an article in the book by Kopel. The article is entitled, "The Supreme Court's Thirty-five Other Gun Cases: What the Supreme Court has said about the Second Amendment."

182 U.S. Senate, "The Right to Keep and Bear Arms," at 9. See also Stephen P. Halbrook, That Every Man be Armed: The

Evolution of a Constitutional Right (1984): 107-153.

The Senate sponsor of the 14th Amendment, Senator Jacob Howard (R-MI), said the Amendment would force the states to respect "the personal rights guaranteed and secured by the first eight amendments of the Constitution; such as freedom of speech and of the press; . . . the right to keep and bear arms . . . ." Cong. Globe, 39th Cong., 1st Sess., pt. 3, 2765 (23 May 1866), cited in Halbrook, at 112.

The House author of the 14th Amendment, Rep. John Bingham (R-OH), said that the first eight amendments to the U.S. Constitution "never were limitations upon the power of the States, until made so by the fourteenth amendment. The words of that amendment, 'no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States,' are an express prohibition upon every State of the Union." Cong. Globe, 42d Cong., 1st Sess., pt. 2, Appendix, 84 (31 Mr. 1871), cited in Halbrook, at 146. (Rep. Bingham stated that the "privileges and immunities of citizens of a State, are chiefly defined in the first eight amendments to the Constitution of the United States.")

That the Fourteenth Amendment was intended, among other things, to prevent states from disarming black citizens is clear. During debate over the 14th Amendment, Senator Thomas Hendricks (D-IN) bragged that "colored" people in his state do not enjoy the same rights as white people. Thus, he opposed adoption of the 14th Amendment because among other things, it would grant Second Amendment rights to the "negroes, the coolies, and the Indians." Cong. Globe, 39th Cong., 1st Sess., pt. 3, 2939 (4 June 1866) cited in Halbrook, at 113.

183 Public Law 99-308, Sect. 1(b).

184 Elliot, 3:425.

185 [Richard Henry Lee]. Letters from the Federal Farmer to the Republican, ed. Walter Hartwell Bennett (Alabama: The University of Alabama Press, 1978): 124.

186 Militia Act of 1792, printed in John F. Callan, The Military Laws of the United States (Baltimore: John Murphy & Co., 1858): 65.

187 U.S. Senate, "The Right to Keep and Bear Arms," Report of the Subcommittee on the Constitution of the Committee on the Judiciary (1982):7.

188 Title 10 of the U.S. Code (Sec. 311) also defines the Militia to include "female citizens of the United States who are members of the National Guard." The Code then divides the Militia into two groups—the "unorganized" militia (the body of the people) and the "organized" militia (the National Guard). This two-fold division of the Militia was not added to federal law until 1903.

189 U.S. v. Miller, 307 U.S. 174 (1939).

190 Kimi Yoshino, "Gun advocates say fear of liability keeps parents from teaching survival skills," The Fresno Bee (August 26, 2000).

191 William Rasberry, "Ask A.D. Parker about gun control," The Denver Post (March 20, 2000).

192 Gerald Mizejewski, "Device wins police praise but fails to move skeptics," The Washington Times (March 23, 2000).

193 Interview with Sammy Gravano in Howard Blum, "The Reluctant Don," Vanity Fair (September 1999), p. 165.

194 In Gun Facts, Guy Smith astutely observes that pollsters will often use questions like "If it reduced crime, would you favor stronger gun control laws." These questions, he says, are then rephrased in an editor's headline to read "Americans demand gun control" while ignoring the leading goal of reducing crime. These surveys also fail in one other important respect, Smith says. They fail to ask counter balancing questions to prove/disprove any bias in questions. For example, a counter-balancing question might be "If it were shown that gun control laws were ineffective in preventing crime, would you favor enacting more gun control laws?" Guy Smith, Gun Facts (2001) at

http://www.KeepAndBearArms.com/images/gunfacts.pdf.

195 Jack Kelly, "Moms Make Too Much of Guns," The Baltimore Sun (May 22, 2001).

196 Liz Marlantes, "Democrats tone down gun-control stance: After years of pushing restrictions, they're on a new quest to capture southern votes," The Christian Science Monitor (May 10, 2002).

197 Noam Scheiber, "The Dems abandou gun control: Gun shy," The New Republic Online (January 24, 2001).

198 Susan Page, "Democrats sing new tune on gun control," USA Today (August 13, 2001).

199 Evelyn Theiss, "Clinton blames losses on NRA," The (Cleveland) Plain Dealer (January 14, 1995).

200 President Bill Clinton, State of the Union Address (January 24, 1995).

201 The White House, Office of the Press Secretary, "Remarks by the President and the First Lady on Gun Control Legislation," White House Briefing Room (April 27, 1999).

202 President Bill Clinton on ABC's Good Morning America (June 4, 1999).

203 Brady O'Leary, "Fire Power: Surprising poll results and election returns show that the National Rifle Association had a lot more to do with November 8 than most pundits realize," Campaigns & Elections (December/January 1995), pp. 32-34.

204 Michelle Malkin, "Feminization of gun debate drowns out sober analysis," Seattle Times (June 23, 1998).

205 "Election 98," Milwaukee Journal Sentinel (November 5, 1998).

206 "Ballot Issues," Chicago Sun-Times (November 10, 1994). Neal Knox, "Referendums Defeated In Milwaukee, Kenosha," Online Report to the Firearms Coalition (January 10, 1995).at http://www.rkba.org/knox/9jan95.

207 Josh Sugarman, The National Rifle Association: Money, Firepower and Fear (1992) at

http://www.vpc.org/nrainfo/chapter2.html.

208 Tanya Metaksa, "The Price of Appeasement," FrontPageMagazine.com (October 24, 2000).

209 Daniel Merkle, "America: It's Our Right to Bear Arms: ABCNEWS.com Poll Finds Most Support Individuals' Right to Own Guns," ABCNEWS.com (May 14, 2002). The poll of 1,028 adults was conducted between May 8 and 12 of 2002. The poll found that after hearing the text of the Second Amendment verbatim, 73 percent of the American public viewed the amendment as guaranteeing an individual right. Only 20 percent thought the amendment guaranteed the right of a state to maintain a militia.

210 "Zogby American Values Poll Results," The Washington Times (March 28, 2000).

211 Research 2000 of Rockville, Maryland. This survey was conducted from January 30 through February 1, 2002. A total of 1101 likely voters nationally were interviewed by telephone.

212 Nancy Wong, "American Confidence in Bush Remains High Post Attacks," Harris Interactive (October 3, 2001) at http://www.harrisinteractive.com/news/allnewsbydate.asp?NewsID=369.

213 "Poll: Majority Support Guns in the Cockpit," U.S. Newswire (May 14, 2002) at

http://www.usnewswire.com/topnews/first/0514-127.html.

214 Carla Crowder, "Gun-Control Opinions Unchanged," Denver Rocky Mountain News (May 20, 1999). The Colorado News Poll was conducted between May 6 – 16 of 1999 for the Denver Rocky Mountain News and News4 in Denver. Results were

based on 600 random phone interviews with Coloradans.
215 Ibid.

© 2009 by Gun Owners of America
8001 Forbes Place, Suite 102, Springfield, VA 22151 - Phone: 703-321-8585 - Fax: 703-321-8408
The information contained herein may be disseminated for non-commercial purposes as long as credit is given to GOA.

1

2

3

4

5

6

7 <div style="text-align:center">**Exhibit "22"**</div>

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div style="text-align:center">- 83 -</div>

<div style="text-align:center">**Complaint for Monetary Damages, Declaratory And Injunctive Relief And Demand For Jury Trial**</div>

U.S. Department of Justice    Federal Bureau of Investigation    *Criminal Justice Information Services Division*
FEEDBACK   CONTACT US   DATA QUALITY GUIDELINES   UCR HOME

CIUS Home   Offenses Known to Law Enforcement   Violent Crime   Property Crime   Clearances   Persons Arrested   Police Employee Data   About CIUS

Return to Previous Page

# Table 5

**Crime in the United States**
by State, 2008

Data Declaration   Download Excel

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar- ti |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **ALABAMA** | Metropolitan Statistical Area | | 3,328,232 | | | | | | | | |
| | | Area actually reporting | 95.8% | 15,761 | 285 | 1,119 | 6,323 | 8,054 | 145,200 | 38,552 | |
| | | Estimated total | 100.0% | 16,207 | 289 | 1,157 | 6,439 | 8,322 | 149,171 | 39,784 | |
| | Cities outside metropolitan areas | | 599,012 | | | | | | | | |
| | | Area actually reporting | 81.6% | 2,972 | 37 | 248 | 654 | 2,035 | 24,945 | 5,801 | |
| | | Estimated total | 100.0% | 3,619 | 45 | 299 | 790 | 2,485 | 30,320 | 7,068 | |
| | Nonmetropolitan counties | | 734,656 | | | | | | | | |
| | | Area actually reporting | 91.8% | 1,179 | 17 | 148 | 107 | 907 | 9,980 | 3,282 | |
| | | Estimated total | 100.0% | 1,285 | 19 | 161 | 117 | 988 | 10,852 | 3,576 | |
| | **State Total** | | **4,661,900** | **21,111** | **353** | **1,617** | **7,346** | **11,795** | **190,343** | **50,408** | **1.** |
| | | Rate per 100,000 inhabitants | | 452.8 | 7.6 | 34.7 | 157.6 | 253.0 | 4,082.9 | 1,081.3 | 2 |
| **ALASKA** | Metropolitan Statistical Area | | 338,417 | | | | | | | | |
| | | Area actually reporting | 100.0% | 3,068 | 13 | 310 | 582 | 2,163 | 11,609 | 1,439 | |
| | Cities outside metropolitan areas | | 121,702 | | | | | | | | |
| | | Area actually reporting | 89.7% | 570 | 5 | 71 | 27 | 467 | 3,804 | 556 | |
| | | Estimated total | 100.0% | 635 | 6 | 79 | 30 | 520 | 4,341 | 620 | |
| | Nonmetropolitan counties | | 226,174 | | | | | | | | |
| | | Area actually reporting | 100.0% | 771 | 9 | 52 | 33 | 677 | 4,174 | 1,181 | |
| | **State Total** | | **686,293** | **4,474** | **28** | **441** | **645** | **3,360** | **20,124** | **3,240** | |
| | | Rate per 100,000 inhabitants | | 651.9 | 4.1 | 64.3 | 94.0 | 489.6 | 2,932.3 | 472.1 | 2 |
| **ARIZONA** | Metropolitan Statistical Area | | 6,032,461 | | | | | | | | |
| | | Area actually reporting | 99.5% | 27,035 | 398 | 1,563 | 9,549 | 15,505 | 266,499 | 53,086 | 1. |
| | | Estimated total | 100.0% | 27,133 | 399 | 1,590 | 9,579 | 15,565 | 267,706 | 53,381 | 1. |
| | Cities outside metropolitan areas | | 292,905 | | | | | | | | |
| | | Area actually reporting | 83.7% | 601 | 3 | 41 | 80 | 477 | 6,548 | 1,511 | |
| | | Estimated total | 100.0% | 958 | 4 | 49 | 96 | 809 | 7,820 | 1,805 | |
| | | | 265,214 | | | | | | | | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar u |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Area actually reporting | 100.0% | 966 | 4 | 34 | 22 | 906 | 3,392 | 1,315 | |
| | State Total | | 6,500,180 | 29,059 | 407 | 1,673 | 9,597 | 17,282 | 276,920 | 56,481 | 1t |
| | | Rate per 100,000 inhabitants | | 447.0 | 6.3 | 25.7 | 149.2 | 265.9 | 4,291.0 | 868.9 | 2 |
| ARKANSAS | Metropolitan Statistical Area | | 1,709,152 | | | | | | | | |
| | | Area actually reporting | 98.1% | 10,254 | 111 | 850 | 2,223 | 6,970 | 74,982 | 21,710 | 4 |
| | | Estimated total | 100.0% | 10,382 | 111 | 984 | 2,240 | 7,087 | 76,003 | 22,062 | 4 |
| | Cities outside metropolitan areas | | 500,029 | | | | | | | | |
| | | Area actually reporting | 96.5% | 2,651 | 20 | 257 | 410 | 1,964 | 22,084 | 7,549 | |
| | | Estimated total | 100.0% | 2,747 | 21 | 266 | 425 | 2,035 | 22,884 | 7,822 | |
| | Nonmetropolitan counties | | 646,209 | | | | | | | | |
| | | Area actually reporting | 86.8% | 1,081 | 26 | 143 | 61 | 851 | 9,222 | 3,308 | |
| | | Estimated total | 100.0% | 1,245 | 30 | 165 | 70 | 980 | 10,621 | 3,810 | |
| | State Total | | 2,855,390 | 14,374 | 162 | 1,395 | 2,735 | 10,082 | 109,508 | 33,694 | t |
| | | Rate per 100,000 inhabitants | | 503.4 | 5.7 | 48.9 | 95.8 | 353.1 | 3,835.1 | 1,180.0 | 2 |
| CALIFORNIA | Metropolitan Statistical Area | | 35,922,181 | | | | | | | | |
| | | Area actually reporting | 100.0% | 181,952 | 2,114 | 8,621 | 69,012 | 102,205 | 1,092,787 | 232,054 | 6: |
| | Cities outside metropolitan areas | | 269,326 | | | | | | | | |
| | | Area actually reporting | 100.0% | 1,389 | 11 | 128 | 216 | 1,032 | 9,323 | 2,589 | |
| | Nonmetropolitan counties | | 565,159 | | | | | | | | |
| | | Area actually reporting | 100.0% | 1,832 | 17 | 154 | 155 | 1,506 | 8,637 | 3,192 | |
| | State Total | | 36,756,666 | 185,173 | 2,142 | 8,903 | 69,385 | 104,743 | 1,080,747 | 237,835 | 6! |
| | | Rate per 100,000 inhabitants | | 503.8 | 5.8 | 24.2 | 188.8 | 285.0 | 2,940.3 | 647.1 | 1 |
| COLORADO | Metropolitan Statistical Area | | 4,260,351 | | | | | | | | |
| | | Area actually reporting | 97.2% | 14,830 | 139 | 1,834 | 3,200 | 9,657 | 121,651 | 24,930 | t |
| | | Estimated total | 100.0% | 15,134 | 140 | 1,877 | 3,258 | 9,859 | 125,062 | 25,495 | ἐ |
| | Cities outside metropolitan areas | | 308,538 | | | | | | | | |
| | | Area actually reporting | 92.9% | 1,089 | 10 | 140 | 86 | 853 | 10,815 | 1,729 | |
| | | Estimated total | 100.0% | 1,173 | 11 | 151 | 93 | 918 | 11,646 | 1,862 | |
| | Nonmetropolitan counties | | 370,567 | | | | | | | | |
| | | Area actually reporting | 88.2% | 563 | 5 | 62 | 12 | 484 | 3,551 | 793 | |
| | | Estimated total | 100.0% | 639 | 6 | 70 | 14 | 549 | 4,027 | 899 | |
| | State Total | | 4,939,456 | 16,946 | 157 | 2,098 | 3,365 | 11,326 | 140,725 | 28,256 | 1 |
| | | Rate per 100,000 inhabitants | | 343.1 | 3.2 | 42.5 | 68.1 | 229.3 | 2,849.0 | 572.0 | 2 |
| CONNECTICUT | Metropolitan Statistical Area | | 2,821,572 | | | | | | | | |
| | | Area actually reporting | 100.0% | 9,789 | 113 | 573 | 3,792 | 5,311 | 77,607 | 12,874 | : |
| | Cities outside metropolitan areas | | 158,076 | | | | | | | | |
| | | Area actually reporting | 100.0% | 242 | 1 | 38 | 62 | 141 | 2,962 | 607 | |
| | | | 521,604 | | | | | | | | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar U |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Area actually reporting | 100.0% | 396 | 9 | 63 | 53 | 271 | 5,288 | 1,539 | |
| | **State Total** | | 3,501,252 | 10,427 | 123 | 674 | 3,907 | 5,723 | 86,087 | 15,011 | ı |
| | | Rate per 100,000 inhabitants | | 297.8 | 3.5 | 19.3 | 111.8 | 163.5 | 2,458.7 | 428.7 | 1 |
| DELAWARE | Metropolitan Statistical Area | | 685,609 | | | | | | | | |
| | | Area actually reporting | 100.0% | 5,058 | 51 | 268 | 1,620 | 3,119 | 25,098 | 5,026 | |
| | Cities outside metropolitan areas | | 41,305 | | | | | | | | |
| | | Area actually reporting | 100.0% | 352 | 0 | 24 | 125 | 203 | 2,402 | 541 | |
| | Nonmetropolitan counties | | 146,178 | | | | | | | | |
| | | Area actually reporting | 100.0% | 731 | 6 | 74 | 93 | 558 | 3,803 | 1,193 | · |
| | **State Total** | | 873,092 | 6,141 | 57 | 366 | 1,838 | 3,880 | 31,303 | 6,760 | ı |
| | | Rate per 100,000 inhabitants | | 703.4 | 6.5 | 41.9 | 210.5 | 444.4 | 3,585.3 | 774.3 | 2 |
| DISTRICT OF COLUMBIA[1] | Metropolitan Statistical Area | | 591,833 | | | | | | | | |
| | | Area actually reporting | 100.0% | 8,509 | 186 | 186 | 4,430 | 3,707 | 30,211 | 3,788 | · |
| | Cities outside metropolitan areas | | None | | | | | | | | |
| | Nonmetropolitan counties | | None | | | | | | | | |
| | **Total** | | 591,833 | 8,509 | 186 | 186 | 4,430 | 3,707 | 30,211 | 3,788 | · |
| | | Rate per 100,000 inhabitants | | 1,437.7 | 31.4 | 31.4 | 748.5 | 626.4 | 5,104.6 | 640.0 | 3 |
| FLORIDA | Metropolitan Statistical Area | | 17,257,234 | | | | | | | | |
| | | Area actually reporting | 99.9% | 120,225 | 1,118 | 5,620 | 35,474 | 78,015 | 726,217 | 177,962 | 4l |
| | | Estimated total | 100.0% | 120,266 | 1,116 | 5,622 | 35,488 | 78,040 | 726,521 | 178,030 | 4l |
| | Cities outside metropolitan areas | | 189,567 | | | | | | | | |
| | | Area actually reporting | 94.6% | 1,798 | 6 | 102 | 355 | 1,335 | 9,428 | 2,576 | |
| | | Estimated total | 100.0% | 1,901 | 8 | 108 | 375 | 1,412 | 9,970 | 2,726 | |
| | Nonmetropolitan counties | | 881,539 | | | | | | | | |
| | | Area actually reporting | 99.1% | 4,062 | 46 | 240 | 406 | 3,370 | 22,243 | 7,542 | · |
| | | Estimated total | 100.0% | 4,098 | 46 | 242 | 410 | 3,400 | 22,443 | 7,711 | · |
| | **State Total** | | 18,328,340 | 126,265 | 1,168 | 5,972 | 36,273 | 82,852 | 758,934 | 188,467 | 5( |
| | | Rate per 100,000 inhabitants | | 688.9 | 6.4 | 32.6 | 197.9 | 452.0 | 4,140.8 | 1,028.3 | 2 |
| GEORGIA | Metropolitan Statistical Area | | 7,893,647 | | | | | | | | |
| | | Area actually reporting | 99.2% | 38,298 | 560 | 1,765 | 15,846 | 20,125 | 325,509 | 85,208 | 2( |
| | | Estimated total | 100.0% | 38,572 | 563 | 1,779 | 15,950 | 20,280 | 328,043 | 85,833 | 2( |
| | Cities outside metropolitan areas | | 671,634 | | | | | | | | |
| | | Area actually reporting | 84.9% | 4,223 | 35 | 204 | 985 | 2,999 | 30,042 | 6,438 | ı |
| | | Estimated total | 100.0% | 4,971 | 41 | 240 | 1,159 | 3,531 | 35,367 | 7,579 | ı |
| | Nonmetropolitan counties | | 1,120,463 | | | | | | | | |
| | | Area actually reporting | 84.7% | 2,405 | 27 | 149 | 210 | 2,019 | 21,607 | 8,109 | · |
| | | Estimated total | 100.0% | 2,841 | 32 | 176 | 248 | 2,385 | 25,525 | 7,217 | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar u |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **State Total** | | **9,685,744** | **46,364** | **636** | **2,195** | **17,357** | **26,196** | **388,935** | **100,629** | **2/** |
| | | Rate per 100,000 inhabitants | | 478.9 | 6.6 | 22.7 | 179.2 | 270.5 | 4,015.5 | 1,038.9 | 2 |
| **HAWAII** | Metropolitan Statistical Area | | 906,349 | | | | | | | | |
| | | Area actually reporting | 100.0% | 2,575 | 18 | 203 | 928 | 1,426 | 31,781 | 6,370 | : |
| | Cities outside metropolitan areas | | None | | | | | | | | |
| | Nonmetropolitan counties | | 381,849 | | | | | | | | |
| | | Area actually reporting | 100.0% | 937 | 7 | 162 | 159 | 610 | 14,223 | 3,009 | - |
| | **State Total** | | **1,288,198** | **3,512** | **25** | **365** | **1,086** | **2,036** | **46,004** | **9,379** | **:** |
| | | Rate per 100,000 inhabitants | | 272.6 | 1.9 | 28.3 | 84.3 | 158.1 | 3,571.2 | 728.1 | 2 |
| **IDAHO** | Metropolitan Statistical Area | | 1,001,505 | | | | | | | | |
| | | Area actually reporting | 99.7% | 2,563 | 12 | 405 | 194 | 1,952 | 23,232 | 4,843 | - |
| | | Estimated total | 100.0% | 2,571 | 12 | 406 | 195 | 1,958 | 23,307 | 4,857 | - |
| | Cities outside metropolitan areas | | 236,594 | | | | | | | | |
| | | Area actually reporting | 99.3% | 523 | 3 | 86 | 33 | 401 | 5,561 | 1,023 | |
| | | Estimated total | 100.0% | 527 | 3 | 87 | 33 | 404 | 5,619 | 1,030 | |
| | Nonmetropolitan counties | | 285,717 | | | | | | | | |
| | | Area actually reporting | 100.0% | 385 | 8 | 58 | 13 | 306 | 3,093 | 814 | |
| | **State Total** | | **1,523,816** | **3,463** | **23** | **551** | **241** | **2,668** | **32,019** | **6,701** | **:** |
| | | Rate per 100,000 inhabitants | | 228.6 | 1.5 | 36.2 | 15.8 | 175.1 | 2,101.2 | 439.6 | 1 |
| **ILLINOIS[7,3]** | **State Total** | | **12,901,563** | **67,780** | **790** | **4,118** | **24,064** | **38,818** | **378,355** | **78,968** | **2(** |
| | | Rate per 100,000 inhabitants | | 525.4 | 6.1 | 31.9 | 186.4 | 300.9 | 2,932.6 | 612.1 | 2 |
| **INDIANA** | Metropolitan Statistical Area | | 4,989,614 | | | | | | | | |
| | | Area actually reporting | 86.5% | 18,709 | 297 | 1,345 | 7,011 | 10,056 | 165,176 | 38,380 | 1 |
| | | Estimated total | 100.0% | 19,610 | 310 | 1,437 | 7,217 | 10,646 | 179,230 | 41,263 | 1: |
| | Cities outside metropolitan areas | | 500,292 | | | | | | | | |
| | | Area actually reporting | 79.2% | 760 | 3 | 111 | 190 | 456 | 17,498 | 3,210 | - |
| | | Estimated total | 100.0% | 960 | 4 | 140 | 240 | 576 | 22,106 | 4,055 | |
| | Nonmetropolitan counties | | 886,686 | | | | | | | | |
| | | Area actually reporting | 61.5% | 438 | 8 | 88 | 46 | 296 | 6,994 | 2,045 | |
| | | Estimated total | 100.0% | 713 | 13 | 143 | 75 | 482 | 11,379 | 3,327 | |
| | **State Total** | | **6,376,792** | **21,283** | **327** | **1,720** | **7,532** | **11,704** | **212,715** | **48,645** | **1•** |
| | | Rate per 100,000 inhabitants | | 333.8 | 5.1 | 27.0 | 118.1 | 183.5 | 3,335.8 | 762.8 | 2 |
| **IOWA** | Metropolitan Statistical Area | | 1,689,224 | | | | | | | | |
| | | Area actually reporting | 99.0% | 5,921 | 54 | 656 | 1,080 | 4,131 | 50,751 | 10,938 | : |
| | | Estimated total | 100.0% | 5,948 | 54 | 660 | 1,082 | 4,152 | 51,097 | 11,003 | : |
| | Cities outside metropolitan areas | | 585,345 | | | | | | | | |
| | | Area actually reporting | 93.1% | 1,825 | 7 | 150 | 143 | 1,525 | 15,751 | 3,807 | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar u |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Estimated total | 100.0% | 1,961 | 8 | 161 | 154 | 1,638 | 16,918 | 3,874 | · |
| | Nonmetropolitan counties | | 727.986 | | | | | | | | |
| | | Area actually reporting | 96.2% | 567 | 13 | 64 | 12 | 498 | 4,495 | 1,513 | |
| | | Estimated total | 100.0% | 611 | 14 | 67 | 12 | 518 | 4,674 | 1,573 | |
| | **State Total** | | 3,002,555 | 8,520 | 76 | 888 | 1,248 | 6,308 | 72,689 | 16,450 | ! |
| | | Rate per 100,000 inhabitants | | 283.8 | 2.5 | 29.6 | 41.6 | 210.1 | 2,420.9 | 547.9 | 1 |
| **KANSAS** | Metropolitan Statistical Area | | 1,907,099 | | | | | | | | |
| | | Area actually reporting | 99.5% | 8,436 | 88 | 808 | 1,476 | 6,064 | 68,680 | 13,862 | · |
| | | Estimated total | 100.0% | 8,471 | 88 | 812 | 1,480 | 6,091 | 69,147 | 13,907 | · |
| | Cities outside metropolitan areas | | 569,387 | | | | | | | | |
| | | Area actually reporting | 95.9% | 2,219 | 18 | 276 | 172 | 1,753 | 19,547 | 3,984 | · |
| | | Estimated total | 100.0% | 2,314 | 19 | 288 | 179 | 1,828 | 20,487 | 4,154 | · |
| | Nonmetropolitan counties | | 325,668 | | | | | | | | |
| | | Area actually reporting | 95.9% | 691 | 6 | 66 | 24 | 575 | 4,797 | 1,488 | |
| | | Estimated total | 100.0% | 720 | 6 | 90 | 25 | 599 | 5,001 | 1,551 | |
| | **State Total** | | 2,802,134 | 11,505 | 113 | 1,190 | 1,684 | 8,518 | 94,635 | 19,612 | ! |
| | | Rate per 100,000 inhabitants | | 410.6 | 4.0 | 42.5 | 60.1 | 304.0 | 3,377.2 | 699.9 | 2 |
| **KENTUCKY** | Metropolitan Statistical Area | | 2,451,356 | | | | | | | | |
| | | Area actually reporting | 92.0% | 9,417 | 103 | 702 | 3,354 | 5,258 | 72,904 | 17,160 | ! |
| | | Estimated total | 100.0% | 9,708 | 105 | 736 | 3,443 | 5,424 | 76,232 | 18,018 | ! |
| | Cities outside metropolitan areas | | 523,235 | | | | | | | | |
| | | Area actually reporting | 80.8% | 904 | 7 | 129 | 275 | 493 | 12,637 | 3,010 | |
| | | Estimated total | 100.0% | 1,119 | 9 | 160 | 340 | 610 | 15,893 | 3,726 | · |
| | Nonmetropolitan counties | | 1,294.654 | | | | | | | | |
| | | Area actually reporting | 91.4% | 1,663 | 77 | 468 | 202 | 916 | 16,626 | 6,435 | |
| | | Estimated total | 100.0% | 1,819 | 84 | 512 | 221 | 1,002 | 18,189 | 7,095 | |
| | **State Total** | | 4,269,245 | 12,646 | 198 | 1,408 | 4,004 | 7,036 | 110,314 | 28,839 | ! |
| | | Rate per 100,000 inhabitants | | 296.2 | 4.6 | 33.0 | 93.8 | 164.8 | 2,583.9 | 675.5 | 1 |
| **LOUISIANA** | Metropolitan Statistical Area | | 3,269,753 | | | | | | | | |
| | | Area actually reporting | 97.0% | 21,071 | 439 | 862 | 5,196 | 14,554 | 127,741 | 31,736 | ! |
| | | Estimated total | 100.0% | 21,584 | 445 | 907 | 5,279 | 14,953 | 131,822 | 32,590 | ! |
| | Cities outside metropolitan areas | | 384,508 | | | | | | | | |
| | | Area actually reporting | 57.5% | 1,987 | 26 | 94 | 281 | 1,586 | 11,375 | 3,208 | |
| | | Estimated total | 100.0% | 3,456 | 45 | 163 | 489 | 2,759 | 19,789 | 5,581 | · |
| | Nonmetropolitan counties | | 756,535 | | | | | | | | |
| | | Area actually reporting | 85.7% | 3,347 | 32 | 139 | 194 | 2,982 | 14,589 | 4,414 | |
| | | Estimated total | 100.0% | 3,904 | 37 | 162 | 226 | 3,479 | 17,019 | 5,149 | · |
| | **State Total** | | 4,410,796 | 28,944 | 527 | 1,232 | 5,994 | 21,191 | 168,630 | 43,320 | 1' |

Table 5 - Crime in the United States 2008
Case 2:10-cv-00913-LKK-EFB   Document 1-3   Filed 04/16/2010   Page 85 of 128
Page 6 of 14

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar t |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rate per 100,000 inhabitants | | 656.2 | 11.9 | 27.9 | 135.9 | 480.4 | 3,823.1 | 982.1 | 2 |
| MAINE | Metropolitan Statistical Area | | 769,193 | | | | | | | | |
| | | Area actually reporting | 100.0% | 965 | 15 | 220 | 288 | 442 | 19,755 | 3,719 | |
| | Cities outside metropolitan areas | | 278,344 | | | | | | | | |
| | | Area actually reporting | 100.0% | 389 | 8 | 106 | 39 | 236 | 6,374 | 1,389 | |
| | Nonmetropolitan counties | | 270,919 | | | | | | | | |
| | | Area actually reporting | 100.0% | 193 | 8 | 49 | 6 | 130 | 4,156 | 1,414 | |
| | State Total | | 1,316,456 | 1,547 | 31 | 375 | 333 | 806 | 32,285 | 6,522 | : |
| | | Rate per 100,000 inhabitants | | 117.5 | 2.4 | 28.5 | 25.3 | 61.4 | 2,452.4 | 495.4 | 1 |
| MARYLAND | Metropolitan Statistical Area | | 5,332,290 | | | | | | | | |
| | | Area actually reporting | 100.0% | 34,203 | 479 | 1,084 | 12,970 | 19,690 | 189,212 | 36,639 | 1: |
| | Cities outside metropolitan areas | | 79,007 | | | | | | | | |
| | | Area actually reporting | 100.0% | 547 | 4 | 25 | 148 | 370 | 4,315 | 873 | |
| | Nonmetropolitan counties | | 222,300 | | | | | | | | |
| | | Area actually reporting | 100.0% | 643 | 10 | 38 | 65 | 510 | 4,638 | 1,337 | |
| | State Total | | 5,633,597 | 35,393 | 493 | 1,127 | 13,203 | 20,570 | 198,165 | 38,849 | 1: |
| | | Rate per 100,000 inhabitants | | 628.2 | 8.8 | 20.0 | 234.4 | 365.1 | 3,517.9 | 689.6 | 2 |
| MASSACHUSETTS | Metropolitan Statistical Area | | 6,471,015 | | | | | | | | |
| | | Area actually reporting | 98.3% | 28,785 | 165 | 1,708 | 6,998 | 19,914 | 152,910 | 35,388 | 1( |
| | | Estimated total | 100.0% | 29,116 | 166 | 1,733 | 7,059 | 20,158 | 155,227 | 35,957 | 1( |
| | Cities outside metropolitan areas | | 26,781 | | | | | | | | |
| | | Area actually reporting | 100.0% | 58 | 1 | 3 | 10 | 44 | 732 | 137 | |
| | Nonmetropolitan counties | | 171 | | | | | | | | |
| | | Area actually reporting | 100.0% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | State Total | | 6,497,967 | 29,174 | 167 | 1,736 | 7,069 | 20,202 | 155,959 | 36,094 | 1( |
| | | Rate per 100,000 inhabitants | | 449.0 | 2.6 | 26.7 | 108.8 | 310.9 | 2,400.1 | 555.5 | 1 |
| MICHIGAN | Metropolitan Statistical Area | | 8,160,670 | | | | | | | | |
| | | Area actually reporting | 97.8% | 49,026 | 509 | 3,365 | 12,679 | 29,475 | 251,966 | 64,634 | 1: |
| | | Estimated total | 100.0% | 49,519 | 511 | 3,434 | 12,776 | 29,798 | 256,484 | 65,604 | 1: |
| | Cities outside metropolitan areas | | 638,021 | | | | | | | | |
| | | Area actually reporting | 90.4% | 1,267 | 5 | 308 | 116 | 838 | 16,273 | 2,504 | |
| | | Estimated total | 100.0% | 1,370 | 6 | 334 | 122 | 908 | 17,711 | 2,725 | |
| | Nonmetropolitan counties | | 1,204,731 | | | | | | | | |
| | | Area actually reporting | 93.0% | 2,118 | 23 | 653 | 61 | 1,351 | 18,061 | 5,441 | |
| | | Estimated total | 100.0% | 2,277 | 25 | 734 | 66 | 1,452 | 19,410 | 5,847 | |
| | State Total | | 10,003,422 | 50,166 | 542 | 4,502 | 12,964 | 32,158 | 293,585 | 74,176 | 1! |
| | | Rate per 100,000 inhabitants | | 501.5 | 5.4 | 45.0 | 129.6 | 321.5 | 2,934.8 | 741.5 | 1 |

3,905,117

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar u |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Area actually reporting | 98.5% | | 96 | | 4,037 | 6,335 | 122,577 | 21,286 | 1 |
| | | Estimated total | 100.0% | | 97 | | 4,065 | 6,384 | 124,415 | 21,534 | 1 |
| | Cities outside metropolitan areas | | 499,297 | | | | | | | | |
| | | Area actually reporting | 98.1% | | 5 | | 84 | 678 | 14,131 | 1,952 | · |
| | | Estimated total | 100.0% | | 5 | | 86 | 691 | 14,398 | 1,989 | · |
| | Nonmetropolitan counties | | 615,979 | | | | | | | | |
| | | Area actually reporting | 98.2% | | 7 | | 26 | 541 | 9,815 | 2,834 | |
| | | Estimated total | 100.0% | | 7 | | 26 | 551 | 9,997 | 2,887 | |
| | **State Total** | | **5,220,393** | **13,717** | **109** | **1,805** | **4,177** | **7,626** | **148,810** | **26,410** | **1** |
| | | Rate per 100,000 inhabitants | | 262.8 | 2.1 | 34.6 | 80.0 | 146.1 | 2,850.6 | 505.9 | 2 |
| MISSISSIPPI | Metropolitan Statistical Area | | 1,295,027 | | | | | | | | |
| | | Area actually reporting | 65.6% | 3,727 | 116 | 391 | 1,657 | 1,563 | 42,458 | 11,182 | ; |
| | | Estimated total | 100.0% | 3,956 | 123 | 425 | 1,708 | 1,700 | 45,684 | 11,992 | ; |
| | Cities outside metropolitan areas | | 590,822 | | | | | | | | |
| | | Area actually reporting | 71.9% | 1,790 | 45 | 166 | 686 | 893 | 18,529 | 5,742 | · |
| | | Estimated total | 100.0% | 2,480 | 63 | 231 | 954 | 1,242 | 25,787 | 7,985 | |
| | Nonmetropolitan counties | | 1,052,769 | | | | | | | | |
| | | Area actually reporting | 51.4% | 990 | 26 | 120 | 182 | 662 | 7,685 | 3,107 | |
| | | Estimated total | 100.0% | 1,927 | 51 | 234 | 354 | 1,288 | 14,957 | 6,047 | |
| | **State Total** | | **2,938,618** | **8,373** | **237** | **890** | **3,016** | **4,230** | **86,408** | **26,024** | **!** |
| | | Rate per 100,000 inhabitants | | 264.9 | 8.1 | 30.3 | 102.6 | 143.9 | 2,940.4 | 885.6 | 1 |
| MISSOURI | Metropolitan Statistical Area | | 4,431,679 | | | | | | | | |
| | | Area actually reporting | 99.9% | 25,412 | 400 | 1,328 | 7,068 | 16,618 | 179,730 | 37,464 | 1; |
| | | Estimated total | 100.0% | 25,413 | 400 | 1,328 | 7,068 | 16,619 | 179,751 | 37,468 | 1; |
| | Cities outside metropolitan areas | | 640,561 | | | | | | | | |
| | | Area actually reporting | 99.5% | 2,493 | 18 | 181 | 273 | 2,021 | 24,801 | 4,408 | |
| | | Estimated total | 100.0% | 2,506 | 18 | 182 | 274 | 2,032 | 24,931 | 4,432 | · |
| | Nonmetropolitan counties | | 639,365 | | | | | | | | |
| | | Area actually reporting | 99.4% | 1,689 | 37 | 106 | 48 | 1,698 | 11,835 | 3,866 | |
| | | Estimated total | 100.0% | 1,900 | 37 | 107 | 48 | 1,708 | 11,903 | 3,888 | |
| | **State Total** | | **5,911,605** | **29,819** | **455** | **1,615** | **7,390** | **20,359** | **216,585** | **45,788** | **1!** |
| | | Rate per 100,000 inhabitants | | 504.4 | 7.7 | 27.3 | 125.0 | 344.4 | 3,663.7 | 774.5 | 2 |
| MONTANA | Metropolitan Statistical Area | | 340,604 | | | | | | | | |
| | | Area actually reporting | 100.0% | 869 | 7 | 96 | 110 | 656 | 11,429 | 1,474 | |
| | Cities outside metropolitan areas | | 210,221 | | | | | | | | |
| | | Area actually reporting | 97.3% | 637 | 5 | 89 | 41 | 502 | 7,240 | 804 | |
| | | Estimated total | 100.0% | 655 | 5 | 92 | 42 | 516 | 7,445 | 827 | · |
| | Nonmetropolitan counties | | 416,615 | | | | | | | | |
| | | Area actually reporting | 97.4% | 947 | 11 | 103 | 19 | 814 | 6,143 | 1,004 | |

Table 5 - Crime in the United States 2008
Page 8 of 14
Case 2:10-cv-00913-LKK-EFB    Document 1-3    Filed 04/16/2010    Page 87 of 128

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar u |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Estimated total | 100.0% | 973 | 11 | 106 | 20 | 836 | 6,306 | 1,031 | |
| | **State Total** | | **967,440** | **2,497** | **23** | **294** | **172** | **2,008** | **25,182** | **3,332** | : |
| | | Rate per 100,000 inhabitants | | 258.1 | 2.4 | 30.4 | 17.8 | 207.6 | 2,603.0 | 344.4 | 2 |
| **NEBRASKA** | Metropolitan Statistical Area | | 1,039,693 | | | | | | | | |
| | | Area actually reporting | 99.9% | 4,327 | 52 | 347 | 1,195 | 2,733 | 35,124 | 5,832 | : |
| | | Estimated total | 100.0% | 4,328 | 52 | 347 | 1,195 | 2,734 | 35,144 | 5,835 | : |
| | Cities outside metropolitan areas | | 392,104 | | | | | | | | |
| | | Area actually reporting | 87.9% | 740 | 10 | 175 | 76 | 478 | 11,007 | 1,825 | |
| | | Estimated total | 100.0% | 842 | 11 | 200 | 87 | 544 | 12,529 | 2,077 | |
| | Nonmetropolitan counties | | 351,435 | | | | | | | | |
| | | Area actually reporting | 86.0% | 212 | 4 | 31 | 15 | 162 | 3,152 | 742 | |
| | | Estimated total | 100.0% | 248 | 5 | 36 | 17 | 188 | 3,685 | 863 | |
| | **State Total** | | **1,783,432** | **5,416** | **68** | **583** | **1,299** | **3,466** | **51,338** | **8,775** | : |
| | | Rate per 100,000 inhabitants | | 303.7 | 3.8 | 32.7 | 72.8 | 194.3 | 2,878.6 | 492.0 | 2 |
| **NEVADA** | Metropolitan Statistical Area | | 2,335,456 | | | | | | | | |
| | | Area actually reporting | 100.0% | 18,155 | 151 | 1,022 | 6,405 | 10,576 | 85,038 | 22,774 | * |
| | Cities outside metropolitan areas | | 47,239 | | | | | | | | |
| | | Area actually reporting | 100.0% | 178 | 3 | 21 | 26 | 128 | 1,376 | 345 | |
| | Nonmetropolitan counties | | 217,472 | | | | | | | | |
| | | Area actually reporting | 100.0% | 504 | 9 | 59 | 41 | 395 | 3,226 | 1,037 | |
| | **State Total** | | **2,600,167** | **18,837** | **163** | **1,102** | **6,473** | **11,099** | **89,640** | **24,156** | * |
| | | Rate per 100,000 inhabitants | | 724.5 | 6.3 | 42.4 | 248.9 | 426.9 | 3,447.5 | 929.0 | 1 |
| **NEW HAMPSHIRE** | Metropolitan Statistical Area | | 820,353 | | | | | | | | |
| | | Area actually reporting | 90.6% | 1,301 | 8 | 215 | 301 | 777 | 15,727 | 2,419 | |
| | | Estimated total | 100.0% | 1,386 | 8 | 230 | 312 | 818 | 16,863 | 2,590 | |
| | Cities outside metropolitan areas | | 447,139 | | | | | | | | |
| | | Area actually reporting | 87.6% | 570 | 3 | 130 | 91 | 346 | 9,121 | 1,365 | |
| | | Estimated total | 100.0% | 649 | 3 | 148 | 104 | 394 | 10,385 | 1,554 | |
| | Nonmetropolitan counties | | 48,317 | | | | | | | | |
| | | Area actually reporting | 100.0% | 52 | 2 | 13 | 3 | 34 | 278 | 142 | |
| | **State Total** | | **1,315,809** | **2,069** | **13** | **391** | **419** | **1,246** | **27,526** | **4,286** | : |
| | | Rate per 100,000 inhabitants | | 157.2 | 1.0 | 29.7 | 31.8 | 94.7 | 2,091.9 | 325.7 | 1 |
| **NEW JERSEY** | Metropolitan Statistical Area | | 8,682,661 | | | | | | | | |
| | | Area actually reporting | 99.9% | 28,341 | 376 | 1,122 | 12,696 | 14,147 | 199,047 | 40,385 | 1: |
| | | Estimated total | 100.0% | 28,351 | 376 | 1,122 | 12,701 | 14,152 | 199,126 | 40,401 | 1: |
| | Cities outside metropolitan areas | | None | | | | | | | | |
| | Nonmetropolitan counties | | None | | | | | | | | |

Table 5 - Crime in the United States 2008
Case 2:10-cv-00913-LKK-EFB    Document 1-3    Filed 04/16/2010    Page 9 of 14
Page 88 of 128

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar t |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | State Total | | 8,682,661 | 28,351 | 376 | 1,122 | 12,701 | 14,152 | 199,126 | 40,401 | 1: |
| | | Rate per 100,000 inhabitants | | 326.5 | 4 3 | 12.9 | 146 3 | 163.0 | 2,293 4 | 465.3 | 1 |
| NEW MEXICO | Metropolitan Statistical Area | | 1,315,538 | | | | | | | | |
| | | Area actually reporting | 99.8% | 9,101 | 94 | 796 | 1,831 | 6,380 | 55,477 | 14,555 | : |
| | | Estimated total | 100 0% | 9,114 | 94 | 797 | 1,832 | 6,391 | 55,551 | 14,571 | : |
| | Cities outside metropolitan areas | | 397,834 | | | | | | | | |
| | | Area actually reporting | 93 1% | 2,676 | 28 | 222 | 265 | 2,161 | 16,386 | 4,756 | |
| | | Estimated total | 100.0% | 2,873 | 30 | 238 | 285 | 2,320 | 17,573 | 5,109 | |
| | Nonmetropolitan counties | | 270,984 | | | | | | | | |
| | | Area actually reporting | 83.5% | 759 | 15 | 87 | 48 | 611 | 3,712 | 1,697 | |
| | | Estimated total | 100.0% | 909 | 18 | 104 | 55 | 732 | 4,448 | 2,033 | |
| | State Total | | 1,984,356 | 12,896 | 142 | 1,139 | 2,172 | 9,443 | 77,572 | 21,713 | / |
| | | Rate per 100,000 inhabitants | | 649.9 | 7.2 | 57 4 | 109.5 | 475.9 | 3,909.2 | 1,094.2 | 2 |
| NEW YORK | Metropolitan Statistical Area | | 17,944,434 | | | | | | | | |
| | | Area actually reporting | 99.9% | 74,456 | 812 | 2,419 | 31,509 | 39,716 | 357,697 | 58,693 | 2: |
| | | Estimated total | 100.0% | 74,489 | 812 | 2,420 | 31,521 | 39,736 | 358,070 | 58,751 | 2: |
| | Cities outside metropolitan areas | | 564,788 | | | | | | | | |
| | | Area actually reporting | 97.6% | 1,530 | 8 | 154 | 181 | 1,187 | 15,681 | 2,889 | |
| | | Estimated total | 100 0% | 1 567 | 8 | 158 | 185 | 1,216 | 16,059 | 2,959 | |
| | Nonmetropolitan counties | | 981,095 | | | | | | | | |
| | | Area actually reporting | 91.8% | 1,404 | 15 | 205 | 66 | 1,118 | 13,223 | 3,595 | |
| | | Estimated total | 100.0% | 1,529 | 16 | 223 | 72 | 1,218 | 14,404 | 4,025 | |
| | State Total | | 19,490,297 | 77,585 | 836 | 2,801 | 31,778 | 42,170 | 388,533 | 65,735 | 2: |
| | | Rate per 100,000 inhabitants | | 398.1 | 4.3 | 14.4 | 163.0 | 216.4 | 1,993.5 | 337.3 | 1 |
| NORTH CAROLINA | Metropolitan Statistical Area | | 6,483,533 | | | | | | | | |
| | | Area actually reporting | 99 0% | 32,013 | 420 | 1,661 | 11,652 | 18,270 | 268,633 | 76,939 | 1: |
| | | Estimated total | 100.0% | 32,291 | 432 | 1,681 | 11,733 | 18,445 | 271,886 | 77,393 | 1: |
| | Cities outside metropolitan areas | | 849,069 | | | | | | | | |
| | | Area actually reporting | 94.1% | 5,521 | 54 | 256 | 1,764 | 3,447 | 49,722 | 13,564 | : |
| | | Estimated total | 100.0% | 5,855 | 57 | 272 | 1,869 | 3,657 | 52,746 | 14,384 | : |
| | Nonmetropolitan counties | | 1,889,812 | | | | | | | | |
| | | Area actually reporting | 98.6% | 4,683 | 113 | 326 | 722 | 3,722 | 47,652 | 19,547 | : |
| | | Estimated total | 100 0% | 4,953 | 115 | 331 | 732 | 3,775 | 48,329 | 19 825 | : |
| | State Total | | 9,222,414 | 43,099 | 604 | 2,264 | 14,334 | 25,877 | 372,961 | 111,602 | 2: |
| | | Rate per 100,000 inhabitants | | 467.3 | 6.5 | 24.6 | 155.4 | 280.6 | 4,044.1 | 1,210.1 | 2 |
| NORTH DAKOTA | Metropolitan Statistical Area | | 311,685 | | | | | | | | |
| | | Area actually reporting | 99.6% | 690 | 2 | 137 | 58 | 493 | 8,044 | 1,259 | |
| | | Estimated total | 100.0% | 692 | 2 | 138 | 58 | 494 | 8,078 | 1,264 | |

Table 5 - Crime in the United States 2008
Case 2:10-cv-00913-LKK-EFB   Document 1-3   Filed 04/16/2010   Page 89 of 128
Page 10 of 14

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar t |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cities outside metropolitan areas | | 137,224 | | | | | | | | |
| | | Area actually reporting | 92 1% | 247 | 1 | 65 | 12 | 169 | 2,495 | 412 | |
| | | Estimated total | 100.0% | 269 | 1 | 71 | 13 | 184 | 2,711 | 448 | |
| † | Nonmetropolitan counties | | 192,572 | | | | | | | | |
| | | Area actually reporting | 91.1% | 98 | 0 | 21 | 1 | 76 | 1,241 | 359 | |
| | | Estimated total | 100.0% | 107 | 0 | 23 | 1 | 83 | 1,363 | 394 | |
| | **State Total** | | 641,481 | 1,068 | 3 | 232 | 72 | 761 | 12,152 | 2,106 | |
| | | Rate per 100,000 inhabitants | | 166.5 | 0.5 | 36 2 | 11.2 | 118.6 | 1,894.4 | 328.3 | 1 |
| OHIO | Metropolitan Statistical Area | | 9,267.288 | | | | | | | . | |
| | | Area actually reporting | 88.2% | 35,481 | 488 | 3,494 | 17,404 | 14,095 | 304,742 | 82,532 | 19 |
| | | Estimated total | 100.0% | 37,200 | 503 | 3,788 | 18,054 | 14,857 | 333,464 | 88,535 | 2· |
| | Cities outside metropolitan areas | | 921,678 | | | | | | | | |
| | | Area actually reporting | 77.4% | 1,336 | 15 | 299 | 427 | 595 | 28,148 | 5,432 | : |
| | | Estimated total | 100 0% | 1,726 | 19 | 386 | 552 | 769 | 36,379 | 7,020 | : |
| | Nonmetropolitan counties | | 1,296.944 | | | | | | | | |
| | | Area actually reporting | 84 7% | 906 | 18 | 209 | 96 | 585 | 18,632 | 5,922 | |
| | | Estimated total | 100.0% | 1,071 | 21 | 247 | 113 | 690 | 21,989 | 6,989 | |
| | **State Total** | | 11,485,910 | 39,997 | 543 | 4,419 | 18,719 | 16,316 | 391,862 | 102,544 | 21 |
| | | Rate per 100,000 inhabitants | | 348.2 | 4.7 | 38.5 | 163 0 | 142.1 | 3,411 7 | 892.8 | 2 |
| OKLAHOMA | Metropolitan Statistical Area | | 2,324.166 | | | | | | | | |
| | | Area actually reporting | 100 0% | 14,711 | 159 | 1,034 | 3,302 | 10,216 | 90,973 | 25,562 | : |
| | Cities outside metropolitan areas | | 706,342 | | | | | | | | |
| | | Area actually reporting | 99.7% | 3,126 | 24 | 312 | 349 | 2,441 | 26,222 | 6,531 | · |
| | | Estimated total | 100.0% | 3,134 | 24 | 313 | 350 | 2,447 | 26,287 | 6,547 | · |
| | Nonmetropolitan counties | | 611,853 | | | | | | | | |
| | | Area actually reporting | 99.5% | 1,332 | 29 | 118 | 31 | 1,154 | 8,083 | 2,957 | |
| | | Estimated total | 100.0% | 1,339 | 29 | 119 | 31 | 1,160 | 8,124 | 2,972 | |
| | **State Total** | | 3,642,361 | 19,184 | 212 | 1,466 | 3,683 | 13,823 | 125,384 | 35,081 | : |
| | | Rate per 100,000 inhabitants | | 526.7 | 5.8 | 40 2 | 101.1 | 379.5 | 3,442.4 | 963.1 | 2 |
| OREGON | Metropolitan Statistical Area | | 2,949,725 | | | | | | | | |
| | | Area actually reporting | 99.2% | 8,392 | 70 | 959 | 2,392 | 4,971 | 101,369 | 16,280 | : |
| | | Estimated total | 100.0% | 8,430 | 70 | 965 | 2,400 | 4,994 | 101,894 | 16,367 | : |
| | Cities outside metropolitan areas | | 395,284 | | | | | | | | |
| | | Area actually reporting | 97.6% | 905 | 7 | 123 | 201 | 574 | 15,380 | 2,514 | · |
| | | Estimated total | 100.0% | 927 | 7 | 126 | 206 | 588 | 15,738 | 2,575 | · |
| | Nonmetropolitan counties | | 445,051 | | | | | | | | |
| | | Area actually reporting | 82.9% | 323 | 4 | 53 | 29 | 237 | 5,610 | 1,589 | |
| | | Estimated total | 100.0% | 390 | 5 | 64 | 35 | 286 | 6,795 | 1,916 | |
| | **State Total** | | 3,790.060 | 9,747 | 82 | 1,155 | 2,641 | 5,868 | 124,397 | 20,879 | 1 |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar th |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Rate per 100,000 inhabitants | | 257.2 | 2.2 | 30.5 | 69.7 | 154.6 | 3,282.2 | 550.9 | 2 |
| PENNSYLVANIA | Metropolitan Statistical Area | | 10,465,127 | | | | | | | | |
| | | Area actually reporting | 98.9% | 46,785 | 654 | 2,847 | 18,285 | 24,979 | 260,739 | 49,561 | 1! |
| | | Estimated total | 100.0% | 47,031 | 655 | 2,864 | 18,355 | 25,157 | 263,087 | 49,913 | 1! |
| | Cities outside metropolitan areas | | 923,487 | | | | | | | | |
| | | Area actually reporting | 94.3% | 2,307 | 18 | 245 | 327 | 1,717 | 19,557 | 3,333 | * |
| | | Estimated total | 100.0% | 2,447 | 19 | 260 | 347 | 1,821 | 20,746 | 3,536 | |
| | Nonmetropolitan counties | | 1,059,665 | | | | | | | | |
| | | Area actually reporting | 100.0% | 1,558 | 27 | 354 | 171 | 1,006 | 16,199 | 5,171 | - |
| | State Total | | 12,448,279 | 51,035 | 701 | 3,478 | 18,873 | 27,984 | 300,032 | 58,620 | 2° |
| | | Rate per 100,000 inhabitants | | 410.0 | 5.6 | 27.9 | 151.6 | 224.8 | 2,410.2 | 470.9 | 1 |
| PUERTO RICO | Metropolitan Statistical Area | | 3,758,119 | | | | | | | | |
| | | Area actually reporting | 100.0% | 9,167 | 776 | 91 | 5,345 | 2,955 | 56,900 | 18,086 | : |
| | Cities outside metropolitan areas | | 195,918 | | | | | | | | |
| | | Area actually reporting | 100.0% | 317 | 31 | 4 | 122 | 160 | 2,354 | 1,052 | |
| | Total | | 3,954,037 | 9,484 | 807 | 95 | 5,467 | 3,115 | 59,254 | 19,138 | : |
| | | Rate per 100,000 inhabitants | | 239.9 | 20.4 | 2.4 | 138.3 | 78.8 | 1,498.6 | 484.0 | |
| RHODE ISLAND | Metropolitan Statistical Area | | 1,050,788 | | | | | | | | |
| | | Area actually reporting | 100.0% | 2,606 | 27 | 272 | 879 | 1,428 | 29,774 | 5,750 | : |
| | Cities outside metropolitan areas | | None | | | | | | | | |
| | Nonmetropolitan counties | | None | | | | | | | | |
| | | Area actually reporting | 100.0% | 15 | 2 | 5 | 0 | 8 | 75 | 0 | |
| | State Total | | 1,050,788 | 2,621 | 29 | 277 | 879 | 1,436 | 29,849 | 5,750 | : |
| | | Rate per 100,000 inhabitants | | 249.4 | 2.8 | 26.4 | 83.7 | 136.7 | 2,840.6 | 547.2 | 1 |
| SOUTH CAROLINA | Metropolitan Statistical Area | | 3,416,295 | | | | | | | | |
| | | Area actually reporting | 99.9% | 24,609 | 229 | 1,292 | 5,360 | 17,728 | 144,756 | 33,736 | ! |
| | | Estimated total | 100.0% | 24,611 | 229 | 1,292 | 5,360 | 17,730 | 144,772 | 33,739 | ! |
| | Cities outside metropolitan areas | | 269,123 | | | | | | | | |
| | | Area actually reporting | 99.6% | 3,203 | 24 | 113 | 624 | 2,442 | 17,014 | 3,884 | - |
| | | Estimated total | 100.0% | 3,218 | 24 | 113 | 627 | 2,452 | 17,087 | 3,901 | - |
| | Nonmetropolitan counties | | 794,382 | | | | | | | | |
| | | Area actually reporting | 100.0% | 4,864 | 52 | 233 | 612 | 3,967 | 27,824 | 8,327 | |
| | State Total | | 4,479,800 | 32,691 | 305 | 1,638 | 6,599 | 24,149 | 189,683 | 45,967 | 1: |
| | | Rate per 100,000 inhabitants | | 729.7 | 6.8 | 36.6 | 147.3 | 539.1 | 4,234.2 | 1,026.1 | 2 |
| SOUTH DAKOTA | Metropolitan Statistical Area | | 369,048 | | | | | | | | |
| | | Area actually reporting | 92.5% | 1,058 | 10 | 279 | 100 | 669 | 7,763 | 1,348 | |
| | | Estimated total | 100.0% | 1,100 | 11 | 294 | 101 | 694 | 8,081 | 1,412 | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar b |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cities outside metropolitan areas | | 207,818 | | | | | | | | |
| | | Area actually reporting | 87.6% | 267 | 3 | 84 | 10 | 170 | 3,589 | 563 | |
| | | Estimated total | 100.0% | 304 | 3 | 96 | 11 | 194 | 4,098 | 843 | |
| | Nonmetropolitan counties | | 227,328 | | | | | | | | |
| | | Area actually reporting | 78.4% | 169 | 9 | 33 | 6 | 121 | 842 | 294 | |
| | | Estimated total | 100.0% | 216 | 12 | 42 | 8 | 154 | 1,075 | 375 | |
| | **State Total** | | 804,194 | 1,620 | 26 | 432 | 120 | 1,042 | 13,234 | 2,430 | |
| | | Rate per 100,000 inhabitants | | 201.4 | 3.2 | 53.7 | 14.9 | 129.6 | 1,645.6 | 302.2 | 1 |
| **TENNESSEE** | Metropolitan Statistical Area | | 4,558,480 | | | | | | | | |
| | | Area actually reporting | 100.0% | 37,577 | 349 | 1,655 | 10,111 | 25,462 | 197,582 | 49,789 | 1: |
| | Cities outside metropolitan areas | | 605,092 | | | | | | | | |
| | | Area actually reporting | 100.0% | 4,102 | 27 | 227 | 548 | 3,302 | 30,695 | 6,968 | : |
| | Nonmetropolitan counties | | 1,051,316 | | | | | | | | |
| | | Area actually reporting | 100.0% | 3,218 | 32 | 180 | 143 | 2,863 | 22,988 | 8,249 | |
| | **State Total** | | 6,214,888 | 44,897 | 408 | 2,062 | 10,800 | 31,627 | 251,245 | 65,006 | 1( |
| | | Rate per 100,000 inhabitants | | 722.4 | 6.6 | 33.2 | 173.8 | 508.9 | 4,042.8 | 1,046.0 | 2 |
| **TEXAS** | Metropolitan Statistical Area | | 21,339,780 | | | | | | | | |
| | | Area actually reporting | 99.9% | 113,882 | 1,252 | 7,087 | 36,746 | 68,795 | 896,963 | 208,760 | 6( |
| | | Estimated total | 100.0% | 113,903 | 1,252 | 7,088 | 36,754 | 68,809 | 897,227 | 208,815 | 6( |
| | Cities outside metropolitan areas | | 1,376,122 | | | | | | | | |
| | | Area actually reporting | 99.0% | 6,415 | 53 | 602 | 822 | 4,938 | 46,597 | 12,499 | : |
| | | Estimated total | 100.0% | 6,459 | 54 | 607 | 825 | 4,973 | 48,949 | 12,595 | : |
| | Nonmetropolitan counties | | 1,611,072 | | | | | | | | |
| | | Area actually reporting | 100.0% | 3,202 | 68 | 319 | 174 | 2,641 | 23,394 | 8,713 | |
| | **State Total** | | 24,326,974 | 123,564 | 1,374 | 8,014 | 37,753 | 76,423 | 969,570 | 230,123 | 6! |
| | | Rate per 100,000 inhabitants | | 507.9 | 5.6 | 32.9 | 155.2 | 314.1 | 3,985.6 | 946.0 | 2 |
| **UTAH** | Metropolitan Statistical Area | | 2,437,372 | | | | | | | | |
| | | Area actually reporting | 99.9% | 5,609 | 38 | 805 | 1,384 | 3,382 | 85,111 | 13,323 | ( |
| | | Estimated total | 100.0% | 5,613 | 38 | 806 | 1,385 | 3,384 | 85,175 | 13,333 | ( |
| | Cities outside metropolitan areas | | 146,125 | | | | | | | | |
| | | Area actually reporting | 87.3% | 230 | 0 | 41 | 23 | 166 | 3,797 | 842 | |
| | | Estimated total | 100.0% | 263 | 0 | 47 | 26 | 190 | 4,349 | 755 | |
| | Nonmetropolitan counties | | 152,927 | | | | | | | | |
| | | Area actually reporting | 88.3% | 171 | 1 | 35 | 9 | 126 | 2,074 | 542 | |
| | | Estimated total | 100.0% | 194 | 1 | 40 | 10 | 143 | 2,349 | 614 | |
| | **State Total** | | 2,736,424 | 6,070 | 39 | 893 | 1,421 | 3,717 | 91,873 | 14,562 | ( |
| | | Rate per 100,000 inhabitants | | 221.8 | 1.4 | 32.6 | 51.9 | 135.8 | 3,357.4 | 536.5 | 2 |
| **VERMONT** | | | 207,874 | | | | | | | | |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar tl |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Area actually reporting | 100.0% | 398 | 1 | 58 | 57 | 282 | 7,476 | 1,444 | |
| | Cities outside metropolitan areas | | 205,381 | | | | | | | | |
| | | Area actually reporting | 100.0% | 277 | 1 | 37 | 22 | 217 | 5,188 | 878 | |
| | Nonmetropolitan counties | | 208,015 | | | | | | | | |
| | | Area actually reporting | 98.0% | 188 | 15 | 31 | 10 | 110 | 3,058 | 1,118 | |
| | | Estimated total | 100.0% | 169 | 15 | 32 | 10 | 112 | 3,129 | 1,140 | |
| | **State Total** | | **621,270** | **844** | **17** | **127** | **89** | **611** | **15,771** | **3,462** | |
| | | Rate per 100,000 inhabitants | | 135.9 | 2.7 | 20.4 | 14.3 | 98.3 | 2,538.5 | 557.2 | 1 |
| **VIRGINIA** | Metropolitan Statistical Area | | 6,684,217 | | | | | | | | |
| | | Area actually reporting | 100.0% | 17,875 | 298 | 1,519 | 7,080 | 8,978 | 175,420 | 27,532 | 1: |
| | Cities outside metropolitan areas | | 268,624 | | | | | | | | |
| | | Area actually reporting | 99.6% | 770 | 19 | 77 | 180 | 494 | 8,164 | 1,266 | |
| | | Estimated total | 100.0% | 773 | 19 | 77 | 181 | 496 | 8,194 | 1,271 | |
| | Nonmetropolitan counties | | 636,248 | | | | | | | | |
| | | Area actually reporting | 100.0% | 1,234 | 51 | 162 | 176 | 845 | 12,020 | 3,190 | |
| | **State Total** | | **7,769,089** | **19,882** | **368** | **1,758** | **7,437** | **10,319** | **195,634** | **31,993** | **1!** |
| | | Rate per 100,000 inhabitants | | 255.9 | 4.7 | 22.6 | 95.7 | 132.8 | 2,518.1 | 411.3 | 1 |
| **WASHINGTON** | Metropolitan Statistical Area | | 5,742,340 | | | | | | | | |
| | | Area actually reporting | 99.9% | 19,960 | 176 | 2,275 | 6,124 | 11,385 | 219,008 | 45,450 | 1₄ |
| | | Estimated total | 100.0% | 19,979 | 178 | 2,278 | 6,130 | 11,395 | 219,273 | 45,496 | 1₄ |
| | Cities outside metropolitan areas | | 338,434 | | | | | | | | |
| | | Area actually reporting | 94.6% | 1,017 | 5 | 200 | 153 | 659 | 15,529 | 3,115 | |
| | | Estimated total | 100.0% | 1,075 | 5 | 211 | 162 | 697 | 16,412 | 3,295 | |
| | Nonmetropolitan counties | | 468,450 | | | | | | | | |
| | | Area actually reporting | 100.0% | 637 | 11 | 139 | 55 | 432 | 10,463 | 3,635 | |
| | **State Total** | | **6,549,224** | **21,691** | **192** | **2,628** | **6,347** | **12,524** | **246,148** | **52,478** | **1!** |
| | | Rate per 100,000 inhabitants | | 331.2 | 2.9 | 40.1 | 96.9 | 191.2 | 3,758.4 | 801.3 | 2 |
| **WEST VIRGINIA** | Metropolitan Statistical Area | | 1,007,935 | | | | | | | | |
| | | Area actually reporting | 91.4% | 2,858 | 38 | 237 | 640 | 1,945 | 27,658 | 6,591 | |
| | | Estimated total | 100.0% | 3,055 | 38 | 252 | 675 | 2,090 | 29,975 | 7,089 | : |
| | Cities outside metropolitan areas | | 221,426 | | | | | | | | |
| | | Area actually reporting | 78.9% | 543 | 5 | 23 | 100 | 415 | 5,442 | 971 | |
| | | Estimated total | 100.0% | 688 | 6 | 29 | 127 | 526 | 6,901 | 1,231 | |
| | Nonmetropolitan counties | | 585,107 | | | | | | | | |
| | | Area actually reporting | 89.4% | 1,095 | 14 | 72 | 78 | 931 | 8,699 | 2,455 | |
| | | Estimated total | 100.0% | 1,225 | 16 | 81 | 87 | 1,041 | 9,731 | 2,746 | |
| | **State Total** | | **1,814,468** | **4,968** | **60** | **362** | **889** | **3,657** | **46,607** | **11,066** | **:** |
| | | Rate per 100,000 inhabitants | | 273.8 | 3.3 | 20.0 | 49.0 | 201.5 | 2,568.6 | 609.9 | 1 |

| State | Area | | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Lar th |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WISCONSIN | Metropolitan Statistical Area | | 4,099,796 | | | | | | | | |
| | | Area actually reporting | 100.0% | 13,691 | 123 | 697 | 5,034 | 7,637 | 125,892 | 21,883 | 1 |
| | Cities outside metropolitan areas | | 624,257 | | | | | | | | |
| | | Area actually reporting | 99.9% | 1,010 | 10 | 101 | 63 | 836 | 16,548 | 2,337 | · |
| | | Estimated total | 100.0% | 1,011 | 10 | 101 | 63 | 837 | 16,558 | 2,338 | · |
| | Nonmetropolitan counties | | 903,912 | | | | | | | | |
| | | Area actually reporting | 100.0% | 719 | 13 | 122 | 29 | 555 | 10,877 | 3,258 | |
| | State Total | | 5,627,967 | 15,421 | 146 | 1,120 | 5,126 | 9,028 | 155,127 | 27,479 | 1· |
| | | Rate per 100,000 inhabitants | | 274.0 | 2.6 | 19.9 | 91.1 | 160.4 | 2,756.4 | 488.3 | 2 |
| WYOMING | Metropolitan Statistical Area | | 161,180 | | | | | | | | |
| | | Area actually reporting | 100.0% | 379 | 4 | 65 | 51 | 259 | 5,916 | 912 | |
| | Cities outside metropolitan areas | | 217,857 | | | | | | | | |
| | | Area actually reporting | 97.8% | 635 | 4 | 85 | 32 | 514 | 6,741 | 907 | |
| | | Estimated total | 100.0% | 649 | 4 | 87 | 33 | 525 | 6,888 | 927 | |
| | Nonmetropolitan counties | | 153,631 | | | | | | | | |
| | | Area actually reporting | 100.0% | 208 | 2 | 28 | 2 | 176 | 1,670 | 345 | |
| | State Total | | 532,668 | 1,236 | 10 | 180 | 86 | 960 | 14,474 | 2,184 | · |
| | | Rate per 100,000 inhabitants | | 232.0 | 1.9 | 33.8 | 16.1 | 180.2 | 2,717.3 | 410.0 | 2 |

[1] Includes offenses reported by the Zoological Police and the Metro Transit Police.

[2] Limited data for 2008 were available for Illinois. See Data Declaration.

[3] The data collection methodology for the offense of forcible rape used by the Illinois and the Minnesota state UCR Programs (with the exception of Rockford, IL, and Minneapolis and St. Paul, MN) does not comply with natio guidelines. Consequently, their state figures for forcible rape (with the exception of Rockford, IL, and Minneapolis and St. Paul, MN) have been estimated for inclusion in this table. Table 8, Offenses Known to Law Enforceme reported female forcible rape crime figure.

NOTE: Although arson data are included in the trend and clearance tables, sufficient data are not available to estimate totals for this offense. Therefore, no arson data are published in this table.

Back to Top

### Data Declaration

Provides the methodology used in constructing this table and other pertinent information about this table.

Crime in the United States, 2008
U.S. Department of Justice — Federal Bureau of Investigation
September 2009

1

2

3

4

5

6

7                                          **Exhibit "23"**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 84 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

This is a WorldNetDaily printer-friendly version of the article which follows.
To view this item online, visit http://www.worldnetdaily.com/index.php?pageId=1933

## World Net Daily

Thursday, October 15, 2009

# Crime up Down Under
Since Australia's gun ban, armed robberies increase 45%

Posted: March 03, 2000
1:00 am Eastern

By Jon Dougherty

WorldNetDaily.com

Since Australia banned private ownership of most guns in 1996, crime has risen dramatically on that continent, prompting critics of U.S. gun control efforts to issue new warnings of what life in America could be like if Congress ever bans firearms.

After Australian lawmakers passed widespread gun bans, owners were forced to surrender about 650,000 weapons, which were later slated for destruction, according to statistics from the Australian Sporting Shooters Association.

The bans were not limited to so-called "assault" weapons or military-type firearms, but also to .22 rifles and shotguns. The effort cost the Australian government about \$500 million, said association representative Keith Tidswell.

Though lawmakers responsible for passing the ban promised a safer country, the nation's crime statistics tell a different story:

- Countrywide, homicides are up 3.2 percent;
- Assaults are up 8.6 percent;
- Amazingly, armed robberies have climbed nearly 45 percent;
- In the Australian state of Victoria, gun homicides have climbed 300 percent;
- In the 25 years before the gun bans, crime in Australia had been dropping steadily;
- There has been a reported "dramatic increase" in home burglaries and assaults on the elderly.

At the time of the ban, which followed an April 29, 1996 shooting at a Port Arthur tourist spot by lone gunman Martin Bryant, the continent had an annual murder-by-firearm rate of about 1.8 per 100,000 persons, "a safe society by any standards," said Tidswell. But such low rates of crime and rare shootings did not deter then-Prime Minister John Howard from calling for and supporting the weapons ban.

Since the ban has been in effect, membership in the Australian Sporting Shooters Association has climbed to about 112,000 -- a 200 percent increase.

Australian press accounts report that the half a million-plus figure of weapons turned in to authorities so far only represents a tiny fraction of the guns believed to be in the country.

According to one report, in March 1997 the number of privately-held firearms in Australia numbered around 10 million. "In the State of Queensland," for example, the report said only "80,000 guns have been seized out of a total of approximately 3 million, a tiny fraction."

And, said the report, 15 percent of the more than half a million guns collected came from licensed gun dealers.

Moreover, a black market allegedly has developed in the country. The report said about 1 million Chinese-made semi-automatics, "one type of gun specifically targeted by the new law," have been imported and sold throughout the country.

Larry Pratt, executive director of Gun Owners of America, said the situation in Australia reminds him of Great Britain, where English lawmakers have passed similar restrictive gun control laws.

"In fact, when you brought up the subject of this interview, I didn't hear you clearly -- I thought you were talking about England, not Australia," Pratt told WorldNetDaily. "It's hard to tell the difference between them."

Pratt said officials in both countries can "no longer control what the criminals do," because an armed society used to serve as a check on the power and influence of the criminal element.

Worse, Pratt said he was "offended by people who say, basically, that I don't have a right to defend myself or my family." Specifically, during debates with gun control advocates like members of Handgun Control, Inc. or similar organizations, Pratt said he routinely asks them if they're "against self defense."

Most often, he said, "they don't say anything -- they just don't answer me. But occasionally I'll get one of them to admit it and say 'yes.'"

Pratt said, based on the examples of democracies that have enacted near-total bans on private firearm ownership, that the same thing could happen to Americans. His organization routinely researches and reports incidents that happen all over the country when private armed citizens successfully defend themselves against armed robbers or intruders, but "liberals completely ignore this reality."

Pratt, who said was scheduled to appear in a televised discussion later in the day about a shooting incident between two first graders in Michigan on Tuesday, said he was in favor of allowing teachers to carry weapons to protect themselves and their students on campus.

Pratt pointed to the example of a Pearl, Mississippi teacher who, in 1997, armed with his own handgun, was able to blunt the killing spree of Luke Woodham.

"By making schools and even entire communities 'gun free zones,' you're basically telling the criminal element that you're unarmed and extremely vulnerable," Pratt said.

Pratt also warned against falling into the gun registration trap.

"Governments will ask you to trust them to allow gun registration, then use those registration lists to later confiscate the firearms," he said. "It's happened countless times throughout history."

Sarah Brady, head of Handgun Control, Inc., issued a statement calling on lawmakers in Michigan and in Washington to pass more restrictive gun access laws.

"This horrible tragedy should send a clear message to lawmakers in Michigan and around the country: they should quickly pass child access prevention or 'safe storage' laws that make it a crime to leave a loaded firearm where it is accessible by children," Brady said.

Brady also blamed gun makers for the Michigan shooting.

"The responsibility for shootings like these do not stop at the hands of the gun owner," Brady said. "Why are ... gun makers manufacturing weapons that a six-year old child can fire? This makes no rational sense. When will gun makers realize that they bear a responsibility to make sure that their products do not mete out preventable deaths, and that they do not warrant nor deserve special protection from the law to avoid that burden? Instead of safeguarding the gun makers, we should be childproofing the guns."

In contrast to near-complete bans in Australia and Great Britain, many U.S. states have passed liberal concealed carry laws that allow private citizens to obtain a permit to carry a loaded gun at all times in most public places. According to Yale University researcher John R. Lott, formerly of the University of Chicago and a gun control analyst who has conducted the most extensive study on the impact of concealed carry laws in the nation's history, the more liberal the right to carry, the less violent crime occurs.

Lott, who examined a mass of crime data spanning decades in all 3,200-plus counties in the United States, concluded that the most important factor in the deterrence of violent crimes were increased police presence and longer jail sentences. However, his research also demonstrated that liberal concealed carry laws were at the top of the list of reasons violent crime has dropped steadily since those laws began to be enacted by state legislatures a decade ago.

The Center to Prevent Handgun Violence, a division of Handgun Control, Inc., disagreed with Lott's findings, as well as the overall assumption that a reduction in the availability of guns in society reduces violent crime.

"Using violent crime data provided by the FBI, the Center to Prevent Handgun Violence determined that, on average over a five-year period, violent crime dropped almost 25 percent in states that limit or prohibit carrying concealed weapons," the Center said. "This compares with only a 11 percent drop in states with lax concealed carry weapons (CCW) laws. Moreover, states with some of the strongest laws against concealed weapons experienced the largest drops."

Without naming its source, the Center also claimed "a prominent criminologist from Johns Hopkins University has stated that Lott's study was so flawed that 'nothing can be learned of it,' and that it should not be used as the basis for policy-making."

In his most recent research, Lott noted a few examples of mass shootings in schools when teachers who were armed, albeit illegally, were able to prevent further loss of life among students indiscriminately targeted by other students with guns.

Ironically, both Lott and Handgun Control acknowledge that the reams of gun control laws on the books in Washington and in all 50 states have been ineffective in eradicating mass shootings or preventing children from bringing weapons to school. However, Lott's research indicates the criminal element has been successful in obtaining weapons despite widespread bans and gun control laws, while HCI continues to push for more laws that further restrict, license or eliminate handguns and long guns.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit "24"**

- 85 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

# CRIME

# IN
# CALIFORNIA

# 2007



**Edmund G. Brown Jr., Attorney General**
California Department of Justice
Division of California Justice Information Services
Bureau of Criminal Information and Analysis
CRIMINAL JUSTICE STATISTICS CENTER



# CRIME



IN

CALIFORNIA

2007



liberty
and justice
under law

**Published Annually by the**
California Department of Justice
Division of California Justice Information Services
Bureau of Criminal Information and Analysis
CRIMINAL JUSTICE STATISTICS CENTER

Released December 2008

An electronic version of this report and other reports are available on the
California Attorney General's website: http://ag.ca.gov

**CALIFORNIA DEPARTMENT OF JUSTICE**
Edmund G. Brown Jr., Attorney General

**DIVISION OF CALIFORNIA JUSTICE INFORMATION SERVICES**
Gary Cooper, Director

**BUREAU OF CRIMINAL INFORMATION AND ANALYSIS**
Julie Basco, Bureau Chief
Marilyn Yankee, Assistant Bureau Chief

**CRIME IN CALIFORNIA, 2007**
Marie Herbert, Principal Analyst

*liberty and justice under law*

*The role of the Criminal Justice Statistics Center is to:*

❑ *Collect, analyze, and report statistical data which provide valid measures of crime and the criminal justice process.*

❑ *Examine these data on an ongoing basis to better describe crime and the criminal justice system.*

❑ *Promote the responsible presentation and use of crime statistics.*

# CONTENTS

EXECUTIVE SUMMARY ............................................................. iv
AT A GLANCE .............................................................................. vi

CRIMES .......................................................................................... 1
  Crime Trends, 1983–2007 ........................................................... 3
  Violent and Property Crimes ....................................................... 4
    Violent Crimes ......................................................................... 5
    Property Crimes ..................................................................... 11
  Larceny-Theft.............................................................................. 16
    Value of Stolen and Recovered Property................................. 18
  Arson.......................................................................................... 20
  Clearances.................................................................................. 22

ARRESTS ...................................................................................... 25
  Arrest Trends, 1966–2007 ........................................................ 27
  Total Arrests .............................................................................. 28
    Felony Arrests.......................................................................... 31
      Arrests for Violent Offenses................................................. 33
      Arrests for Property Offenses ............................................. 40
      Arrests for Drug Offenses .................................................... 47
    Misdemeanor Arrests............................................................... 53
  Personal Characteristics of Felony and
    Misdemeanor Arrestees........................................................... 60

ADULT FELONY ARREST DISPOSITIONS ........................... 65
  Adult Felony Arrest Dispositions ............................................... 68
  Adult Felony Arrestees Convicted.............................................. 70
    Adult Felony Arrestees Convicted of Violent Offenses ........... 71
    Adult Felony Arrestees Convicted of Property Offenses......... 72
    Adult Felony Arrestees Convicted of Drug Offenses .............. 73
  Dispositions for Adult Felony Arrests ........................................ 74

ADULT CORRECTIONS ............................................................. 77
  Adults Under State and Local Supervision ................................ 79
    Adults Under State Supervision............................................... 80
    Adults Under Local Supervision.............................................. 81
      Adults on Active Probation.................................................... 82
      Adults Placed on Probation .................................................. 83
      Adults Removed From Probation .......................................... 84
    Adults Committed to State Institutions..................................... 85

CRIMINAL JUSTICE EXPENDITURES AND PERSONNEL .. 87
  Expenditures............................................................................... 89
  Personnel.................................................................................... 92

OTHER DATABASES ................................................................. 95
  Citizens' Complaints Against Peace Officers............................. 96
  Domestic Violence-Related Calls for Assistance ....................... 97

DATA TABLES ............................................................................. 99

APPENDICES ............................................................................. 169
  1 Data Characteristics and Known Limitations.......................... 170
  2 Computational Formulas........................................................ 172
  3 Arrest Offense Codes............................................................. 174
  4 Criminal Justice Glossary....................................................... 176
  5 Notes ..................................................................................... 180

# CRIME IN CALIFORNIA, 2007

Section 15 of the California Penal Code defines a crime as "an act specifically prohibited by law or, failure to perform an act specifically required by law for which punishment is prescribed."

In addition to preparing statistical reports such as *Crime in California*, the DOJ compiles and reports data to the Federal Bureau of Investigation (FBI) on crime in California to fulfill the data reporting requirements of the national Uniform Crime Reporting (UCR) program. The UCR program standardizes crime reporting across all states to eliminate differences in Penal Code definitions.

States are required to report statistics on the following eight offenses known as Part 1 crimes: homicide, forcible rape, robbery, aggravated assault, burglary, larceny-theft, motor vehicle theft, and arson. The FBI selected these eight crimes for the UCR because of the seriousness of the offenses, the frequency of occurrence, and the likelihood of their being reported to law enforcement. Other than larceny-theft, the UCR does not count misdemeanors or infractions.

At the DOJ, Part 1 crimes are further categorized as follows: Violent crimes include homicide, forcible rape, robbery, and aggravated assault. Property crimes include burglary, motor vehicle theft, and larceny-theft over $400.

Some crimes, even Part 1 crimes, are undetected by law enforcement and/or not reported by the public. Undetected and unreported crimes are one reason that crimes in California produce an unknown amount of under-reporting to the DOJ. A second reason for under-reporting is a result of the 'hierarchy rule'. The hierarchy rule is a method used in reporting crime statistics under UCR guidelines whereby only the most serious offense is reported. This is an issue only when multiple offenses occur at the same time, during the same criminal event. For example, if a victim was murdered during a robbery, under the UCR guidelines, only the murder would be reported. There is one exception to the hierarchy rule. Since arson frequently occurs at the same time as other crimes, arson is counted in addition to the most serious offense.

1
2
3
4
5
6
7          **Exhibit "25"**
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 86 -



Craig Weaver <craigcweaver@gmail.com>

# FW: Mr. Thomas Jacobs

8 messages

**Gary W. Gorski <usrugby@pacbell.net>**                        Wed, Oct 28, 2009 at 10:49 PM
Reply-To: usrugby@pacbell.net
To: Craig Weaver <craigcweaver@gmail.com>
Cc: Gary W Gorski <usrugby@gmail.com>

Craig, please respond

-----Original Message-----
From: Rick.Sung@SHO.CO.SANTA-CLARA.CA.US
[mailto:Rick.Sung@SHO.CO.SANTA-CLARA.CA.US]
Sent: Wednesday, October 28, 2009 5:23 PM
To: usrugby@pacbell.net
Cc: Cheryl.Stevens@cco.sccgov.org
Subject: Mr. Thomas Jacobs

Mr. Gorski,

We received Mr. Jacobs' written appeal via fax today.  Please email me with
his availability for the next three weeks for an interview at Sheriff's
Headquarters regarding his CCW application.  The interview will last
approximately one hour.

Regards,

Sergeant Rick Sung#1853, Public Information Officer
Santa Clara County Sheriff's Office
55 W. Younger Avenue, San Jose CA
Office: 408) 808-4905
Pager: 408) 280-8886

**Craig Weaver <craigcweaver@gmail.com>**                        Thu, Oct 29, 2009 at 2:18 PM
To: Rick.Sung@sho.co.santa-clara.ca.us
Cc: Gary W Gorski <usrugby@gmail.com>, Cheryl.Stevens@cco.sccgov.org

Sergeant Sung,

I am a legal intern with The Law Offices of Gary W. Gorski. Mr. Gorski asked that I respond to your e-mail.

Thank you for your prompt response concerning Mr. Jacobs' appeal from the denial of his CCW application.

As you requested, I spoke with Mr. Jacobs today concerning his availability to meet with you for an interview
over the next three (3) weeks. Mr. Jacobs is unavailable to meet on the following dates:
Tuesday, November 3, 2009;
Tuesday, November 10, 2009;

Wednesday, November 18, 2009.

Otherwise, Mr. Jacobs is generally available Monday through Friday, from 9:00 a.m. through 2:00 p.m.

Please find a date and time when you and Mr. Jacobs are both available and kindly let me know the date, time, and address where you would like to meet with Mr. Jacobs for the interview.

Thank you for your time and consideration and I look forward to your response.

Sincerely,

Craig Weaver

Craig C. Weaver, J.D.
Legal Intern
THE LAW OFFICES OF GARY W. GORSKI
craigcweaver@gmail.com
Tel. (916) 941-5184
Fax (916) 404-4867
"Legum servi sumus ut liberi esse possimus." - Cicero

CONFIDENTIALITY NOTICE: The information contained in this electronic message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. § 2510-2521 and is confidential. It is to be conveyed only to the designated recipient(s) and may contain privileged information including attorney work product and privileged attorney-client communications. Any unauthorized review, use, disclosure, distribution, copying, or reliance on information contained herein is prohibited. If you are not the intended recipient of this communication, please contact the sender and delete and destroy all copies. Thank you.

[Quoted text hidden]

--
Craig C. Weaver, J.D.
craigcweaver@gmail.com
Tel. (916) 941-5184
Fax (916) 404-4867
"Legum servi sumus ut liberi esse possimus." - Cicero

CONFIDENTIALITY NOTICE: The information contained in this electronic message, including attachments, is covered by the Electronic Communications Privacy Act, 18 U.S.C. § 2510-2521 and is confidential. It is to be conveyed only to the designated recipient(s) and may contain privileged information including attorney work product and privileged attorney-client communications. Any unauthorized review, use, disclosure, distribution, copying, or reliance on information contained herein is prohibited. If you are not the intended recipient of this communication, please contact the sender and delete and destroy all copies. Thank you.

**Rick.Sung@sho.co.santa-clara.ca.us <Rick.Sung@sho.co.santa-clara.ca.us>  Mon, Nov 2, 2009 at 8:00 AM**
To: Craig Weaver <craigcweaver@gmail.com>
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com> .

Mr. Weaver,

I like to set up the interview for this Thursday, November 5th, at 2 p.m.
at our Office, 55 W. Younger Avenue, San Jose. Upon arrival in the main
lobby of our building, Mr. Jacobs needs to check in with a deputy at the
Ops Window, which will be on his left side, and let the deputy know that he

is there to see me.  Please let me know if there are any questions.

Regards,

Sergeant Rick Sung#1853, Public Information Officer
Santa Clara County Sheriff's Office
55 W. Younger Avenue, San Jose CA
Office: 408) 808-4905
Pager: 408) 280-8886


           Craig Weaver
           <craigcweaver@gma        To:    Rick.Sung@SHO.CO.SANTA-CLARA.CA.US
           il.com>          cc:    Gary W Gorski <usrugby@gmail.com>,
    Cheryl.Stevens@cco.sccgov.org
                             Subject: Re: FW: Mr. Thomas Jacobs
           10/29/2009 03:18
           PM

[Quoted text hidden]

---

**Craig Weaver <craigcweaver@gmail.com>**                       Mon, Nov 2, 2009 at 4:07 PM
To: Rick.Sung@sho.co.santa-clara.ca.us
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com>

Sergeant Sung,

Again, thank you for your prompt response.

Mr. Jacobs looks forward to meeting with you on Thursday at 2 p.m.

Please contact me if you have any questions before then.

Thank you,

Craig Weaver

[Quoted text hidden]

--

[Quoted text hidden]

---

**Craig Weaver <craigcweaver@gmail.com>**                       Thu, Nov 5, 2009 at 9:49 PM
To: Rick.Sung@sho.co.santa-clara.ca.us
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com>

Sergeant Sung,
I spoke with Mr. Jacobs today and understand that there was some confusion regarding where today's
meeting was to take place on the part of Mr. Jacobs. I apologize for any inconvenience this may have caused
you.

We are optimistic that we will be able to reschedule another meeting in the very near future.

As stated before, Mr. Jacobs is unavailable to meet on the following dates:
Tuesday, November 10, 2009;
Wednesday, November 18, 2009.

Otherwise, Mr. Jacobs is generally available Monday through Friday, from 9:00 a.m. through 2:00 p.m.

Again, please let me know a date and time that will work for both you and Mr. Jacobs.

Thank you for your attention to this matter.

Sincerely,

Craig Weaver

Craig C. Weaver, J.D.
Legal Intern
THE LAW OFFICES OF GARY W. GORSKI
craigcweaver@gmail.com
Tel. (916) 941-5184
Fax (916) 404-4867
"Legum servi sumus ut liberi esse possimus." - Cicero
[Quoted text hidden]

--
[Quoted text hidden]

**Rick.Sung@sho.co.santa-clara.ca.us <Rick.Sung@sho.co.santa-clara.ca.us>  Tue, Nov 10, 2009 at 7:35 AM**
To: Craig Weaver <craigcweaver@gmail.com>
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com>


Mr. Weaver,

I'm available to meet with Mr. Jacobs on Tuesday, November 17, at 9 a.m.,
at our headquarters.

Sergeant Rick Sung#1853, Public Information Officer
Santa Clara County Sheriff's Office
55 W. Younger Avenue, San Jose CA
Office: 408) 808-4905
Pager: 408) 280-8886


              Craig Weaver
              <craigcweaver@gma      To:    Rick.Sung@sho.co.santa-clara.ca.us
              il.com>          cc:    Cheryl.Stevens@cco.sccgov.org, Gary W Gorski
<usrugby@gmail.com>
                                Subject:  Re: FW: Mr. Thomas Jacobs
              11/05/2009 09:49
              PM

[Quoted text hidden]

**Craig Weaver <craigcweaver@gmail.com>                          Tue, Nov 10, 2009 at 5:00 PM**
To: Rick.Sung@sho.co.santa-clara.ca.us
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com>, Tom Jacobs
<m.t.jacobs@sbcglobal.net>

Sgt. Sung,

Mr. Jacobs looks forward to meeting with you on Tuesday, November 17, 2009, at 9:00 a.m.

Thank you for your help coordinating this meeting.

Sincerely,

Craig Weaver
Legal Intern

On Tue, Nov 10, 2009 at 7:35 AM, <Rick.Sung@sho.co.santa-clara.ca.us> wrote:


Mr. Weaver,

I'm available to meet with Mr. Jacobs on Tuesday, November 17, at 9 a.m.,
at our headquarters.

Sergeant Rick Sung#1853, Public Information Officer
Santa Clara County Sheriff's Office
55 W. Younger Avenue, San Jose CA
Office: 408) 808-4905
Pager: 408) 280-8886


--
Craig C. Weaver, J.D.
craigcweaver@gmail.com
Tel. (916) 941-5184 | Fax (916) 404-4867
"Legum servi sumus ut liberi esse possimus." - Cicero

CONFIDENTIALITY NOTICE: The information contained in this electronic message, including attachments,
is covered by the Electronic Communications Privacy Act, 18 U.S.C. § 2510-2521 and is confidential. It is to
be conveyed only to the designated recipient(s) and may contain privileged information including attorney
work product and privileged attorney-client communications. Any unauthorized review, use, disclosure,
distribution, copying, or reliance on information contained herein is prohibited. If you are not the intended
recipient of this communication, please contact the sender and delete and destroy all copies. Thank you.

**Craig Weaver <craigcweaver@gmail.com>**                    **Wed, Nov 18, 2009 at 4:08 PM**
To: Rick.Sung@sho.co.santa-clara.ca.us
Cc: Cheryl.Stevens@cco.sccgov.org, Gary W Gorski <usrugby@gmail.com>

Sgt. Sung,

Please see attached.

Thank you,

Craig Weaver
Legal Intern

--
Craig C. Weaver, J.D.
craigcweaver@gmail.com

Tel. (916) 941-5184 | Fax (916) 404-4867
"Legum servi sumus ut liberi esse possimus." - Cicero

CONFIDENTIALITY NOTICE: The information contained in this electronic message, including attachments, is
covered by the Electronic Communications Privacy Act, 18 U.S.C. § 2510-2521 and is confidential. It is to be
conveyed only to the designated recipient(s) and may contain privileged information including attorney work
product and privileged attorney-client communications. Any unauthorized review, use, disclosure, distribution,
copying, or reliance on information contained herein is prohibited. If you are not the intended recipient of this
communication, please contact the sender and delete and destroy all copies. Thank you.

**Letter_to_Sgt_Sung_11-18-2009.pdf**
14K

1

2

3

4

5

6

7

**Exhibit "26"**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 87 -



*San José Police Department*

October 28, 2009

Mr. Thomas Jacobs
3309 Padilla Way,
San Jose CA 95148

Dear Mr. Jacobs,

Your application for a Concealed Weapon Permit has been reviewed. The request for a
CCW Permit has been declined. The Chief of Police is given the sole discretion for the
issuance of CCW Permits. This authority is outlined in the California Penal Code
Section 12050.

Your application has been declined for one or more of the following reasons:

☐ Good moral character cannot be established (12050 PC)
☑ Good cause has not been established (12050 PC)
☐ You are a person prohibited from possessing a firearm(12021.1PC)
☐ You have not completed the minimum training as established by SJPD
   (12050 PC),
☐ Psychological clearance has not been obtained from the Department
   Psychologist (12054 PC)
☐ Application is incomplete/false statements provided. (12051 PC)
☐ Applicant does not meet residence requirement (12050 PC)

This decision is final and no appeal can be made.

If you have any questions regarding this decision, please feel free to contact me.

Sincerely,

Robert L. Davis, Chief of Police
San Jose Police Department

Sgt. Steven J. McEwan, # 3112
Permits Unit
(408) 277-2680



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit "27"**

- 88 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

# THE LAW OFFICES OF GARY W. GORSKI

**1207 Front Street, Suite 15**
**Sacramento, CA 95814**
**Tel. (916) 965-6800**

To:     Sergeant Rick Sung
        Badge #1853
        Public Information Officer
        Santa Clara County Sheriff's Office
        55 W. Younger Avenue
        San Jose, CA 95110
        Rick.Sung@sho.co.santa-clara.ca.us

From:  Gary W. Gorski
        Attorney at Law
        1207 Front St., Suite 15
        Sacramento, CA 95814
        Tel. (916) 965-6800

November 18, 2009

## RE:     CCW Application of Thomas Jacobs

Sgt. Sung:

Thank you for responding to Mr. Jacobs's appeal to the denial of his CCW application and scheduling and eventually meeting with Mr. Jacobs regarding his appeal.

Mr. Jacobs has informed me that during your November 17, 2009, meeting, in addition to posing questions to Mr. Jacobs, you also requested that he consent to a criminal background check and provide you with additional information including his personal medical records and client contact information.

While Mr. Jacobs has already given his consent for your office to perform a criminal background check, and has signed the corresponding requisite forms, he is not willing to provide you or your office with any other additional information. Mr. Jacobs has already completed and submitted the standard California CCW application and has interviewed with you personally. Had you desired this information, you should have requested that Mr. Jacobs bring it with him to your meeting on November 17th.

Since the simple fact of the matter is that your office has the purported authority to deny Mr. Jacobs's CCW application without giving any reason whatsoever, Mr. Jacobs is unwilling to continue consuming his time and resources by providing you with further

personal information. My client has provided you with ample information to make a determination on his fitness to carry a concealed weapon. If California employed a "shall issue" policy as opposed to a "may issue" policy, Mr. Jacobs's application would unequivocally be granted.

All my client asks is that he be afforded the same right to defend himself and his family that is given to retired California peace officers who are issued a CCW by your office. Please make your determination as to the status of Mr. Jacobs's appeal with the information you already have available to you. Again, thank you for your time and consideration and we look forward to your response.

Sincerely,

*Gary W. Gorski*

Gary W. Gorski
Attorney at Law

Encl.:

Cc:     Thomas Jacobs
        Craig C. Weaver
        Cheryl Stevens

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit "28"**

- 89 -

## CALIFORNIA PENAL CODE SECTIONS 12025

1

2    (a) A person is guilty of carrying a concealed firearm when he or she does any of the following:

3    (1) Carries concealed within any vehicle which is under his or her control or direction any pistol, revolver, or other firearm capable
4    of being concealed upon the person.

5    (2) Carries concealed upon his or her person any pistol, revolver, or other firearm capable of being concealed upon the person.
6

7    (3) Causes to be carried concealed within any vehicle in which he or she is an occupant any pistol, revolver, or other firearm capable
8    of being concealed upon the person.

9    (b) Carrying a concealed firearm in violation of this section is punishable, as follows:

10   (1) Where the person previously has been convicted of any felony,
11   or of any crime made punishable by this chapter, as a felony.

12   (2) Where the firearm is stolen and the person knew or had reasonable cause to believe that it was stolen, as a felony.

13   (3) Where the person is an active participant in a criminal street
14   gang, as defined in subdivision (a) of Section 186.22, under the Street Terrorism Enforcement and Prevention Act (Chapter 11 (commencing with
15   Section 186.20) of Title 7 of Part 1), as a felony.

16   (4) Where the person is not in lawful possession of the firearm, as defined in this section, or the person is within a class of persons
17   prohibited from possessing or acquiring a firearm pursuant to Section 12021 or 12021.1 of this code or Section 8100
18   or 8103 of the Welfare and Institutions Code, as a felony.

19   (5) Where the person has been convicted of a crime against a person
20   or property, or of a narcotics or dangerous drug violation, by imprisonment in the state prison, or by imprisonment in a county jail not to exceed
21   one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

22   (6) By imprisonment in the state prison, or by imprisonment in a county
23   jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment if both of the following
24   conditions are met:

25   (A) Both the pistol, revolver, or other firearm capable of being concealed upon the person and the unexpended ammunition capable of being
26   discharged from that firearm are either in the immediate possession of the person or readily accessible to that person, or the pistol,
27   revolver, or other firearm capable of being concealed upon the person is loaded as defined in subdivision (g) of Section 12031.

28

- 90 -

2:10-cv-00913-LKK-EFB    Document 1-3    Filed 04/16/2010    Page 119 of 128

(B) The person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106, as the registered owner of that pistol, revolver, or other firearm capable of being concealed upon the person.

(7) In all cases other than those specified in paragraphs (1) to (6), inclusive, by imprisonment in a county jail not to exceed one year, by a fine not to exceed one thousand dollars ($1,000), or by both that imprisonment and fine.

(c) A peace officer may arrest a person for a violation of paragraph (6) of subdivision (b) if the peace officer has probable cause to believe that the person is not listed with the Department of Justice pursuant to paragraph (1) of subdivision (c) of Section 11106 as the registered owner of the pistol, revolver, or other firearm capable of being concealed upon the person, and one or more of the conditions in subparagraph (A) of paragraph (6) of subdivision (b) is met.

(d) (1) Every person convicted under this section who previously has been convicted of a misdemeanor offense enumerated in Section 12001.6 shall be punished by imprisonment in a county jail for at least three months and not exceeding six months, or, if granted probation, or if the execution or imposition of sentence is suspended, it shall be a condition thereof that he or she be imprisoned in a county jail for at least three months.

(2) Every person convicted under this section who has previously been convicted of any felony, or of any crime made punishable by this chapter, if probation is granted, or if the execution or imposition of sentence is suspended, it shall be a condition thereof that he or she be imprisoned in a county jail for not less than three months.

(e) The court shall apply the three-month minimum sentence as specified in subdivision (d), except in unusual cases where the interests of justice would best be served by granting probation or suspending the imposition or execution of sentence without the minimum imprisonment required in subdivision (d) or by granting probation or suspending the imposition or execution of sentence with conditions other than those set forth in subdivision (d), in which case, the court shall specify on the record and shall enter on the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

(f) Firearms carried openly in belt holsters are not concealed within the meaning of this section.

(g) For purposes of this section, "lawful possession of the firearm" means that the person who has possession or custody of the firearm either lawfully owns the firearm or has the permission of the lawful owner or a person who otherwise has apparent authority to possess or have custody of the firearm. A person who takes a firearm without the permission of the lawful owner or without the permission of a person who has lawful custody of the firearm does not have lawful possession of the firearm.

(h) (1) The district attorney of each county shall submit annually a

- 91 -

1  report on or before June 30, to the Attorney General consisting
   of profiles by race, age, gender, and ethnicity of any person charged with a
2  felony or a misdemeanor under this section and any other offense charged
   in the same complaint, indictment, or information.

3  (2) The Attorney General shall submit annually, a report on
   or before December 31, to the Legislature compiling all of the reports
4  submitted pursuant to paragraph (1).

5  (3) This subdivision shall remain operative until January 1, 2005,
   and as of that date shall be repealed.
6

7  (Amended by Stats. 1999, Ch. 571, § 2. Effective January 1,
   2000. Subd. (h) is inoperative on Jan. 1, 2005.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 92 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

1
2
3
4
5
6
7
8                                    **Exhibit "29"**
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- 93 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief**
**And Demand For Jury Trial**

**CALIFORNIA PENAL CODE SECTIONS 12027**

1

2   Section 12025 does not apply to, or affect, any of the following;

3   (a)(1)(A) Any peace officer, listed in Section 830.1
4   or 830.2, or subdivision (a) of Section 830.33, whether
    active or honorably retired, other duly appointed peace
5   officers, honorably retired peace officers listed in
    subdivision (c) of Section 830.5, other honorably retired
6   peace officers who during the course and scope of their
    employment as peace officers were authorized to, and did,
7   carry firearms, full-time paid peace officers of other
    states and the federal government who are carrying out
8   official duties while in California, or any person summoned
    by any of these officers to assist in making arrests
9   or preserving the peace while he or she is actually engaged in
    assisting that officer. Any peace officer described in this
10  paragraph who has been honorably retired shall be issued an
    identification certificate by the law enforcement agency
11  from which the officer has retired. The issuing agency may
    charge a fee necessary to cover any reasonable expenses
12  incurred by the agency in issuing certificates pursuant to
    this subdivision. As used in this section and Section 12031,
13  the term "honorably retired" includes all peace officers who
    have qualified for, and have accepted, a service
14  or disability retirement. For purposes of this section and
    Section 12031, the term "honorably retired" does not include
15  an officer who has agreed to a service retirement in lieu
    of termination.

16  (B) Any officer, except an officer listed in Section 830.1
17  or 830.2, subdivision (a) of Section 830.33,
    or subdivision (c) of Section 830.5 who retired prior to
18  January 1, 1981, shall have an endorsement on the
    identification certificate stating that the issuing agency
19  approves the officer's carrying of a concealed firearm.

20  (C) No endorsement or renewal endorsement issued pursuant to
    paragraph (2) shall be effective unless it is in the format
21  set forth in subparagraph (D), except that any peace officer
    listed in subdivision (f) of Section 830.2 or in
22  subdivision (c) of Section 830.5, who is retired between
    January 2, 1981, and on or before December 31, 1988, and who
23  is authorized to carry a concealed firearm pursuant to this
    section, shall not be required to have an endorsement in the
24  format set forth in subparagraph (D) until the time of the
    issuance, on or after January 1, 1989, of a renewal
25  endorsement pursuant to paragraph (2).

26  (D) A certificate issued pursuant to this paragraph for
    persons who are not listed in Section 830.1 or 830.2,
27  subdivision (a) of Section 830.33, or subdivision (c)
    of Section 830.5 or for persons retiring after January 1, 1981,

28

- 94 -

shall be in the following format: it shall be on a 2 x 3 inch card, bear the photograph of the retiree, the retiree's name, date of birth, the date that the retiree retired, name and address of the agency from which the retiree retired, have stamped on it the endorsement "CCW Approved" and the date the endorsement is to be renewed. A certificate issued pursuant to this paragraph shall not be valid as identification for the sale, purchase, or transfer of a firearm.

(E) For purposes of this section and Section 12031, "CCW means "carry concealed weapons."

(2) A retired peace officer, except an officer listed in Section 830.1 or 830.2, subdivision (a) of Section 830.33, or subdivision (c) of Section 830.5 who retired prior to January 1, 1981, shall petition the issuing agency for the renewal of his or her privilege to carry a concealed firearm every five years. An honorably retired peace officer listed in Section 830.1 or 830.2, subdivision (a) of Section 830.33, or subdivision (c) of Section 830.5 who retired prior to January 1, 1981, shall not be required to obtain an endorsement from the issuing agency to carry a concealed firearm. The agency from which a peace officer is honorably retired may, upon initial retirement of that peace officer, or at any time subsequent thereto, deny or revoke for good cause the retired officer's privilege to carry a concealed firearm. A peace officer who is listed in Section 830.1 or 830.2, subdivision (a) of Section 830.33, or subdivision (c) of Section 830.5 who retired prior to January 1, 1981, shall have his or her privilege to carry a concealed firearm denied or revoked by having the agency from which the officer retired stamp on the officer's identification certificate "No CCW privilege."

(3) An honorably retired peace officer who is listed in subdivision (c) of Section 830.5 and authorized to carry concealed firearms by this subdivision shall meet the training requirements of Section 832 and shall qualify with the firearm at least annually. The individual retired peace officer shall be responsible for maintaining his or her eligibility to carry a concealed firearm. The Department of Justice shall provide subsequent arrest notification pursuant to Section 11105.2 regarding honorably retired peace officers listed in subdivision (c) of Section 830.5 to the agency from which the officer has retired.

(b) The possession or transportation of unloaded pistols, revolvers, or other firearms capable of being concealed upon the person as merchandise by a person who is engaged in the business of manufacturing, importing, wholesaling, repairing, or dealing in firearms and who is licensed to engage in that business or the authorized representative or authorized agent of that person while engaged in the lawful

-95-

1  course of the business.

2     (c) Members of the Army, Navy, Air Force, Coast Guard,
or Marine Corps of the United States, or the National Guard,
3  when on duty, or organizations which are by law authorized
to purchase or receive those weapons from the United States
4  or this state.

5     (d) The carrying of unloaded pistols, revolvers, or other
firearms capable of being concealed upon the person by duly
6  authorized military or civil organizations while parading,
or the members thereof when going to and from the places
7  of meeting of their respective organizations.

8     (e) Guards or messengers of common carriers, banks, and
other financial institutions while actually employed in and
9  about the shipment, transportation, or delivery of any
money, treasure, bullion, bonds, or other thing of value
10  within this state.

11     (f) Members of any club or organization organized for the
purpose of practicing shooting at targets upon established
12  target ranges, whether public or private, while the members
are using pistols, revolvers, or other firearms capable
13  of being concealed upon the person upon the target ranges,
or transporting these firearms unloaded when going to and from
14  the ranges.

15     (g) Licensed hunters or fishermen carrying pistols,
revolvers, or other firearms capable of being concealed upon
16  the person while engaged in hunting or fishing,
or transporting those firearms unloaded when going to
17  or returning from the hunting or fishing expedition.

18     (h) Transportation of unloaded firearms by a person
operating a licensed common carrier or an authorized agent
19  or employee thereof when transported in conformance with
applicable federal law.

20
   (i) Upon approval of the sheriff of the county in which they
21  reside, honorably retired federal officers or agents
of federal law enforcement agencies, including, but not limited
22  to, the Federal Bureau of Investigation, the Secret Service,
the United States Customs Service, the Federal Bureau
23  of Alcohol, Tobacco, and Firearms, the Federal Bureau
of Narcotics, the Drug Enforcement Administration, the United
24  States Border Patrol, and officers or agents of the Internal
Revenue Service who were authorized to carry weapons while
25  on duty, who were assigned to duty within the state for a
period of not less than one year, or who retired from active
26  service in the state.

27    Retired federal officers or agents shall provide the sheriff
with certification from the agency from which they retired

28
- 96 -

1  certifying their service in the state, the nature of their retirement, and indicating the agency's concurrence that the
2  retired federal officer or agent should be accorded the privilege of carrying a concealed firearm.

3    Upon that approval, the sheriff shall issue a permit to the
4  retired federal officer or agent indicating that he or she may carry a concealed firearm in accordance with this
5  subdivision. The permit shall be valid for a period not exceeding five years, shall be carried by the retiree while
6  carrying a concealed firearm, and may be revoked for good cause.

7    The sheriff of the county in which the retired federal
8  officer or agent resides may require recertification prior to a permit renewal, and may suspend the privilege for
9  cause. The sheriff may charge a fee necessary to cover any reasonable expenses incurred by the county.

10    (j) The carrying of a pistol, revolver, or other firearm
11  capable of being concealed upon the person by a person who is authorized to carry that weapon in a concealed manner
12  pursuant to Article 3 (commencing with Section 12050).

13  (Added by Stats. 1953, c. 36, p. 655, § 1. Amended by
   Stats. 1959, c. 1854, p. 4409, § 1; Stats. 1963, c. 1677,
14  p. 3262, § 1; Stats. 1965, c. 281, p. 1281, § 2; Stats. 1968,
   c. 1222, p. 2322, § 61; Stats. 1969, c. 1012, p. 1982, § 1;
15  Stats. 1974, c. 1090, p. 2316, § 1; Stats. 1980, c. 1340,
   § 24, eff. Sept. 30, 1980; Stats. 1981, c. 32, § 2, eff.
16  May 14, 1981; Stats. 1984, c. 351, § 1; Stats. 1986, c. 937,
   § 2; Stats. 1987, c. 115, § 1; Stats. 1987, c. 700, § 3;
17  Stats. 1988, c. 998, § 1; Stats. 1988, c. 1212, § 1.5;
   Stats. 1991, c. 952, § 1; Stats. 1992, c. 1326, § 3;
18  Stats. 1992, c. 1340, § 8; Stats. 1993, c. 224, § 1;
   Stats. 1993, c. 428, § 2; Stats. 1996, c. 668, § 1;
19  Stats. 1998, c. 760, § 7; Stats. 2007, c. 139, § 1.)

20

21

22

23

24

25

26

27

28

- 97 -

1

2

3

4

5

6

7

8

**Exhibit "30"**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 98 -

**Complaint for Monetary Damages, Declaratory And Injunctive Relief
And Demand For Jury Trial**

## CALIFORNIA PENAL CODE SECTIONS 12027.1

(a) (1) (A) (i) Any peace officer employed by an agency and listed in Section 830.1 or 830.2 or subdivision (c) of Section 830.5 who retired after January 1, 1981, shall have an endorsement on the identification certificate stating that the issuing agency approves the officer's carrying of a concealed and loaded firearm.

(ii) Any peace officer listed in Section 830.1 or 830.2 or subdivision (c) of Section 830.5 who retired prior to January 1, 1981, is authorized to carry a concealed and loaded firearm if the agency issued the officer an identification certificate and the certificate has not been stamped as specified in paragraph (2) of subdivision (a) of Section 12027.

(iii) Peace officers not listed in clause (i) or (ii) who were authorized to, and did, carry firearms during the course and scope of their employment as peace officers, shall have an endorsement on the identification certificate stating that the issuing agency approves the officer's carrying of a concealed and loaded firearm.

(B) An identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement on the certificate may be revoked or denied by the issuing agency only upon a showing of good cause. Good cause shall be determined at a hearing, as specified in subdivision (d).

(2) A retired peace officer may have his or her privilege to carry a concealed and loaded firearm revoked or denied by violating any departmental rule, or state or federal law that, if violated by an officer on active duty, would result in that officer's arrest, suspension, or removal from the agency.

(b) (1) An identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement may be revoked or denied by the issuing agency only upon a showing of good cause. Good cause shall be determined at a hearing, as specified in subdivision (d).

(2) An identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement may be revoked only after a hearing, as specified in subdivision (d). Any retired peace officer whose identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement is to be revoked shall have 15 days to respond to the notice of the hearing. Notice of the hearing shall be served either personally on the retiree or sent by first-class mail, postage prepaid, return receipt requested to the retiree's last known place of residence. Upon the date the agency receives the signed registered receipt or upon the date the notice is served personally on the retiree, the retiree shall have 15 days to respond to the notification. A retired peace officer who fails to respond to the notice of the hearing shall forfeit his or her right to respond.

(3) An identification certificate authorizing the officer to carry a concealed and loaded firearm or an endorsement may be denied prior to a

- 99 -

hearing. If a hearing is not conducted prior to the denial of an endorsement, a retired peace officer, within 15 days of the denial, shall have the right to request a hearing. A retired peace officer who fails to request a hearing pursuant to this paragraph shall forfeit his or her right to the hearing.

(c) A retired peace officer, when notified of the revocation of his or her privilege to carry a concealed and loaded firearm, after the hearing, or upon forfeiting his or her right to a hearing, shall immediately surrender to the issuing agency his or her identification certificate. The issuing agency shall reissue a new identification certificate without an endorsement. However, if the peace officer retired prior to January 1, 1981, and was at the time of his or her retirement a peace officer listed in Section 830.1 or 830.2 or subdivision (c) of Section 830.5, the issuing agency shall stamp on the identification certificate "No CCW privilege."

(d) Any hearing conducted under this section shall be held before a three-member hearing board. One member of the board shall be selected by the agency and one member shall be selected by the retired peace officer or his or her employee organization. The third member shall be selected jointly by the agency and the retired peace officer or his or her employee organization.

Any decision by the board shall be binding on the agency and the retired peace officer.

(e) No peace officer who is retired after January 1, 1989, because of a psychological disability shall be issued an endorsement to carry a concealed and loaded firearm pursuant to this section.

(Amended by Stats. 1993, Ch. 428, § 3. Effective January 1, 1994.)

- 100 -